Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494, 25-3563, 25-3564

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL CORPORATION, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

(caption continued on following pages)

On Appeals from the United States District Court for the District of Delaware
Nos. 17-mc-151, 19-mc-79, 19-mc-290, 19-mc-342, 20-mc-257, 21-mc-18, 21-mc-46, 21-mc-481, 22-mc-68, 22-mc-69, 22-mc-131, 22-mc-156, 22-mc-263, 22-mc-264, 22-mc-347, 22-mc-453, 22-mc-464, 23-mc-298, 23-mc-340, 23-mc-378, 23-mc-379, 23-mc-397
(Hon. Leonard P. Stark, United States Circuit Judge)

## APPELLANTS' OPENING BRIEF

George M. Garvey
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
  50th Floor
Los Angeles, CA 90071
(213) 683-9100

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Xiaonan April Hu
Kyle A. Schneider
Nicole R. Allicock
Andrew J. Slottje
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Bolivarian Republic of Venezuela*

———————————————

TIDEWATER INVESTMENT SRL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

OI EUROPEAN GROUP B.V.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants.*

———————————————

NORTHROP GRUMMAN SHIP SYSTEMS INC.,
*Plaintiff-Appellee,*
v.
MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

ACL1 INVESTMENTS LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

RUSORO MINING LTD,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*
——————————————

RED TREE INVESTMENTS LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants.*
——————————————

KOCH MINERALS SARL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*
——————————————

CONOCOPHILLIPS GULF OF PARIA B.V.,
*Plaintiff-Appellee,*
v.
CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,
*Defendants-Appellants.*
——————————————

XYQ US, LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants.*
——————————————

GOLD RESERVE INC.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*
——————————————

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

VALORES MUNDIALES S.L., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

RUDI LOVATI, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

———————————————

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corporation ("CITGO") hereby disclose as follows:

PDVSA is a Venezuelan corporation that is wholly owned by the Venezuelan government. PDVH is a wholly owned subsidiary of PDVSA. CITGO is a wholly owned subsidiary of CITGO Holding, Inc., which is a wholly owned subsidiary of PDVH. No publicly owned company not a party to this appeal has a financial interest in the outcome of this litigation.

Date: January 8, 2026                    Respectfully submitted,

                                         */s/ Donald B. Verrilli, Jr.*
                                         Donald B. Verrilli, Jr.

i

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES PRESENTED ..........................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

INTRODUCTION ...............................................................................3

STATEMENT OF THE CASE ...............................................................6

    A.    The Writs Of Attachment. ....................................................6

    B.    The Sale Process. ...............................................................10

    C.    The Special Master's Conflicts Of Interest. ......................17

    D.    The Final Sale Order. ........................................................22

SUMMARY OF ARGUMENT ...............................................................23

I.    THE WRITS OF ATTACHMENT GRANTED TO THE
    REPUBLIC'S CREDITORS ARE INVALID UNDER DELAWARE
    LAW. ..........................................................................................25

    A.    Standard Of Review. ..........................................................25

    B.    Delaware Law Governs Whether The Republic's Creditors May
        Attach PDVSA's Property. .................................................26

        1.    Under Rule 69(a), Delaware law governs the creditors'
            use of alter-ego principles to attach PDVSA's property. .........26

        2.    The district court erred in holding that *Bancec*, rather
            than Delaware law, governs. ....................................28

    C.    Under Delaware Law, The Writs Granted To The Republic's
        Creditors Are Invalid Because The Creditors Have Not Shown
        Fraud. ................................................................................35

    D.    The District Court's Collateral Estoppel And Untimeliness
        Determinations Were Erroneous. ......................................37

        1.    Collateral estoppel does not apply. ...........................37

        2.    The Rule 69 argument was timely asserted. .............43

# TABLE OF CONTENTS
### (Continued)

Page

II.  DISQUALIFYING CONFLICTS OF INTEREST COMPROMISED THE PROCEEDINGS BELOW ...................................................45

    A.  Standard Of Review. ............................................................46

    B.  The Special Master And His Advisors Were Subject To The Conflict-Of-Interest Restrictions Governing Judicial Officers. ..........46

    C.  The Advisors' Ties To Elliott And The Bondholders Created A Disqualifying Appearance Of Partiality Under 28 U.S.C. § 455(a). ....................................................................................47

    D.  The Advisors' Relationships Also Constituted A Disqualifying Interest Under 28 U.S.C. § 455(b)(4). ...................................57

    E.  The VPs Promptly Sought Disqualification. .......................60

    F.  The Sale Order Must Be Vacated. ........................................65

III.  DEFECTS IN THE SALE PROCESS REQUIRE VACATUR ...................66

    A.  Standard Of Review. ............................................................66

    B.  The Sale Price Is Grossly Inadequate. .................................67

    C.  The Grossly Inadequate Sale Price Is The Inevitable Consequence Of Errors In The Sale Process. .......................69

    D.  Rerunning The Sale Process Likely Would Yield A Higher Bid. ......74

CONCLUSION .................................................................................75

CERTIFICATE OF BAR MEMBERSHIP ..............................................77

CERTIFICATE OF COMPLIANCE .......................................................78

CERTIFICATE OF SERVICE .............................................................79

CERTIFICATE OF ELECTRONIC FILING ............................................80

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Antoine v. Byers & Anderson*,
   508 U.S. 429 (1993)........................................................................47

*B&B Hardware v. Hargis Indus.*,
   575 U.S. 138 (2015)........................................................................42

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988)........................................................................33

*BFP v. Resolution Tr. Corp.*,
   511 U.S. 531 (1994)........................................................................67

*Blossom v. Milwaukee & C.R. Co.*,
   70 U.S. 196 (1865)..........................................................................73

*In re Brooks*,
   383 F.3d 1036 (D.C. Cir. 2004)....................................................56

*Burgos-Yantin v. Municipality of Juana Diaz*,
   909 F.3d 1 (1st Cir. 2018)........................................................28, 29

*Calderon-Cardona v. Bank of New York Mellon*,
   770 F.3d 993 (2d Cir. 2014)..........................................................35

*In re Cement Antitrust Litig.*,
   688 F.2d 1297 (9th Cir. 1982)......................................................58

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
   343 F.3d 120 (2d Cir. 2003)..........................................................56

*Clark v. Coupe*,
   55 F.4th 167 (3d Cir. 2022)......................................................37, 38

*Crystallex Int'l v. Venezuela*,
   932 F.3d 126 (3d Cir. 2019)....................................................passim

*Crystallex Int'l v. Venezuela*,
   24 F.4th 242 (3d Cir. 2022)....................................................passim

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Democratic Republic of Congo v. Air Cap. Grp.*,
  2018 WL 324976 (S.D. Fla. Jan. 8, 2018)...........................................27

*Dexia Credit Loc. v. Rogan*,
  629 F.3d 612 (7th Cir. 2010) .............................................................27

*Edmondson v. Lilliston Ford Inc.*,
  2024 WL 5155557 (3d Cir. 2024) .....................................................25

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
  12 F.3d 1270 (3d Cir. 1993) .........................................................39, 43

*FG Hemisphere Assocs. v. Republique du Congo*,
  455 F.3d 575 (5th Cir. 2006) .............................................................41

*First National City Bank v. Banco Para El Comercio Exterior de
  Cuba*,
  462 U.S. 611 (1983)....................................................................passim

*Hall v. SBA*,
  695 F.2d 175 (5th Cir. 1983) .............................................................56

*Henglein v. Colt Indus. Operating Corp.*,
  260 F.3d 201 (3d Cir. 2001) .............................................................37

*Jenkins v. Sterlacci*,
  849 F.2d 627 (D.C. Cir. 1988)..................................................46, 55, 56

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
  Bumi Negara*,
  313 F.3d 70 (2d Cir. 2002) ...........................................................26, 27

*In re Kempthorne*,
  449 F.3d 1265 (D.C. Cir. 2006)......................................................57, 65

*In re Kensington Int'l*,
  368 F.3d 289 (3d Cir. 2004) .......................................................passim

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

<u>Page(s)</u>

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847 (1988) ............................................................................57

*Litovich v. Bank of Am.*,
  106 F.4th 218 (2d Cir. 2024) .............................................................56

*Mackey v. Lanier Collection Agency & Serv.*,
  486 U.S. 825 (1988) ......................................................................29, 30

*NLRB v. Frazier*,
  966 F.2d 812 (3d Cir. 1992) ...............................................................25

*OIEG v. Bolivarian Republic of Venezuela*,
  73 F.4th 157 (3d Cir. 2023) .........................................................passim

*Pac. Reinsurance Mgmt. Corp. v. Fabe*,
  929 F.2d 1215 (7th Cir. 1991) ............................................................28

*PDVSA v. MUFG Union Bank*,
  2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025) .............................22, 23

*PDVSA v. MUFG Union Bank, N.A.*,
  106 F.4th 263 (2d Cir. 2024) ........................................................11, 12

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ..............................................................27

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ......................................................26, 29

*Porter v. Graves*,
  104 U.S. 171 (1881) ...........................................................................70

*In re R.M.L., Inc.*,
  92 F.3d 139 (3d Cir. 1996) .................................................................72

*Republic of Argentina v. NML Capital*,
  573 U.S. 134 (2014) ...............................................................26, 34, 35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) ...........................................................................43

*SCA Servs. v. Morgan*,
    557 F.2d 110 (7th Cir. 1977) .............................................................59

*In re Sch. Asbestos Litig.*,
    977 F.2d 764 (3d Cir. 1992) ..........................................................46, 47

*Schreiber v. Kellogg*,
    50 F.3d 264 (3d Cir. 1995) .................................................................26

*Selkridge v. United of Omaha Life Ins.*,
    360 F.3d 155 (3d Cir. 2004) ..........................................................50, 66

*In re Sept. 11 Litig.*,
    802 F.3d 314 (2d Cir. 2015) ..............................................................33

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ...........................................................................42

*Sys. Div., Inc. v. Teknek Elecs., Ltd.*,
    253 F. App'x 31 (Fed. Cir. 2007) ......................................................27

*Trust v. Kummerfeld*,
    153 F. App'x 761 (2d Cir. 2005) .......................................................27

*United Artists Theatre Cir. v. Twp. of Warrington*,
    316 F.3d 392 (3d Cir. 2003) ..............................................................44

*United States v. Chem. Found.*,
    5 F.2d 191 (3d Cir. 1925) ...................................................................72

*United States v. Nobel*,
    696 F.2d 231 (3d Cir. 1982) ..............................................................63

*United States v. Schreiber*,
    599 F.2d 534 (3d Cir. 1979) ..............................................................53

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Wilson*,
601 F.2d 95 (3d Cir. 1979) ...............................................................74

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983)...........................................................................43

*Vukadinovich v. McCarthy*,
59 F.3d 58 (7th Cir. 1995) ................................................................35

*In re Watertech Holdings, LLC*,
619 B.R. 324 (Bankr. D.S.C. 2020)...................................................15

*Wedgewood Vill. Pharm. v. United States*,
421 F.3d 263 (3d Cir. 2005) ..............................................................25

*Westinghouse Elec. v. Kerr-McGee*,
580 F.2d 1311 (7th Cir. 1978) ...........................................................55

*Wye Oak Tech. v. Republic of Iraq*,
666 F.3d 205 (4th Cir. 2011) .............................................................39

*In re Xonics Photochem., Inc.*,
841 F.2d 198 (7th Cir. 1988) .............................................................72

STATE CASES

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
154 A.2d 684 (Del. 1959) ....................................................31, 32, 35

*Burge v. Fid. Bond & Mortg. Co.*,
648 A.2d 414 (Del. 1994) ..........................................................passim

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*,
51 A.2d 854 (Del. Super. Ct. 1947)...................................................74

*Crosse v. BCBSD*,
836 A.2d 492 (Del. 2003) ..................................................................35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Girard Tr. Bank v. Castle Apartments*,
  379 A.2d 1144 (Del. Super. Ct. 1977) .................................................67

*Hibou, Inc. v. Ramsing*,
  324 A.2d 777 (Del. Super. Ct. 1974) ...................................................43

*Johnson v. Craddock*,
  365 P.2d 89 (Or. 1961) ........................................................................72

*Kingsland Holdings, Inc. v. Bracco*,
  1996 WL 104257 (Del. Ch. Mar. 5, 1996) ......................28, 29, 30, 31

*Manichaean Cap., LLC v. Exela Techs.*,
  251 A.3d 694 (Del. Ch. 2021) .............................................................32

*Midland Interiors v. Burleigh*,
  2006 WL 4782237 (Del. Ch. Dec. 19, 2006) ......................................29

*Offredi v. Huhla*,
  60 A.2d 779 (Conn. 1948) ...................................................................70

*Poole v. N.V. Deli Maatschappij*,
  243 A.2d 67 (Del. 1968) ......................................................................67

*Shields v. Bobby Murray Chevrolet, Inc.*,
  261 S.E.2d 238 (N.C. Ct. App. 1980) .................................................70

*State ex rel. King v. Lyons*,
  248 P.3d 878 (N.M. 2011) ...................................................................72

*Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*,
  752 A.2d 1175 (Del. Ch. 1999) ...........................................................36

**FEDERAL STATUTES**

28 U.S.C. § 455 ...............................................................................passim

28 U.S.C. § 455(a) ..........................................................................passim

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

28 U.S.C. § 455(b)(4)................................................................passim

28 U.S.C. § 455(c) ............................................................................61

28 U.S.C. § 455(d)(4).......................................................................57

28 U.S.C. § 455(e) ......................................................................62, 63

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1605 ................................................................................7

28 U.S.C. § 1606 .........................................................................26, 34

28 U.S.C. § 1610 ................................................................................7

28 U.S.C. § 1963 ................................................................................1

**STATE STATUTES**

8 Del. C. § 324 ..........................................................................passim

8 Del. C. § 324(a)................................................................36, 51, 71

9 Del. C. § 4535 ..............................................................................72

9 Del. C. § 8753 ..............................................................................72

**RULES - OTHER**

Fed.R.App.P. 21(a)(1).....................................................................59

Fed.R.Civ.P. 24(a)(2).......................................................................59

Fed.R.Civ.P. 53(a)(2).............................................................45, 46, 53

Fed.R.Civ.P. 53(b)(3)(B) .................................................................62

Fed.R.Civ.P. 69 .........................................................................passim

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1487 (1976)................................................................34

**TREATISES**

Restatement (Second) of Judgments § 28(1) (1982) ...............................38

Wright & Miller, *Federal Practice & Procedure* § 3012 (3d ed.) .........31

**OTHER AUTHORITIES**

*Ballentine's Law Dictionary* (3d ed. 2010) ............................................58

*Black's Law Dictionary* (12th ed. 2024)................................................58

Model Rules of Pro. Conduct r. 1.0(k) (A.B.A. 1983) ...........................65

Model Rules of Pro. Conduct r. 1.8 (A.B.A. 1983)................................61

Model Rules of Pro. Conduct r. 1.9 (A.B.A. 1983)................................61

## JURISDICTIONAL STATEMENT

The district court exercised subject-matter jurisdiction pursuant to 28 U.S.C. § 1963.

In No. 17-mc-151, the district court entered the final sale order on November 29, 2025.  The Republic, PDVSA, PDVH, and CITGO (collectively, the "Venezuela Parties" or "VPs") timely appealed on December 1, 2025.

In actions brought by various other creditors seeking to obtain a portion of the sale proceeds, the district court entered the same final sale order on December 9, 2025.  PDVH and CITGO were not parties; PDVSA and the Republic timely appealed each case on December 12 and 15, 2025, respectively.

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

1.    Whether the district court erred in concluding that notwithstanding Federal Rule of Civil Procedure 69's requirement that Delaware law govern procedure on execution, federal common law authorized attachment of property belonging to PDVSA to satisfy the Republic's judgment debts.  JA94-109 (1/14/21 Opinion); JA196-197 (Opinion, "*OIEG*"); JA219-236 (Opinion, "*Tidewater*"); JA1906 (Motion); JA10506-10510 (Brief); 19-mc-79_Dkt.53 at 8-19.

2. Whether the district court erred in refusing to disqualify the Special Master and his advisors under 28 U.S.C. § 455, requiring that the sale order be vacated. JA256 (Disqualification Order); JA10412-10465 (Disqualification Opinion); JA13049-13050 (9/15/25 Hearing Tr.); JA9489 (Brief).

3. Whether the district court erred in concluding that the sale price of the PDVH shares is not grossly inadequate under Delaware law. JA390-397 (Sale Opinion); JA12387-12400 (Brief).

4. Whether the district court prejudicially erred in overseeing the sale process and approving its outcome. JA387-390, JA398-407, JA413-416 (Sale Opinion); JA12406-12410, JA12416-12423 (Brief).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The *Crystallex* action, No. 17-mc-151, was previously before the Court: Nos. 18-2797, 18-2889, and 18-3124, *see* 932 F.3d 126 (2019), and Nos. 21-1276, 21-1277, and 21-1289, *see* 24 F.4th 242 (2022).

The *OIEG* actions, Nos. 19-mc-290, 20-mc-257, 21-mc-46, 21-mc-481, 22-mc-156, 22-mc-453, were previously before the Court: Nos. 23-1647, 23-1648, 23-1649, 23-1650, 23-1651, 23-1652, 23-1781, *see* 73 F.4th 157 (2023).

The *Tidewater* actions, Nos. 19-mc-79, 21-mc-18, 22-mc-131, 22-mc-263, 23-mc-298, 23-mc-340, 23-mc-378, 23-mc-379, 23-mc-397, were previously before this Court when PDVSA filed protective appeals: Nos. 23-3144, 23-3145, 23-3146,

23-3147, 23-3148, 23-3149, 23-3150, 23-3151, 23-3152, 23-3153, 23-3154.  Those

appeals were voluntarily dismissed before briefing.  2024 WL 2830502 (2024).

*PDVSA v. MUFG Union Bank*, No. 25-2652, is pending in the Second Circuit

and involves certain bondholders' claim to a 50.1% interest in CITGO Holding.  *See*

pp. 11-12, *infra*.

## INTRODUCTION

This appeal presents issues of enormous consequence.  In an unprecedented

series of rulings, the district court sold off CITGO—a U.S. operating subsidiary of

PDVSA, a foreign sovereign instrumentality of the Venezuelan government.[1]  The

court's orders resulted in the largest-ever forced sale under Delaware law, transfer-

ring a thriving multi-billion dollar refining company with thousands of American

employees.  A forced judicial sale of this magnitude would be an enormously sig-

nificant step under any circumstances.  That it involves the transfer into private

hands of by far the most important U.S.-based asset of a foreign sovereign under-

scores just how consequential this case is.

Given those stakes, scrupulous adherence to the law and to bedrock tenets of

fair procedure was especially important.  Unfortunately, that was not the case.  With

a perhaps understandable zeal to compensate judgment creditors who had suffered

---

[1] The sale of CITGO was accomplished by selling all of the stock of PDV Holding, Inc., which is wholly and directly owned by PDVSA.

expropriations at the hands of the corrupt Maduro and Chávez regimes, the district court departed sharply from what the law requires in three critical respects.

First, the court applied the wrong law when it approved writs of attachment enforcing judgments against the Republic, and then manufactured procedural justifications for refusing to allow the VPs to challenge that critical legal error. To justify selling CITGO (PDVSA's indirect asset) to satisfy judgments against the Republic, the district court had to find that PDVSA was the Republic's alter ego. Federal Rule of Civil Procedure 69 unambiguously provides that Delaware law governs that determination, but the district court chose to apply federal common law instead. While federal common law requires only extensive control to deem entities alter egos, "Delaware law requires showing fraud—not just extensive control—to seize the property of a non-debtor like PDVSA." 24 F.4th 242, 247-48. The district court never found fraud; in fact, it specifically found no proof of fraud. The attachments of PDVSA's shares therefore are invalid under the law that properly governs their validity. Because writs dependent on an alter-ego finding represent 90% of the total judgment amount at issue, excluding those writs would have fundamentally altered the proceeding. PDVSA could have satisfied the remaining judgments in other ways—making the sale of all of CITGO both wholly unnecessary and flatly unlawful. The VPs raised this issue again and again to the district court, but each time

they were met with meritless estoppel and (contradictory) waiver arguments that denied them a hearing on this dispositive issue.

Second, the court turned a blind eye to obvious conflicts of interest on the part of the judicial officers in whose hands the court had placed responsibility for managing the forced sale. Just as the sale process was coming to a head in September 2025, facts came to light showing that key advisors of the Special Master, who designed and ran the sale process, had substantial and growing multi-million-dollar client relationships with the bidder they selected as the winner, Elliott Investment Management and its affiliates (together, "Elliott"), and with major holders of Maduro-issued bonds who are to be paid as part of the winning bid (the "Bondholders"). Those conflicting loyalties raise material doubts about the fairness and objectivity of the Special Master and his advisors and thus of the sale process itself—which, as events unfolded, was reconfigured at key junctures to favor Elliott and the Bondholders. At minimum, those conflicts created an unmistakable appearance of partiality. Disqualification and vacatur of the sale order are therefore required under 28 U.S.C. § 455.

Third, the sale price that resulted from the conflicted process shocks the judicial conscience because it is billions of dollars below any fair valuation. It is also the result of significant legal errors, including the failure to conduct a "public sale" as Delaware law requires. That left bidders in the dark, unable to engage in price

competition. The Special Master also recommended, and the court approved, the sale to Elliott even though its bid was not the highest, in violation of Delaware law. And throughout, the Special Master and the court prioritized the interests of the Bondholders—even though they did not hold writs of attachment and the validity of their interest is hotly contested in other litigation—with predictably adverse effects on the ultimate sale price.

All told, the forced sale of CITGO is legally indefensible and deeply unjust. This Court should vacate the final sale order and remand to permit a lawful, impartial resolution.

## STATEMENT OF THE CASE

### A.    The Writs Of Attachment.

1. In 2016, Crystallex, a Canadian mining company, obtained a $1.4 billion judgment against the Republic, confirming an arbitral award based on expropriation by then-president Chávez. *Crystallex Int'l v. Venezuela*, 932 F.3d 126, 132 (3d Cir. 2019) ("*Crystallex II*"). Crystallex then filed a judgment-enforcement action in the District of Delaware against the Republic under Delaware law and Rule 69. *Id.* at 134. Crystallex sought a writ of attachment against property owned by PDVSA: the shares of PDVH, a Delaware corporation that is the parent of CITGO Holding, which owns CITGO Petroleum Corp. ("CITGO"), a leading U.S. refining company. *Id.* at 132.

CITGO is the foreign crown jewel of the Republic's oil industry, and its forced sale will have significant and unpredictable geopolitical consequences. As the United States has explained, CITGO is a key "national resource" of Venezuela, and it is viewed as "a central piece of the national patrimony." JA2103, 2110-2111 (U.S. Statement). Its forced sale would be a grave loss for Venezuela and the Venezuelan people. *Id*.

In 2018, the district court held that PDVSA was not immune from suit and its assets were not immune from execution under the Foreign Sovereign Immunities Act (FSIA). 28 U.S.C. §§ 1605 (jurisdictional immunity), 1610 (execution immunity); JA1792 (Opinion, "*Crystallex I*"). Because the Republic and PDVSA are separate entities, the court could exercise jurisdiction over PDVSA only if PDVSA could be considered the Republic's alter ego for purposes of FSIA immunity. That question is governed by the federal common law alter-ego standard of *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). *Crystallex II*, 932 F.3d at 132. *Bancec* permits an alter-ego finding if (1) the instrumentality is extensively controlled by the state, or (2) respecting separate-entity status would work a fraud or injustice. *Id*. The court held that Crystallex had "not shown that the Republic abused PDVSA's corporate form to perpetrate a fraud or injustice," but found alter-ego status appropriate based on the extensive control the Maduro and Chávez regimes exercised over PDVSA. JA1771

(*Crystallex I*).  Observing that parties could raise "non-jurisdictional" challenges to Crystallex's writ of attachment later, JA1812-1813, the court granted the writ, JA1878.

PDVSA took a collateral-order appeal of the denial of FSIA immunity.  This Court affirmed, holding that the district court "acted within its jurisdiction when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela, and the PDVH shares are not immune from attachment."  *Crystallex II*, 932 F.3d at 152.

While the appeal was pending, the Venezuelan 2015 National Assembly named opposition leader Juan Guaidó as Interim President of the Republic.  The United States recognized Guaidó, and it continues to recognize the 2015 National Assembly, as the sole legitimate government of Venezuela.  JA8452-8453 (U.S. Statement).  The Republic represents the 2015 National Assembly here.

2.    On remand, the VPs moved to quash the attachment.  JA79 (1/14/21 Opinion).  They argued that under Rule 69(a)(1), which states that the "procedure on execution … must accord with the procedure of the [forum] state," Delaware law governs the writ's validity.  Delaware law prohibits attaching property of a judgment debtor's subsidiary to satisfy the judgment debtor's debt absent a showing that the subsidiary is designed to accomplish fraud.  Because the court had already held that Crystallex had not shown fraud, the VPs argued, the writ was invalid.  JA79.

Declining to address that argument, the court held that the VPs were collaterally estopped from "challenging the validity of the writ under Delaware law" because the Rule 69 issue purportedly had been litigated and decided in *Crystallex I* and *II*—even though those decisions addressed only FSIA immunity under the distinct *Bancec* alter-ego standard.  JA94-99 (1/14/21 Opinion).  The district court then granted Crystallex's motion for a sale order.  JA116.

The VPs appealed.  This Court dismissed for lack of jurisdiction, holding that the order was not final.  The Court observed that "Venezuela or other appellants may raise their arguments in a future appeal from a final decision."  24 F.4th 242, 258.

3.  Other judgment creditors of the Republic or PDVSA brought parallel enforcement actions seeking to attach PDVSA's shares of PDVH.  The VPs again contended that under Delaware law, *PDVSA's* property could not be attached to satisfy the *Republic's* debts absent a showing of fraud, which the creditors had not made.  The court again held the argument precluded, JA197 (Opinion, "*OIEG*"), and this Court again held it lacked appellate jurisdiction, noting that the VPs should "wait" for a final judgment.  *OIEG v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 174-75 (2023).

In 2023, the VPs raised the issue again vis-à-vis additional creditors' attachment actions.  The district court again held the issue precluded, but for the first time

also rejected the argument on the merits.  JA222-236 (Opinion, "*Tidewater*").  The court refused to certify an interlocutory appeal.  19-mc-79_Dkt.100.

The court ultimately issued writs of attachment to creditors collectively holding over $20 billion in judgments against the Republic or PDVSA.[2]

### B.    The Sale Process.

1.  The process of selling the PDVH shares was governed by 8 Del. C. § 324, which authorizes the court to sell "so many of the shares, … at public sale to the highest bidder, as shall be sufficient to satisfy the debt."  The sale process must maximize value, and Delaware courts will "set aside" a forced sale "when the sales price is so grossly inadequate that it shocks the conscience of the court."  *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).  A price of less than 50% of fair market value presumptively is "grossly inadequate."  *Id*.

2.  In 2021, the court appointed Robert Pincus as Special Master to manage the sale.  He engaged Weil, Gotshal & Manges LLP ("Weil") as transaction counsel, JA2438, 2442-2443 (5/27/21 Order), and Evercore Group L.L.C. ("Evercore") for investment-banking advice.  JA2548-2551 (Special Master ("SM") Report).  Recognizing the important role advisors would play, the court granted them judicial immunity.  JA2445 (5/27/21 Order).

---

[2] ConocoPhillips (Petrozuata/Hamaca and Corocoro), Red Tree Investments ("Red Tree"), and XYQ US have judgments against PDVSA; the rest have judgments against the Republic.

In August 2021, the Special Master proposed a sale procedure. JA2460 (SM Report). The VPs objected on multiple grounds, including that the procedure was not designed to maximize value, as it was structured as a bankruptcy-style liquidation even though CITGO was a thriving business. JA6774 (Exhibit); Dkt.354_at_7.[3] The court overruled the VPs' objections. JA3054-3055 (3/2/22 Opinion). The VPs' concerns that the Special Master had not considered other procedures better suited to selling a successful business were later borne out when the process failed to produce bids anywhere near CITGO's value.

In October 2023, the Special Master began soliciting bids. JA4300 (Marketing Motion), JA4321 (10/19/23 Order). To support that effort, Evercore prepared a preliminary valuation of the PDVH shares, calculating their value at $13.2 billion. JA12474 (VPs' Proposed Facts). The effort yielded only a few bids, none exceeding $6.6 billion—just half of Evercore's valuation. JA12476.

The Special Master nevertheless proceeded. In April and May 2024, he instructed bidders to propose a purchase structure that would also address the Bondholders' claims to an interest in 50.1% of the stock of CITGO Holding. JA289 (Sale Opinion), JA12477 (VPs' Proposed Facts); *PDVSA v. MUFG Union Bank, N.A.*, 106 F.4th 263, 265 (2d Cir. 2024). The source of the Bondholders' purported rights was

---

[3] References to "Dkt." refer to 17-mc-151 (D. Del.) unless otherwise noted.

a bond exchange offered by the Maduro regime in 2016 for previously issued notes, secured with a pledge of a 50.1% interest in CITGO Holding. 106 F.4th at 265. The Bondholders' contingent interest thus was not in the PDVH shares to be sold, but instead in CITGO Holding. In contemporaneous resolutions, the National Assembly asserted that the Maduro-issued bonds (the "Notes") were void for lack of constitutionally-required legislative authorization. *Id.* at 266. In 2019, PDVSA and PDVH sued the Bondholders in the Southern District of New York, challenging the Notes' validity. *Id.* at 267. That litigation proceeded concurrently with the sale process. The court in this case repeatedly rejected the VPs' request to pause sale proceedings pending resolution of the Bondholders' claims. *See, e.g.*, Dkt.1338.

3. In June 2024, six bidders submitted second-round bids. JA12478 (VPs' Proposed Facts). Gold Reserve's $6.865 billion bid was the highest. JA12478. Instead of encouraging competition among second-round bidders, the Special Master granted exclusivity to Elliott—whose bid was not the highest—over the VPs' objections. JA12480.

In September 2024, the Special Master recommended approval of Elliott's post-exclusivity revised bid (submitted through its affiliate Amber Energy, Inc.). That bid would have given Elliott immediate ownership of CITGO and its profits, while locking the sale proceeds in escrow indefinitely. JA12483 (VPs' Proposed Facts). That recommendation was met with near-unanimous opposition from the

12

creditors and the VPs.  JA12483, JA12485.  After Elliott again revised its bid to

further reduce the purchase price, the Special Master again presented the bid to the

court, and again nearly all parties objected.  JA12485.

After Elliott withdrew its bid, the district court ordered the Special Master to

restart the process by soliciting stalking-horse bids.[4]  JA6533 (Hiltz Decl.); JA5519

(12/31/24 Order).  The court also rejected the VPs' argument that the widespread

opposition to Elliott's bid demonstrated that the bankruptcy-style sale was not de-

signed to maximize value, and the Special Master should "consider … alternatives."

JA12479 (VPs' Proposed Facts); JA300 (Sale Order).  Instead, the court "effectively

restart[ed] the bidding" without meaningful changes, JA300, directing the Special

Master to generate "competitive tension among bidders" during the newly created

"topping period."  JA5637 (1/27/25 Order).

4.  As the VPs predicted, process design and implementation flaws stymied

the emergence of "competitive tension."  For example, the Special Master did not

share bid prices with bidders during the bidding rounds, denying them the

knowledge necessary to outbid their competitors.  JA388 (Sale Opinion).  Making

matters worse, before the stalking-horse period, the court stated (over the VPs' ob-

jections) that, notwithstanding Delaware's presumption that a sale price of less than

---

[4] A stalking-horse bid sets a floor.  Bidders compete to "top" the stalking-horse bid.

50% of market value is grossly inadequate, the court "anticipate[d]" that "the price that results" from the sale process would itself "be the best evidence" of "fair market value." JA5628-5629 (1/27/25 Order). That drained the shock-the-conscience test of any deterrent effect, as bidders had little reason to fear their bids would be rejected for being lower than Delaware law requires. JA15970-15971 (Weisenberger Decl.).

The Special Master exacerbated these problems by choosing Red Tree's bid of $3.732 billion—one-third of Evercore's $13.2 billion valuation—as the stalking-horse bid. JA12490, JA12493 (VPs' Proposed Facts). That bid was $3 billion *lower* than Gold Reserve's $6.949 billion stalking-horse bid. JA12490, JA12493. Although the Special Master was "initially leaning" towards Gold Reserve's bid, Evercore "convinced" him to recommend Red Tree's instead, on the theory that it allocated $2 billion to pay the Bondholders (the validity of whose interest in CITGO Holding remains unsettled), thereby fostering greater closing certainty—though the Special Master never analyzed whether the risk that the Bondholders might interfere with closing justified accepting a $3 billion lower bid. JA12493-12494. Red Tree is an affiliate of Contrarian, a significant Bondholder. JA307 (Sale Opinion).

The Special Master's stated justification for preferring Red Tree encouraged bidders in the topping period to prioritize the Bondholders, at the expense of the creditors for whose ostensible benefit the sale was occurring. Later, the Special

Master acknowledged another reason for selecting Red Tree:  he feared Gold Reserve's bid might be too high for other bidders to top.  JA309 (Sale Opinion).  That rationale defeated "[t]he very role and value of a stalking horse bidder," which is to demonstrate value and "attract other buyers to a competitive bidding process." *In re Watertech Holdings, LLC*, 619 B.R. 324, 337 (Bankr. D.S.C. 2020).  And it cast further doubt on whether the sale would maximize value.

In April 2025, the court granted Red Tree stalking-horse status.  The court expressed reservations about "the price of the Red Tree bid and the implicit overvaluation" of Red Tree's payment to the Bondholders, as the court did "not view the risk that the Bondholders … will seek to enjoin the Sale Process or transactions" as a "dispositive" issue.  JA5876-5878 (Order).

5.  No price competition emerged during the topping period, as the Special Master withheld critical information from bidders, including what the current highest bid was or even what price bidders were expected to beat.  JA12499-12500 (VPs' Proposed Facts); JA6613 (6/24/25 Ex parte Tr.).  The Special Master admitted that no "competitive tension" "play[ed] out during the Topping Period."  JA13167 (9/15/25 Hearing Tr.).

The Special Master received just two qualifying topping bids: Gold Reserve's $7.382 billion bid and Red Tree's bid, potentially worth $5.306 billion.  JA5917-5918 (Recommendation).  Elliott submitted a $3.831 billion bid that did not conform

to bidding requirements. JA12500 (VPs' Proposed Facts). In July 2025, after the court observed that a much higher purchase price might outweigh the benefits of settlement with the Bondholders, JA6614 (6/24/25 Ex parte Tr.), the Special Master recommended Gold Reserve's bid, which did not earmark money for the Bondholders.[5] JA5920-5921. The Special Master explained that any risk associated with the Bondholders was "outweigh[ed]" by "the expansive gap in purchase price" (approximately $2 billion) between the two bids. JA12501.

6. On August 8, 2025, Elliott offered an unsolicited topping bid, consisting of $5.892 billion for creditors and a separate agreement to pay $2.125 billion to the Bondholders to release the CITGO Holding pledge. JA7427-7429 (Updated Recommendation); JA12502 (VPs' Proposed Facts). In response, Gold Reserve increased its bid to approximately $7.9 billion. The two bids thus resembled the Gold Reserve/Red Tree competition from July: Gold Reserve's increased bid paid creditors $2 billion more than Elliott's bid, and Elliott's bid paid the Bondholders while Gold Reserve's did not. This time, however, the Special Master did an about-face, choosing Elliott. JA7428-7429, JA7432-7434. The Special Master explained that

---

[5] The bid included *possible* additional financing to pay the Bondholders, but the Special Master's recommendation was not contingent on that possibility. JA5921 n.15 (Final Recommendation).

he gave conclusive weight to the fact that Elliott's bid "deliver[ed] a settlement with the PDVSA Bondholders." JA7435.

### C.    The Special Master's Conflicts Of Interest.

Before the sale hearing occurred, the VPs discovered a possible explanation for the Special Master's otherwise inexplicable selection of Elliott's bids and his focus on prioritizing the Bondholders' interests.

1. On September 9, 2025, Michael Turkel, Elliott's assistant general counsel, revealed in a deposition that Elliott had *active and growing* relationships with the Special Master's advisors. JA12110-12132 (Deposition). Elliott was a client of Weil's and had a relationship with Evercore. *Id.* Shortly after Turkel's deposition, the court compelled the Special Master to disclose a list of Weil and Evercore engagements with sale-process bidders. JA12817 (Letter). That list revealed, for the first time, substantial ongoing engagements between Weil and Evercore on the one hand, and Elliott and Bondholders on the other, that generated many millions of dollars for both firms. *Id.*

Those relationships were particularly concerning given those advisors' lead roles in the sale process. Evercore and Weil conducted the 2024 negotiations resulting in selection of Elliott's universally criticized bid. JA6532 (Hiltz Decl.); JA5252 (Time Entries); JA15933-15936 (Email). They also conducted the 2025 negotiations resulting in the selection of Red Tree (a Bondholder affiliate) as the stalking horse

17

bid, Gold Reserve's bid as the initially recommended bid, and Elliott's bid as the final recommendation (from which the Bondholders stood to benefit). JA12493 (VPs' Proposed Facts); JA9358, JA9362-JA9363 (SM's Proposed Facts). The Special Master often was not even copied on the advisors' communications with bidders. JA12770-12782 (Email).

Those September 2025 disclosures revealed the extent to which the Special Master's original March 2025 disclosures—which the Special Master had represented as "complete," JA12783-12785 (Engagements)—had underreported the entanglement between the Special Master's advisors and entities that stood to gain billions of dollars in the sale process. The March disclosures had identified only one brief closed matter between Elliott and Weil, five terminated engagements between Weil and several Bondholders, and a few engagements between Evercore and Bondholders, all but one of which were inactive. *Id.* And because Weil designated the March disclosures Highly Confidential, PDVSA and the Republic were unaware that Evercore or Weil had *any* relationship with Elliott or the Bondholders.[6]

The VPs immediately notified the court of the conflicts and sought to stay the sale hearing. JA12303-12305 (9/13/25 Letter). The court declined, stating: "I see

---

[6] Neither the Republic nor PDVSA could receive or view Highly Confidential materials because they might have submitted competing bids. JA5655 (Confidentiality Agreement).

no reason to waste the efforts that have been made by all of you collectively and myself." JA13053 (9/15/25 Hearing Tr.). The court denied oral motions to disqualify the Special Master and his advisors. *Id.*

2. The Special Master and his advisors then produced additional documents that revealed the scale of Weil's and Evercore's relationships with Elliott and the Bondholders, including that:

- Weil represented Elliott directly in over a dozen matters since 2023, JA12826-12828 (Engagements), and opened a new matter for Elliott as recently as September 10, 2025, JA12831-12832 (Active Engagements). These engagements yielded Weil collections of $300,000 in 2023, $1.25 million in 2024, and $3.1 million in the first half of 2025. JA12829-12830 (Collections). The Weil-Elliott relationship was thus expanding significantly just as Elliott was participating more actively in the sale process and strategizing about offering an unsolicited topping bid.

- Five Weil attorneys who worked on Elliott's matters *also* represented the Special Master, including three Weil partners, one of whom led the design and execution of the sale process before leaving Weil in late 2024. *Compare* JA12833-12839, *with* JA12840-12845 (Weil Attorneys).

- Weil had represented the Bondholders and their affiliates in 116 separate matters since 2021, JA12879-12894 (Bondholder Engagements), and at least

19

21 of the Weil partners who advised the Special Master on the sale *also* represented the Bondholders. *Compare* JA12833-12840 (Weil Attorneys), *with* JA12896-12909 (Weil Attorneys).

- Since 2021, Bondholders and their affiliates had paid Weil over $62 million, and Weil received an additional $12.8 million from ad hoc groups including one or more Bondholders. JA12874-12875 (Collections). That figure— nearly $80 million in all—does *not* include fees that Weil anticipates receiving in connection with 11 active matters for the Bondholders, which Weil declined to estimate. JA12876-JA12878 (Active Collections).

- Since 2021, an ad hoc group that lists Elliott as its second-largest member had paid Evercore $8.9 million. JA12918 (Chart).

- On July 16, 2025, after an attorney in Evercore's conflicts group expressed concern about advising an ad hoc group of creditors that included Elliott, others responded that given the multimillion-dollar fees contemplated, "this is a huge issue for us," JA12926 (Email), and the conflict went unaddressed. JA10397 (VPs' Brief).

- Jeffrey Saferstein, who as Weil's restructuring co-chair was working to increase Weil's business with Elliott and personally worked on Elliott matters—but who was not on the team advising the Special Master— communicated with Weil attorneys representing the Special Master about

Elliott's bid, beginning no later than June 2024. JA12840-12845 (Weil Attorneys); JA12846-12850 (Saferstein Profile); JA12863-12856 (Email) (agreeing to convey messages about Elliott's bid to a Weil partner assisting the Special Master); JA12859-12873 (email exchange between one of the Weil attorneys representing the Special Master and Mr. Saferstein about topping period bids, including Elliott's).

Most concerningly, Saferstein *personally interceded* on Elliott's behalf during the topping period, and he did so to promote Weil's own interests. On June 24, 2025, Saferstein emailed members of the Special Master's Weil team, stating that Elliott was "extremely frustrated" that "we[]"—meaning Weil—were "imposing new conditions and timing on them and it's impossible for them to meet" the Special Master's timeline. JA12760 (Email). Saferstein instructed Weil's Special Master team to speak with Elliott and emphasized that he would "*hate for them [Elliott] to not want to work with us.*" *Id.* (emphasis added).

Weil's Special Master team did as instructed and reported that after speaking, Elliott "realized … we were saving them some money in commitment fees" and would likely wait to see what the Special Master team's recommendation "is on July 2 and try to beat that with an unsolicited offer." JA12860 (Email). That is exactly what happened.

3. In October 2025, the VPs renewed their motions to disqualify the Special Master and his advisors. Dkt.2384. The VPs invoked 28 U.S.C. § 455(a), which states that a judicial officer must be disqualified where his "impartiality might reasonably be questioned," and § 455(b)(4), which states that an officer must be disqualified where he has "a financial interest … in a party to the proceeding," including by serving as an "adviser" to a party, or some "other interest that could be substantially affected by the outcome of the proceeding." The district court denied the motion, reasoning that the sale process was "public," JA10442-10443 (Disqualification Opinion); the advisors earned fees in matters "unrelated to the Sale Process," JA10451-10453; and the fees the advisors received—over $164 million—represented too small a portion of the advisors' overall revenue to be "problematic," JA10451-10452.

**D.    The Final Sale Order.**

On November 25, 2025, the district court approved the Special Master's final recommendation of Elliott's bid and overruled the VPs' and Gold Reserve's objections. JA426 (11/25/25 Order); JA429 (11/29/25 Order). The court stayed the transaction's closing until seven days after notification of necessary regulatory approvals. JA424-425 (Sale Opinion).

The 2020 Bondholder litigation remains pending. In September 2025, the Southern District held that the Notes were valid. *PDVSA v. MUFG Union Bank*,

No.19-cv-10023, 2025 WL 2675871, at *1 (S.D.N.Y. Sept. 18, 2025).  PDVSA and PDVH appealed and sought expedition based on the relevance of the Notes' validity to this proceeding.  *PDVSA v. MUFG Union Bank*, No. 25-2652, Dkt.14 (2d Cir.). The Second Circuit expedited the appeal, with briefing to be completed by March 2026 and argument to be held "promptly."  *Id.*, Dkt.42.

## SUMMARY OF ARGUMENT

I.  The writs of attachment granted to the Republic's creditors—representing 90% of the total judgment amount at issue—are invalid.  Under Rule 69, Delaware law governs the writs' validity, including the showing necessary to permit creditors of the *Republic* to attach *PDVSA*'s property.  Delaware permits a parent company's creditors to enforce their judgments against a subsidiary's property only upon a showing that the subsidiary was used as a sham to commit fraud.  The creditors have not made, and cannot make, that showing, as PDVSA was established to oversee Venezuela's oil industry—a constitutionally mandated function.  Indeed, the district court found that Crystallex had failed to allege or prove fraud.  The writs granted to the Republic's creditors must be vacated.

II.  The Special Master and his advisors, Weil and Evercore—judicial officers granted judicial immunity—should have been disqualified for grave, undisclosed conflicts of interest.  Weil and Evercore were cultivating ever-growing, multi-million-dollar relationships with Elliott and Bondholders, even as they were negotiating

with Elliott and Bondholder affiliates on the Special Master's behalf and advising him on which bid to recommend to the court. Weil's restructuring chair even interceded on Elliott's behalf at a critical moment in the process, admonishing his colleagues advising the Special Master that he would "hate for [Elliott] to not want to work with us." JA12760 (Email). Given those undisputed facts, the Special Master's selection of Elliott's bid—despite its $2 billion shortfall relative to Gold Reserve's and its diversion of that amount to satisfy the Bondholders' still-contested interests—suffers from an unmistakable appearance of partiality, requiring disqualification under 28 U.S.C. § 455(a). Weil and Evercore also had a disqualifying "financial interest … in a party to the proceeding" or other "interest that could be substantially affected by the outcome of the proceeding" under Section 455(b)(4). The only appropriate remedy is vacating the sale and redoing the process.

III. The conflicted sale process resulted in a grossly inadequate sale price that is less than 50% of the Special Master's own valuation of CITGO and that shocks the conscience regardless of Delaware's 50% rule. That grossly inadequate price was the result of significant legal errors in the sale process, including failing to run a public sale and select the highest bidder as 8 Del. C. § 324 requires, and improperly prioritizing the Bondholders' interests over junior creditors despite the Notes and related pledge's contested validity. Those errors too require vacatur.

24

# ARGUMENT

## I. THE WRITS OF ATTACHMENT GRANTED TO THE REPUBLIC'S CREDITORS ARE INVALID UNDER DELAWARE LAW.

The sale order rests on a fatal threshold legal error:  the writs of attachment granted to the Republic's creditors are invalid.  To justify selling *PDVSA's* property to satisfy judgments against the *Republic*, the district court had to find that PDVSA was the Republic's alter ego.  Rule 69 provides that Delaware law governs that determination.  As this Court has recognized, "Delaware law requires showing fraud—not just extensive control—to seize the property of a non-debtor like PDVSA."  24 F.4th 242, 247-48 (2022).  But the court found there was no proof of such fraud.  The attachments of PDVSA's shares therefore are invalid.

### A.    Standard Of Review.

Orders granting writs of attachment and denying motions to quash such writs are reviewed for abuse of discretion.  *Edmondson v. Lilliston Ford Inc.*, No.23-2928, 2024 WL 5155557, at *2 (3d Cir. 2024); *Wedgewood Vill. Pharm. v. United States*, 421 F.3d 263, 268 n.5 (3d Cir. 2005).  Legal error is an abuse of discretion.  *NLRB v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992).

**B. Delaware Law Governs Whether The Republic's Creditors May Attach PDVSA's Property.**

**1. Under Rule 69(a), Delaware law governs the creditors' use of alter-ego principles to attach PDVSA's property.**

Where, as here, the sovereign immunity of a foreign-state judgment debtor and its instrumentality has been overcome, Rule 69's provisions govern as they would for any private party in any ensuing judgment-enforcement action. *Republic of Argentina v. NML Capital*, 573 U.S. 134, 140 (2014); 28 U.S.C. § 1606.

Rule 69(a)(1) provides that the "procedure on execution … must accord with the procedure of the [forum] state, … but a federal statute governs to the extent it applies." Therefore, "a federal court must follow relevant state law in a proceeding to execute on a judgment, unless a federal statute dictates otherwise." *Schreiber v. Kellogg*, 50 F.3d 264, 267 (3d Cir. 1995). It is undisputed that no federal statute dictates otherwise here. *Accord NML*, 573 U.S. at 140 (the FSIA does not "specif[y] a different rule [than Rule 69] when the judgment debtor is a foreign state").

Accordingly, courts adjudicating judgment-enforcement suits against foreign states and instrumentalities routinely apply state law to all dispositive questions. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) (California law governs whether debts owed to Iran were subject to execution in California); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi*

*Negara*, 313 F.3d 70, 83 (2d Cir. 2002) (New York law governs what assets of foreign-sovereign instrumentality are "subject to enforcement").

Court also routinely apply state-law *alter-ego* principles under Rule 69 to determine whether a third party's property can be attached to satisfy the defendant's judgment debts. *See, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677 (9th Cir. 2017); *Dexia Credit Loc. v. Rogan*, 629 F.3d 612, 623 (7th Cir. 2010); *Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 34-35 (Fed. Cir. 2007); *Trust v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005); *Democratic Republic of Congo v. Air Cap. Grp.*, No.12-cv-20607, 2018 WL 324976, at *3 (S.D. Fla. Jan. 8, 2018) (same).

The creditors' use of alter-ego principles here thus falls within the heartland of matters that Rule 69 commits to state law. The Republic's creditors sought writs of attachment against PDVSA's property to satisfy judgments against the Republic, arguing that PDVSA's juridical independence should be disregarded and the Republic deemed to have an attachable interest in PDVSA's property. As Crystallex itself put it: "Under Delaware law, which governs these enforcement proceedings pursuant to Fed.R.Civ.P. 69(a)(1), it is settled that … a court 'may determine the nature of [the judgment debtor's] interest' in that property and in particular may, in appropriate circumstances, 'disregard the existence of a subsidiary corporation and look directly to the specific assets of a subsidiary for the satisfaction of a claim against

27

the parent.'" Crystallex Br. 31-32, No. 18-2797 (3d Cir. Jan. 23, 2019) (citing *Kingsland Holdings, Inc. v. Bracco*, No. CIV.A.14817, 1996 WL 104257, at *7 (Del. Ch. Mar. 5, 1996)). Thus, just as in the cases cited above, Crystallex and the other creditors invoked alter-ego principles to determine which assets are subject to attachment under Delaware's judgment-enforcement procedures. That is a question that Rule 69 commits to state law.

> **2.    The district court erred in holding that *Bancec*, rather than Delaware law, governs.**

The district court's refusal to apply Delaware law was wrong for multiple reasons.

First, the court asserted that Rule 69 provides that state law governs the "*procedure* on execution," Fed.R.Civ.P. 69(a) (emphasis added), and alter-ego principles are "substantive." JA230 (*Tidewater*). The court did not explain how it distinguished procedure from substance—and any such distinction is misconceived. A state's "procedure on execution"—that is, its rules governing judgment collection—contain any number of principles that might be termed "substantive" because they supply the rule of decision in judgment-enforcement proceedings. For instance, state execution procedures include rules establishing what assets are subject to attachment, *Pac. Reinsurance Mgmt. Corp. v. Fabe*, 929 F.2d 1215, 1219 (7th Cir. 1991); when and in what circumstances a party must indemnify another, *Burgos-Yantin v.*

*Municipality of Juana Diaz*, 909 F.3d 1, 8 (1st Cir. 2018); and where particular intangible rights should be deemed located, *Peterson*, 627 F.3d at 1131.  Those state rules are outcome determinative, as the court reasoned, JA230, in cases in which they apply.  Yet federal courts routinely apply them in Rule 69 judgment-enforcement proceedings.

Alter-ego standards are indistinguishable from those other rules of decision that form part of a state's "procedure on execution."  *See* pp. 26-27, *supra*.  Because a judgment creditor may often seek to reach the assets of an alleged alter ego, Delaware, like other states, applies its alter-ego rules as part of its procedure on execution.  *See, e.g.*, *Kingsland*, 1996 WL 104257, at *7; *Midland Interiors v. Burleigh*, No.18544, 2006 WL 4782237, at *1 (Del. Ch. Dec. 19, 2006).

In all events, if Rule 69 distinguishes between "procedure" and non-procedure, the many decisions applying state-law alter-ego and other outcome-determinative rules demonstrate that the substance/procedure distinction cannot turn on whether the rules are outcome determinative.  Rather, the Supreme Court has indicated that the line would fall between state law governing "collect[ing] judgments otherwise obtained," which constitute "procedures on execution" under Rule 69, and "substantive law ... [that] creates rights and liabilities where none existed before."  *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 834 & n.10 (1988).  In *Mackey*, the Court explained that "Georgia garnishment law" was "procedural," and

thus not preempted under ERISA by analogy to Rule 69, because it "create[d] no substantive causes of action, no new bases for relief, or any grounds for recovery," and it did not "create the rule of decision in any case *affixing liability*." *Id.* (emphasis added). That makes sense: Rule 69 points to state law for enforcing liability already created by a judgment. State rules directed toward enforcing such liability constitute a state's "procedure on execution," while rules that impose new liability are "substantive causes of action" excluded from Rule 69. *Id.*

The Delaware alter-ego principles that the creditors invoke are thus indisputably part of Delaware's "procedure on execution." Fed.R.Civ.P. 69(a). As Crystallex itself asserted and the district court held, the creditors invoke alter-ego principles not "to impose personal liability on PDVSA"; instead, they "seek[] to attach assets" in which they allege the Republic has a sufficient interest. Crystallex No.18-2797 Br.19 (quoting JA1753 (*Crystallex I*)). And again, as Crystallex explained, Delaware courts use alter-ego principles to discern whether the judgment debtor has a sufficient interest in property held by another to justify attachment—a use that does not impose liability on new parties. *Id.*; *Kingsland*, 1996 WL 104257, at *7 (in "enforc[ing] the judgment through seizure and sale of property located in Delaware," the court "may determine the nature of [the debtor's] interest in the

stock" by applying alter-ego principles); *Buechner v. Farbenfabriken Bayer Aktieng-esellschaft*, 154 A.2d 684 (Del. 1959) (similar).  Thus, the alter-ego principles here fall within "procedure on execution" under any proper understanding.

Trying a different tack, Crystallex argues that "*ownership* is a question of sub-stance, not procedure," to which Rule 69 does not apply.    25-3347 Dkt.68, Crystallex_Stay_Resp.20 (3d Cir.) (emphasis added).  But according to the leading treatise, questions concerning "whether the defendant has an interest in property sub-ject to execution"—which is the question the creditors use alter-ego principles to answer here—are questions on which the court "is bound to follow state law" under Rule 69.  Wright & Miller, *Federal Practice & Procedure* § 3012 (3d ed.).  Even assuming that rules governing property ownership in the first instance—i.e., what interest the defendant acquired when property was created or transferred—were out-side Rule 69's purview, the alter-ego rules invoked by the creditors and the district court would still fall within Rule 69 because they are distinct.  They operate "inci-dent" to the court's enforcement jurisdiction by providing a mechanism for *deeming* the alter-ego parent to have an *attachable interest* in its subsidiary's property for enforcement purposes, *despite* ordinary ownership rules.  *Kingsland*, 1996 WL 104257, at *7 (alter-ego analysis is "[i]ncident" to court's "power to enforce the judgment").  Delaware cases make clear that alter-ego principles aid enforcement

jurisdiction by identifying attachable interests and preventing judgment evasion, explaining that although a parent has "no direct beneficial interest" in a subsidiary's property, the court may "disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent" if fraud is involved. *Buechner*, 154 A.2d at 687; *Manichaean Cap., LLC v. Exela Techs.*, 251 A.3d 694, 719-20 (Del. Ch. 2021) (veil piercing in judgment-enforcement context establishes that the parent "should be regarded in law and fact" as the real "party in interest," preventing "movement of funds from parent to subsidiary" (citation modified)). That is no doubt why courts have routinely applied state-law alter-ego principles under Rule 69, *see* p. 27, *supra*, and why Delaware courts have applied Delaware alter-ego rules in enforcement proceedings involving (as here) stock of Delaware corporations owned by foreign corporations. *Buechner*, 154 A.2d at 687.[7]

Second, the district court asserted that because PDVSA is a foreign-state instrumentality, *Bancec*'s federal common law rule should govern the alter-ego question, reasoning that "the determination of a sovereign instrumentality's alter-ego status is a matter bearing on the nation's foreign relations." JA230 (*Tidewater*). But

---

[7] The court and creditors have suggested that if Rule 69 did not apply and choice-of-law principles governed, Delaware courts would apply *Bancec*. JA234 (*Tidewater*). But *Buechner* and *Kingsland* applied Delaware alter-ego principles, making clear that is not the case.

*Bancec* cannot supersede Rule 69.  That Rule has the force of a federal statute, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988), and *Bancec*—like other federal common law doctrines—gives way to federal statutes.  *See In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In all events, the district court misunderstood *Bancec*'s scope.  *Bancec* itself held only that "the rule governing the *attribution of liability* among entities of a foreign state"—i.e., whether an instrumentality should be held substantively liable for the state's actions—was sufficiently closely tied to "amenability" to suit, and therefore foreign relations, that it should be a matter of federal common law, rather than state law, in the absence of a contrary statutory command.  462 U.S. at 622 n.11 (emphasis altered).[8]  Here, the creditors do not seek to *attribute liability* as between the Republic and PDVSA by holding PDVSA liable for the Republic's debts.  *See p. 30, supra*.  Instead, now that the Republic's liability has been determined, the creditors seek to use Rule 69 to execute against property in which they contend the Republic has a sufficient interest to justify attachment.

Nothing about *that* question uniquely implicates cognizable foreign-relations concerns—and even if it did, the district court had no authority to depart from Rule

---

[8] Federal courts have subsequently applied *Bancec* to FSIA jurisdiction.  *Crystallex II*, 932 F.3d at 138.  That application too is distinct from Rule 69.  *OIEG*, 73 F.4th at 176 (noting distinction between jurisdiction and attachment-validity questions).  *Bancec* indicated that federal law must govern amenability to suit.  462 U.S. at 622 n.11.  It follows that susceptibility to jurisdiction also should be governed by *Bancec*'s federal common law rule.

69's unambiguous command. The Republic's liability and PDVSA's amenability to suit have been established, leaving only enforcement. And the Supreme Court has rejected the argument that general foreign-relations concerns justify deviating from Rule 69's procedures for enforcing judgments. *NML*, 573 U.S. at 145. That is because Congress enacted the FSIA to replace general foreign-relations principles with statutory law, and it declined to establish federal principles governing judgment enforcement, *id*. at 142-44—even as it was well aware that "Rule 69" would require applying "state law" "to obtain satisfaction of a judgment" against foreign-sovereign entities, H.R. Rep. No. 94-1487, at 28 (1976). As a result, courts must apply Rule 69 and state law, and have no authority to substitute *Bancec* or any other rule of decision simply because they believe foreign-relations concerns are implicated. *NML*, 573 U.S. at 145 (rejecting argument that Court should craft federal common law discovery rule to fill purported "gap" in the FSIA and Rule 69). And in all events, if foreign-relations concerns were relevant, they would point toward state law, as applying *Bancec* would treat foreign-sovereign parties *worse* than other private parties facing execution in Delaware. *Cf.* 28 U.S.C. § 1606.

Finally, Crystallex asserts that *Bancec* applies because it is assertedly a gloss on the FSIA and Rule 69 states that "a federal statute governs to the extent it applies." Crystallex_Stay_Resp.20-21. But *Bancec* is not a federal statute, and its provenance as a federal common law "outgrowth" of the FSIA, *id*., is irrelevant. The FSIA itself

is not a "federal statute" that "applies" to execution questions under Rule 69, *NML*, 573 U.S. at 143 n.3, and the Rules Committee could have—but did not—include federal common law in Rule 69's carveout.  Crystallex is also wrong to suggest that *Bancec* would preempt state alter-ego principles.  Rule 69 displaces *Bancec* and expressly preserves forum-state law, including for foreign-sovereign enforcement proceedings.  *Id*. at 139; *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) ("Rule 69(a) is a choice of law provision.").  And Crystallex has identified no conflict between Rule 69 and state law.  Indeed, foreign-relations interests do *not* justify preempting state-law rules governing property interests in other foreign-sovereign judgment-enforcement contexts.  *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014).

### C.    Under Delaware Law, The Writs Granted To The Republic's Creditors Are Invalid Because The Creditors Have Not Shown Fraud.

"Delaware law requires showing *fraud*—not just extensive control—to seize the property of a non-debtor like PDVSA."  24 F.4th at 247-48 (emphasis added).  The Delaware Supreme Court has left no doubt: "A creditor of the parent corporation may not, in the absence of fraud, … look directly to specific assets of a subsidiary for satisfaction of his claim against the parent."  *Buechner*, 154 A.2d at 687; *accord Crosse v. BCBSD*, 836 A.2d 492, 497 (Del. 2003) (to pierce the corporate veil, "the plaintiff must plead facts supporting an inference that the corporation, through its

alter-ego, has created a *sham entity designed to defraud* investors and creditors" (emphasis added)); *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999).

The Republic's creditors have never alleged fraud or presented evidence that could support such a claim. *See Crystallex II,* 932 F.3d at 145. Indeed, the district court correctly concluded (in its jurisdictional analysis) that Crystallex had failed to sufficiently allege or establish that PDVSA exists "for the purpose of defrauding Crystallex and other creditors." JA1772 (*Crystallex I*). Later-joining creditors did not allege fraud either. *See, e.g.*, 21-mc-18 Dkt.48_at_6-18; 19-mc-79 Dkt.56_at_5-9; 19-mc-290 Dkt.77_at_20; 20-mc-257 Dkt.37_at_13; 23-mc-379 Dkt.3_at_17-20. That is no doubt because it is undisputed that PDVSA was formed as the Republic's state oil concern in 1975 and maintains a "constitutionally prescribed role" "to manage the oil industry, including CITGO." 19-mc-79 Dkt.53_at_8. PDVSA is clearly not a sham entity. Under Delaware law, therefore, the Republic's creditors have not made and could not make the showing necessary to attach PDVSA's assets.

The district court's erroneous grant of writs to the Republic's creditors fundamentally prejudiced the VPs. Judgments held by *PDVSA*'s creditors represent only 10% of the total judgment amount at issue. JA288 (Sale Opinion). Delaware law requires that the court sell only "[s]o many of the shares … as shall be sufficient to satisfy the debt[s]." 8 Del. C. § 324(a). Had the Republic's creditors been excluded,

as Delaware law requires, PDVSA may well have been able to satisfy the judgments directly without selling *any* shares, let alone 100% of the shares. *See, e.g.*, JA11010-10111 (PDVSA debt payments).

### D. The District Court's Collateral Estoppel And Untimeliness Determinations Were Erroneous.

#### 1. Collateral estoppel does not apply.

The district court repeatedly held that the VPs' argument that the writs are invalid under Delaware law is collaterally estopped by the district court's decision in *Crystallex I* and this Court's decision in *Crystallex II*. That was error. Collateral estoppel cannot apply unless "the identical issue was previously adjudicated" and "actually litigated." *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001). But the writs' validity was neither litigated nor decided in those decisions, so the VPs have *never* had "a full and fair opportunity to litigate that issue." *Clark v. Coupe*, 55 F.4th 167, 177 (3d Cir. 2022) (citation omitted).

*a. Collateral estoppel turns on whether the parties litigated, and the courts decided, the writ-validity issue in **Crystallex I** and **II**.* The district court held in *Crystallex* and then in *OIEG* that the VPs' writ-validity argument was collaterally estopped by *Crystallex I* and *II*. JA94-99; JA197. Both times, the VPs appealed, but this Court held it lacked appellate jurisdiction. *Crystallex*, 24 F.4th at 256-58; *OIEG*, 73 F.4th at 176. The district court subsequently held that the writ-validity argument was collaterally estopped by both its *Crystallex I-II* and *OIEG* decisions,

and it refused to certify that ruling for interlocutory appeal.  JA222-229 (*Tidewater*); 19-mc-79_Dkt.100.

Preclusion therefore turns on whether the writ-validity issue was litigated and decided in *Crystallex I* and *II*.  If it was not, the district court's ruling in *OIEG* cannot itself be given preclusive effect, because the *OIEG* holding—that *Crystallex I* and *II* precluded the issue—was erroneous, and the VPs were barred from appealing that error.  *Clark*, 55 F.4th at 177.  Even more to the point, if the VPs are correct that the writ-validity issue was not litigated and decided in *Crystallex I* and *II*, the VPs have *never* had the opportunity for appellate review.  Collateral estoppel cannot apply when the party "could not, as a matter of law, have obtained [appellate] review." Restatement (Second) of Judgments § 28(1) (1982).

> **b.  The writs' validity was not litigated or decided in *Crystallex I* or *II*.**  In *Crystallex I*, the district court held only that under the FSIA, PDVSA lacked juris-dictional immunity and its property lacked execution immunity.  JA1747 ("the dis-putes" are "governed by the FSIA").  That question turned on whether PDVSA was the Republic's alter ego under *Bancec*.  JA1792 ("[T]he Court finds that … PDVSA may be deemed the alter ego of Venezuela pursuant to the exclusive control prong of *Bancec* ….  *Therefore*, Crystallex has proven the applicability of an exception to PDVSA's *sovereign immunity*." (emphases added)).  The parties briefed only FSIA

issues; although PDVSA argued that Delaware law should inform the *Bancec* sovereign immunity analysis, JA1529-1530 (Brief), it did not separately argue that a writ would be invalid under Delaware law, and Crystallex's reply addressed only FSIA immunity, JA1568 (Brief). The briefing and argument in that case thus make crystal clear that the parties did not litigate, and this Court did not decide, the writs' validity.

That is unsurprising: the FSIA erects a threshold federal immunity hurdle to maintaining a suit against a foreign sovereign or encumbering its property, but a party that surmounts that hurdle must still satisfy whatever other legal requirements are necessary to make out its claim—including establishing that the attachments were valid under state law. *Wye Oak Tech. v. Republic of Iraq*, 666 F.3d 205, 212 n.9 (4th Cir. 2011). Indeed, after holding that PDVSA and its PDVH shares lacked FSIA immunity, the district court stated that it would issue the writ—but it noted that Crystallex agreed that the VPs could "seek to challenge the writ on non-jurisdictional grounds" after it issued. JA1813 (*Crystallex I*). That statement would have been inexplicable had the district court in that same order already resolved such "non-jurisdictional grounds," as the court later claimed.

In *Crystallex II*, this Court adjudicated PDVSA's interlocutory appeal of the denial of its FSIA immunity under the collateral-order doctrine. *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1282 (3d Cir. 1993). The Court accordingly

lacked jurisdiction to rule on anything more than whether the district court "acted *within its jurisdiction* when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela, and [whether] the PDVH shares *are not immune* from attachment." *Crystallex II*, 932 F.3d at 152 (emphases added).

This Court's subsequent decision in *OIEG* confirms that *Crystallex II* did not implicitly adjudicate the writ's validity—and *could not* have done so. In *OIEG*, the VPs appealed the district court's determination that PDVSA still lacked FSIA immunity in 2023 because, even under the Guaidó government, it remained the Republic's alter ego under *Bancec*. JA182-190 (*OIEG*). This Court decided that issue in an exercise of its interlocutory jurisdiction under the collateral-order doctrine, just as in *Crystallex II*. *OIEG*, 73 F.4th at 175. The VPs *also* sought to appeal, under pendent appellate jurisdiction, the district court's rejection of their challenge to the writs' validity under Delaware law. This Court held that it lacked pendent appellate jurisdiction and therefore had "no power" to review the writs' validity under Delaware law, because the "immunity" question and the question of the "propriety of attachment under the Federal Rules" were distinct: "[r]esolution of the immunity issue does not dictate the outcome of the attachment issue." *Id.* at 175-76. That conclusion—that the court lacked pendent appellate jurisdiction over the writ-validity issue in a collateral-order appeal concerning PDVSA's FSIA immunity—would

have applied equally in *Crystallex II*, had PDVSA sought to place the validity of Crystallex's writ before this Court.  In other words, this Court in *Crystallex II* would not have had pendent appellate jurisdiction to address the validity of Crystallex's writ, as *OIEG* subsequently made clear.  And thus this Court could not have implicitly adjudicated the issue, and the issue *cannot as a matter of law* be precluded by *Crystallex I* and *II*.

       ***c. The district court's preclusion rulings are erroneous.***  In nonetheless ruling that preclusion applies here, the court elided the distinction between the issues of immunity and the writs' validity.  The court found preclusion only by characterizing the "issue" purportedly litigated and decided as whether "Delaware law should be used to determine PDVSA's alter-ego status for purposes of attaching the PDVH shares owned by PDVSA."  JA224-225 (*Tidewater*).  But that characterization conflates immunity and attachment validity in precisely the manner this Court called out in *OIEG*.  73 F.4th at 176; *see FG Hemisphere Assocs. v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) ("A finding that an exception to executional immunity applies" is "not the same as concluding that execution is appropriate or that writs of garnishment should issue.").

       Here, the immunity issue decided in *Crystallex I* and *II* (whether PDVSA was the Republic's alter ego under *Bancec*, which requires extensive control *or* fraud) clearly involves a different legal standard than the writ's validity (whether PDVSA

41

should be treated as the Republic's alter ego under Delaware law, which requires
extensive control *and* fraud).  Even though both inquiries involve an "alter ego"
question, it is not enough that the same "legal label[]" applies to both.  *Smith v. Bayer
Corp.*, 564 U.S. 299, 310 (2011) (citation omitted); *contra* JA224-225 (*Tidewater*).
Whatever the label, "issues are not identical if [they] involve[] application of a dif-
ferent legal standard"—and without identical issues, collateral estoppel does not ap-
ply.  *B&B Hardware v. Hargis Indus.*, 575 U.S. 138, 154 (2015) (citation omitted).

The district court also fastened upon this Court's statement in *Crystallex II*
that "so long as PDVSA is Venezuela's alter ego under *Bancec*[,] … the District
Court had the power to issue a writ of attachment on that entity's non-immune assets
… to satisfy the judgment against the country."  JA225 (*Tidewater*) (quoting 932
F.3d at 139).  But that statement appeared in this Court's discussion of whether the
court needed an independent basis for *FSIA jurisdiction* over PDVSA—that is,
whether "*Bancec* can[] be used to extend that *jurisdiction* to reach the assets of
PDVSA."  *Crystallex II*, 932 F.3d at 138 (emphasis added).  In that context, the
court's reference to the "power" to issue the writ unambiguously referred to FSIA
subject-matter jurisdiction—not the writ's validity under Delaware law.  And, as
explained above, this Court lacked appellate jurisdiction over the writ's validity and
thus cannot have implicitly decided the issue.

## 2.    The Rule 69 argument was timely asserted.

The district court also held that the VPs forfeited their argument concerning the writ's validity by failing to raise it while litigating immunity in *Crystallex I*. JA104 (1/14/21 Opinion).  That assertion is impossible to square with the court's collateral estoppel ruling.  Either the VPs actually litigated the writ's validity in *Crystallex I* or they did not.  Even more to the point, PDVSA was entitled to wait until its FSIA immunity was resolved before raising substantive state-law challenges to the writ's validity.  Sovereign immunity, as an immunity from the "burdens of litigation," *Fed. Ins. Co.*, 12 F.3d at 1281 (citation omitted), must be resolved before "consideration of the merits."  *Republic of Philippines v. Pimentel*, 553 U.S. 851, 864 (2008); *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983).  The court's untimeliness ruling thus (retroactively) deprived PDVSA of procedural protections guaranteed by the FSIA.

The VPs' assertion of the writs' invalidity in a motion to quash also followed Rule 69, Delaware law, and the court's own assurances, *see* p. 39, *supra*.  As the court recognized, raising validity objections *after* the writ's issuance accords with "ordinary proceedings under Delaware law," which contemplates issuing the writ and "deferring litigation over the validity of the attachment … until after the writ is served."  JA105-106 (1/14/21 Opinion) (citing *Hibou, Inc. v. Ramsing*, 324 A.2d 777, 782-83 (Del. Super. Ct. 1974)).  That is no doubt why Crystallex originally

acknowledged that "non-jurisdictional" challenges would come later. JA1813 (*Crystallex I*). The court nonetheless asserted that PDVSA should have informed the court and Crystallex *while it was still litigating immunity* in *Crystallex I* and *II* that if immunity were denied, it would challenge the writ's validity. JA106-107 (1/14/21 Opinion). But that went without saying, because PDVSA was entitled to a definitive immunity ruling before proceeding to the merits.

*    *    *

The district court's preclusion and timeliness rulings were antithetical to the purposes of those doctrines and deprived the VPs of a full and fair opportunity to litigate the case-dispositive issue of the validity of billions of dollars of attachments. Preclusion is designed to prevent a second bite at the apple, not to deny a first. As this Court has cautioned, "we must be careful to prevent the doctrine from being used to prevent a properly raised argument from being considered even once. Where there is substantial doubt as to whether a prior panel actually decided an issue, the later panel should not be foreclosed from considering the issue." *United Artists Theatre Cir. v. Twp. of Warrington*, 316 F.3d 392, 398 (3d Cir. 2003). And timeliness rules prevent dilatoriness; they are not intended to foreclose arguments raised at the first necessary point. Strikingly, neither the district court nor the creditors can identify even a *single* sentence in *Crystallex I* or *II* that expressly decided the issue or a

44

single point at which the issue should have been raised but was not. In those circumstances, it serves neither international comity nor the rule of law for foreign-sovereign parties to be deprived of an opportunity to receive an adjudication of an issue of grave consequence.

## II. DISQUALIFYING CONFLICTS OF INTEREST COMPROMISED THE PROCEEDINGS BELOW.

The sale order must be vacated for a second reason: the Special Master's choice of Elliott's bid was irredeemably tainted by serious conflicts of interest that were concealed until the last stages of the proceedings. At the same time that Weil and Evercore solicited and evaluated bids as judicial officers working for the Special Master, those firms were cultivating lucrative multi-million dollar client relationships with Elliott and the Bondholders—the very entities that stand to gain so much if the sale order is affirmed.

"[T]he average layperson" would have no difficulty "grasp[ing]" the "impropriety" inherent in Weil and Evercore's dual roles, *In re Kensington Int'l*, 368 F.3d 289, 302 (3d Cir. 2004), and the district court should have disqualified the Special Master and his advisors. The law is clear that special masters must scrupulously avoid even the appearance of partiality. Fed.R.Civ.P. 53(a)(2) (citing 28 U.S.C. § 455). Disqualification is mandatory in "any proceeding" where a judicial officer's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or in which the officer has a "financial interest" in "a party to the proceeding" or some other "interest

that could be substantially affected by the outcome of the proceeding," *id.* § 455(b)(4). Both standards were violated here, and the district court's unpersuasive attempt to trivialize the conflicts ultimately only confirms how serious they are.

### A. Standard Of Review.

An order denying disqualification is reviewed for abuse of discretion. *In re Sch. Asbestos Litig.*, 977 F.2d 764, 778 n.15 (3d Cir. 1992). Failure to remove an officer who falls "within the disqualifying definition" is an abuse of discretion. *Kensington*, 368 F.3d at 301 n.12 (citation omitted).

### B. The Special Master And His Advisors Were Subject To The Conflict-Of-Interest Restrictions Governing Judicial Officers.

Rule 53(a)(2), governing special masters, prohibits any undisclosed "relationship to the parties" or to the "action" that "would require disqualification of a judge under 28 U.S.C. § 455." Section 455, in turn, prohibits both actual self-interest in a proceeding and the appearance of impropriety, whether or not the officer takes advantage of his position. *See Kensington*, 368 F.3d at 294; *Jenkins v. Sterlacci*, 849 F.2d 627, 631 (D.C. Cir. 1988).

Those requirements apply with equal force to Weil and Evercore, and any impropriety on their part is imputed to the Special Master. *See Kensington*, 368 F.3d at 308 ("there is an almost irrebut[t]able presumption" that a judicial officer "is 'tainted' and must be disqualified" when "he surrounds himself with individuals who may not be truly disinterested"). The district court authorized the Special Master to

46

retain Weil and Evercore to assist him as "an arm of the Court" and afforded them the same judicial immunity as the Special Master precisely because they were performing the same judicial function as the Special Master himself.   JA2442-2445 (Order Regarding SM); JA10464 (Disqualification Opinion).   Their "special position of trust and influence" over the sale process demanded the "neutrality normally required of law clerks or court-appointed experts." *Kensington*, 368 F.3d at 307-08. Indeed, the very point of granting immunity was to ensure their "independent and impartial exercise of judgment." *Antoine v. Byers & Anderson*, 508 U.S. 429, 435 (1993).

### C.    The Advisors' Ties To Elliott And The Bondholders Created A Disqualifying Appearance Of Partiality Under 28 U.S.C. § 455(a).

A judicial officer must be disqualified "in any proceeding in which his impartiality might reasonably be questioned."   28 U.S.C. § 455(a); *see Kensington*, 368 F.3d at 301.   Here, the advisors' relationships with Elliott and the Bondholders gave rise to an "appearance of partiality" that would be obvious to a reasonable person, *School Asbestos*, 977 F.2d at 782, and that disqualifies both the Special Master and his advisors, *Kensington*, 368 F.3d at 308.

1. As advisors to the Special Master, Weil and Evercore were charged with an official responsibility:   to ensure that the sale process maximized the value of PDVH shares being sold, for the benefit of the creditors who are parties to these proceedings.   JA6603 (6/24/25 Ex parte Tr.).   But even as they were implementing

the sale procedures and negotiating with bidders on the Special Master's behalf, Weil and Evercore simultaneously maintained, and sought to expand, lucrative client relationships with Elliott and the Bondholders, the key sale process participants who ultimately benefited from their decisions. Weil and Evercore owed Elliott and the Bondholders, as firm clients, "a fiduciary duty to advance" their "interests" by "tak[ing] positions" that "favored" them. *Kensington*, 368 F.3d at 304. And they earned many millions representing those entities. *See* pp. 19-20, *supra*. Indeed, Weil collected over $3 million from Elliott in the first half of 2025 alone. JA12830 (Table).

Those dual roles created enormous conflict-of-interest risks: as judicial officers, Weil and Evercore owed the Special Master, the court, and the public a duty to act impartially in the public interest, but at the same time they had a duty to advance the private interests of Elliott and the Bondholders. Such a conflict should be disqualifying in any case. It is particularly dismaying in a case like this one, involving the forced sale of a foreign sovereign's multibillion-dollar asset, where any perceived lack of integrity in the process would damage the credibility of our judicial system and undermine the U.S. interest in fair treatment of foreign sovereigns.

One example vividly confirms how serious the problem is. On June 24, 2025, the day before topping bids were due, Elliott's in-house counsel Michael Turkel called the co-chair of Weil's restructuring practice, Jeffrey Saferstein, "extremely

frustrated" that the Special Master's Weil team was "imposing new conditions and timing" that Elliott could not meet.  JA12760 (Email); JA12671 (Turkel Deposition).  Saferstein, who represented Elliott but not the Special Master, immediately contacted Chase Bentley, a lawyer on the Special Master's team who had recently made partner in the group Saferstein led, JA13507 (10/20/25 Hearing Tr.).  Saferstein was not subtle.  He bluntly conveyed his intense displeasure that Weil's Special Master's team was jeopardizing the firm's relationship with Elliott, noting that he would "hate for [Elliott] to not want to work with us" as a result of Weil's failure to attend to Elliott's interests in the sale process.  JA12760 (Email).  One need not have worked at a law firm like Weil to appreciate the coercive force of a statement like that from a firm leader.

Bentley swung into action, as Saferstein surely intended.  He apologized to Turkel for the "Weil M&A team" not "offer[ing] up a call."  JA12862 (Email).  And he promised Saferstein "a debrief" session "on the hour long call we just had with Elliott" and later reported to Saferstein that Weil had placated Elliott by saving them "some money in commitment fees in the event they deliver us a half-baked deal tomorrow."  JA12860-12861 (Emails).  Bentley ventured that, with the benefit of the advice Weil had just given, Elliott could wait to see what bid the Special Master recommended and then "try to beat that with an unsolicited offer."  JA12860 (Email).  Elliott then did exactly that, and the Special Master recommended Elliott's bid even

though it was $2 billion below Gold Reserve's.  JA7396 (SM Notice); JA7426 (Updated Final Recommendation).

The undisputed factual record thus makes crystal clear that the very lawyers representing the Special Master were, at the behest of firm leadership, advising Elliott on how to maximize its chances in the sale process.  Section 455's disqualification rules exist to prevent exactly this kind of conduct and the risks it poses to public confidence in the judiciary.  Indeed, this is the rare case in which there is more than merely a risk of perceived bias.  The record demonstrates that Weil crossed the line and provided its client Elliott with advice designed to give it an advantage in the bidding process.[9]

2.  Given these conflicting loyalties, the decisions made by the Special Master and his advisors would certainly raise sufficient "doubts" in the mind of a reasonable observer as to their "impartiality" to require disqualification.  *Kensington*, 368 F.3d at 301-02 (quoting *Selkridge v. United of Omaha Life Ins.*, 360 F.3d 155, 167 (3d Cir. 2004)).  The Special Master and his advisors chose to negotiate exclusively with Elliott during the summer of 2024 (even though Gold Reserve made a higher offer, JA5104 (Table)) and attempted to negotiate a settlement with the Bondholders.  JA4851-4852 (Gold Reserve Letter); JA4873 (Creditors' Submission).  In 2024, they

---

[9] Weil did not institute any ethical screen of the sort that is common at large law firms.  *See* pp. 64-65, *infra*.

recommended Elliott's lowball bids, which were overwhelmingly rejected by creditors and had an escrow structure that prioritized payment to their client Bondholders over the junior creditors. JA4554-4555 (Recommendation). They then selected Red Tree's paltry bid as the stalking horse because it paid out the Bondholders. JA5805 (Stalking Horse Recommendation); JA5874 (Stalking Horse Order); JA9347 (SM's Proposed Findings of Fact). In the topping period, they pressed bidders to cut a deal with the Bondholders. JA9350-9351 (SM's Proposed Findings of Fact). After the topping period—and notwithstanding the requirement of a sale "to the highest bidder," 8 Del. C. § 324(a)—they switched their recommendation from Gold Reserve's superior bid to Elliott's much lower one, in which Elliott, unlike Gold Reserve, promised to transfer over $2 billion to the Bondholders, JA7435 (Updated Final Recommendation); JA8304 (Hiltz Decl.).

To be sure, the Special Master recommended bidders other than Elliott during the stalking-horse and topping phases. JA10448-10449 (Disqualification Opinion). But those steps along the way do not detract from the appearance of partiality. The Special Master's chosen stalking horse was Red Tree—the subsidiary of another advisor Bondholder client. And choosing Elliott as the stalking horse or as the winning topping bid was not a realistic option because its bids were too low and/or non-qualifying. JA13512 (10/20/25 Hearing Tr.); JA14064 (10/21/25 Hearing Tr.); *see* p. 15, *supra*. Moreover, although the Special Master chose Gold Reserve's bid

51

(which was higher-priced but did not pay the Bondholders) after the court suggested ex parte that a higher-priced bid might be preferable to one that settled with the Bondholders, JA6614 (6/24/25 Ex parte Tr.), the Special Master later reversed himself in favor of Elliott's unsolicited bid, which was lower but paid the Bondholders. *See* pp. 15-16, *supra*.  When it came to choosing the ultimate victor in the sale process, then, Weil and Evercore were all in for Elliott and the Bondholders.  Guided by Weil, Elliott decided to "wait to see" what the Special Master's final recommendation would be and then "beat that with an unsolicited offer."  JA12860 (Email). Elliott could thus ensure that it would "offer[] in the Special Master's view the best combination of price and certainty," JA10449 (Disqualification Opinion)—by paying out the Bondholders represented by his advisors.[10]  That approach worked like a charm.

This Court's decision in *Kensington* makes clear that disqualification under Section 455(a) is required here.  There, the district court appointed consulting advisors to assist with a set of bankruptcies, and the court and the advisors discussed "various approaches to estimat[ing]" contingent claims and "the tensions between

---

[10] The district court dismissed the Bondholders' series of wins as merely "recogniz[ing] the reality that the [Bondholders] posed a potential risk to certainty of closing." JA10451 (Disqualification Opinion).  But the appearance of a conflict is unmistakable given the advisors' multimillion-dollar relationships with the Bondholders and the Special Master's failure to evaluate the risk that the Bondholders could have prevented any transaction from closing.  *See* p. 14, *supra*.

various creditor classes." 368 F.3d at 297-98. This Court noted that the advisors proposed decisions in the first instance and that they "were perceived … as being experts" upon whom the judge "depended … to educate him on all the relevant issues." *Id.* at 307. That state of affairs demanded the "neutrality normally required of law clerks or court-appointed experts." *Id.* at 308-09. But, just as in this case, those advisors were also representing interested parties, and that fact created an unacceptable appearance of bias that required disqualification.

3. The advisors' failure to disclose the conflicts—itself a telling indication of their seriousness—further confirms the need for disqualification. Section 455 unambiguously requires judicial officers to disclose "any possible ground for disqualification known" to them. *Kensington*, 368 F.3d at 314 (quoting *United States v. Schreiber*, 599 F.2d 534, 537 (3d Cir. 1979)); *see* Fed.R.Civ.P. 53(a)(2) (requiring special masters to "disclose[] any potential grounds for disqualification"). The Special Master, Weil, and Evercore violated that requirement.

In October 2024, PDVH and CITGO served discovery seeking all "[d]ocuments sufficient to identify any professional engagements in which [the special master] or [his] advisors performed work for any bidder participating in the sale process, whether or not that work related to" the process. JA9523 (Requests for Production). After delaying for six months, in March 2025 the Special Master produced what he represented to be a "complete list" of those engagements. JA9528

(Email).  That disclosure identified a single Weil representation of Elliott in 2024 that had lasted only a few weeks.  JA12784-12785 (Tables).  And on September 4, 2025, days before Turkel's deposition, Weil, on behalf of the Special Master, purported to confirm that "neither Weil nor Evercore has had any engagements with any of the bidders that have participated since the start of the stalking horse period." JA9526 (Email).

Those representations were untrue.  It was only after Turkel's September 9, 2025, deposition that the extent of Weil and Evercore's entanglement with Elliott and the Bondholders came to light.  And those late-disclosed facts require disqualification under Section 455(a).  Given the clarity of Section 455's instruction to disclose all potential conflicts, it is entirely fair to infer that Weil and Evercore understood that the facts they had concealed would, if disclosed, give rise to precisely the perception of partiality that Section 455 guards against.

4.  None of the district court's reasons for refusing to disqualify the Special Master and his advisors under Section 455(a) is persuasive.

First, the court erred by dismissing the conflicts as immaterial on the theory that the sale process was "very public, reducing opportunities for mischief." JA10442 (Disqualification Opinion).  Weil and Evercore's deep and lucrative relationships with Elliott and the Bondholders were not public; they were concealed even from the parties and court, and much of the manipulation—like Saferstein's

54

interference—occurred behind the scenes. In all events, speculation that "the master would keep to the straight and narrow path" is not "a sufficient basis for holding special masters to a lesser standard of conduct." *Jenkins*, 849 F.2d at 630-31. It is *appearance* of impartiality, rather than "absence of actual bias," that matters. *Id.* at 631 (citation omitted).

Second, the court erred in concluding that the millions in fees earned by Weil and Evercore were not material because Weil and Evercore have "enormous annual revenues and a vast number of clients." JA10441 (Disqualification Opinion). "[T]here is no basis for creating separate disqualification rules for large firms even though the burden of complying with ethical considerations will naturally fall more heavily upon their shoulders." *Westinghouse Elec. v. Kerr-McGee*, 580 F.2d 1311, 1321 (7th Cir. 1978). Even more to the point, Weil's leadership obviously thought the fees the firm was earning, and hoped in the future to earn, from Elliott were material. After all, the co-chair of Weil's restructuring practice chastised his colleagues working for the Special Master because he feared their insufficient attention to Elliott's interests might jeopardize the firm's future Elliott revenues. And millions of dollars certainly are material to the individual lawyers to whom those fees would be credited (and to the junior partner working for those lawyers). Given the

undisputed proof that staying in Elliott's good graces was material to Weil, the district court's contrary view is hard to fathom.[11]

Third, the court erred in concluding that "de novo review" of the Special Master's work cleansed any taint arising from the conflicts. JA10454 (Disqualification Opinion). "[R]eview[ing] the Special Master's findings *de novo* does not solve the problem." *In re Brooks*, 383 F.3d 1036, 1045 (D.C. Cir. 2004); *see Jenkins*, 849 F.2d at 631. Just as a judge's "*de novo*" review of a "law clerk['s]" recommendation cannot provide "assurance against the biases of the clerk affecting the judgment of the court," the court's review here cannot absolve the advisors of their conflicts. *Brooks*, 383 F.3d at 1046; *see also Hall v. SBA*, 695 F.2d 175, 178-79 (5th Cir. 1983). Such review does not prevent the diminished confidence in the courts caused by conflicted judicial officers. *Litovich v. Bank of Am.*, 106 F.4th 218, 228 (2d Cir. 2024).

The potential for "the biases of the [advisor]" to "affect[] the judgment of the court," *Brooks*, 383 F.3d at 1045-46, is particularly acute here because the bidding process—indeed, the *bids* themselves—flowed directly from Weil's and Evercore's

---

[11] Judicial officers have been disqualified based on far less substantial interests. *See Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d Cir. 2003) (disqualifying judge whose shares were a negligible fraction of his assets and would not be "discernibl[y]" affected by the case).

conflicted decision-making. The court's role was limited to choosing between complex agreements of hundreds of pages, negotiated by the Special Master's conflicted advisors; in that context, de novo review could not possibly have remedied the conflicts. *See In re Kempthorne*, 449 F.3d 1265, 1271 (D.C. Cir. 2006) (bias in selecting options for decision-maker may "leave[] no trace in the record"). Put simply, Weil and Evercore took actions unmistakably suggesting that they wanted Elliott to prevail and the Bondholders to be paid off, and guided the Special Master's actions toward those aims. The court's approval of the sale cannot be disentangled from the Special Master's decisions about which bidders to present and how to present them.

### D. The Advisors' Relationships Also Constituted A Disqualifying Interest Under 28 U.S.C. § 455(b)(4).

The advisors' relationships with Elliott and the Bondholders also require disqualification under Section 455(b)(4), which prohibits judicial officers from having (1) "a financial interest … in a party to the proceeding," or (2) "any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4); *see Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 n.8 (1988) (disqualification regardless of size of interest). Here, the advisors had both, and those disqualifying conflicts are imputed to the Special Master as well.

1. The advisors had a prohibited "financial interest" in "part[ies] to the proceeding"—namely, Elliott and the Bondholders. Under Section 455(d)(4), such a "financial interest" arises from "a relationship as … adviser … in the affairs of a

party." Weil and Evercore indisputably serve as "advisers" to Elliott and the Bond-holders. *See, e.g.*, *Adviser*, *Black's Law Dictionary* (12th ed. 2024). As in *Kensington*, where the attorneys simultaneously advised the court and represented claimants in related litigation, 368 F.3d at 305, Weil and Evercore advised the Special Master while representing the very entities whose fortunes turned on his decisions.

The court thought it was free to disregard the disqualifying financial interest that both firms had in their clients' success because "[n]either Elliott nor the [Bond-holders] is a party to these proceedings." JA10457 (Disqualification Opinion). That was error. The ordinary meaning of "party" for "purposes" of "disqualification" is "a person interested in the litigation," which describes both Elliott and the Bond-holders. Party, *Ballentine's Law Dictionary* (3d ed. 2010). Both were unquestion-ably interested in the litigation. Elliott actually participated as a litigant below. It filed briefs, called witnesses, presented documentary evidence, and sought relief from the court, *e.g.*, JA9462 (Amber's Post-Trial Brief); JA13978 (10/21/25 Hearing Tr.), including by arguing during the sale hearing, JA9652 (Oral Order Regarding 10/21/25 Hearing). Indeed, a bidder that stands to acquire a multibillion-dollar en-terprise in a judicial sale would seem especially "included in the benefits and bur-dens of a judgment on an equal basis" with named parties. *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1310 (9th Cir. 1982) (citation omitted). That is doubtless why the court allowed Elliott to participate as a litigant. Removing any doubt, Elliott has

designated itself as a "respondent" before this Court, *In re Gold Reserve*, No.25-3091, Dkt.40, a step it could take only because it was one of the "parties to the proceeding" below, Fed.R.App.P. 21(a)(1).   The Bondholders are equally interested. The district court granted some intervention as of right, JA1888-1889 (12/12/19 Order), based on their "interest" in the litigation, Fed.R.Civ.P. 24(a)(2), and afforded them argument time during the sale hearing, JA9652 (Oral Order Regarding 10/21/25 Hearing).

2.   Weil and Evercore also had a disqualifying "interest that could be substantially affected by the outcome of the proceeding," 28 U.S.C. § 455(b)(4)—namely, continuing their lucrative client relationships with Elliott and the Bondholders. *See, e.g.*, *SCA Servs. v. Morgan*, 557 F.2d 110, 115 (7th Cir. 1977) (law-firm partner had "interest" that could be "substantially affected" where another lawyer at the firm represented a party to the litigation).

The district court dismissed those ongoing client relationships as "too 'remote, contingent, and speculative'" to merit disqualification.   JA10458 (Disqualification Opinion).   But no speculation was needed.   Weil itself thought its future fees depended on keeping Elliott happy in the sale process, which is why the co-head of its restructuring practice admonished his junior colleagues on the Special Master's legal team that he would "hate for [Elliott] to not want to work with us."   JA12760 (Email).

### E.    The VPs Promptly Sought Disqualification.

The district court held that the VPs' disqualification motion—first asserted six days after the revelations in Turkel's deposition—was untimely and waived. JA10419-10430 (Disqualification Opinion).  It was neither.

1. The district court erred in concluding that the Special Master's March 2025 disclosures to PDVH and CITGO put the VPs on notice of the relevant conflict-of-interest concerns.  JA10419-10427 (Disqualification Opinion).  To begin with, *neither the Republic nor PDVSA nor their counsel* received those disclosures because the Special Master's counsel designated them "Highly Confidential," so their objection could not possibly be untimely for this reason.  And for PDVH and CITGO, the key facts justifying disqualification only came to light after Turkel's September deposition—and the VPs sought disqualification days later.  JA10418, 10425 (Disqualification Opinion); JA13049 (9/15/25 Hearing Tr.); JA9464 (Motion to Disqualify).

The district court dismissed the new revelations as mere "details" on top of "the fact" that "Weil had represented Elliott."  JA10425 (Disqualification Opinion).  They were anything but.  Before September 2025, the VPs had no way of knowing that Weil and Elliott were building a relationship beyond the single isolated past transaction previously disclosed, or that Weil was *continuing* to open new matters with Elliott and the Bondholders.    JA12832, 12859-12894 (Emails, Tables); JA12125-12129 (Turkel testifying to Evercore representation "kicking off"); *cf.*

Model Rules of Pro. Conduct r. 1.8-1.9 (A.B.A. 1983) (distinguishing current and former clients). Instead, as late as September 4, Weil falsely represented that "neither Weil nor Evercore has had any engagements with any of the bidders that have participated since the start of the stalking horse period." JA9526 (Email).

The district court also sought to shift the blame to PDVH and CITGO by accusing them of insufficient precision because their discovery requests sought information only about engagements with each "bidder," rather than with any "bidder, including its affiliates." JA10420-10425 (Disqualification Opinion). But the affiliates *were* bidders: Elliott's bids (on behalf of its *affiliate* Amber) defined the party who "would acquire" the shares as Elliott Investment Management L.P. "*with its affiliates.*" JA10293 (Proposal Letter); JA8603 (Proposal Letter) (emphasis added). More importantly, it was "improper[]" to "place[] the burden on" the VPs "to uncover" the advisors' dealings with Elliott and the Bondholders, rather than on the advisors "to disclose possible grounds for disqualification." *Kensington*, 368 F.3d at 313. Weil and Evercore had a statutory duty as judicial officers to identify and disclose potential conflicts whether or not the VPs expressly sought that information in discovery. 28 U.S.C. § 455(c), (e). It was therefore especially inappropriate to allow Weil and Evercore to respond to the PDVH/CITGO discovery requests the way a hyperaggressive private litigant might, and it was equally inappropriate for the court to bless that behavior. The VPs had every right to assume that, as judicial

officers, the Special Master's team, Weil, and Evercore would disclose what Section 455 requires. Blame for any timing issue lies at the feet of the Special Master and his advisors.

Finally, even if there were a timeliness concern, this Court has refused to let "the issue of timeliness trump … the principles of § 455(a)" where, as here, there is no indication of an "abuse of § 455(a) procedure." *Kensington*, 368 F.3d at 316-17 (20-month delay). While the district court hypothesized that the VPs had an "incentive" to "delay," it expressly made no "finding[s]," and identified no evidence at all, suggesting that the VPs held the disqualification issue in reserve. JA10427 (Disqualification Opinion). They did not. The Special Master's incomplete March 2025 disclosures—which only PDVH and CITGO had access to in the first place—did not disclose conflicts that would have required disqualification under Section 455. Concealment of the conflicts, not VP gamesmanship, explains why the VPs did not move until the Turkel deposition revealed that the Special Master and his team had been keeping them in the dark.

2. The court also erred in finding waiver. The court recognized that a Section 455(b)(4) objection cannot be waived and that any waiver argument would apply, at most, to the Section 455(a) issue. JA10427 (Disqualification Opinion); *see* 28 U.S.C. § 455(e). But regardless, the court's theories of waiver both fail.

First, Section 455(e) limits when "waiver may be accepted." 28 U.S.C. § 455(e). Waiver is proper only after "a *full disclosure on the record* of the relevant facts," *United States v. Nobel*, 696 F.2d 231, 236 (3d Cir. 1982) (emphasis added), and "*affirmative consent*" to the "participat[ion] or influence" of "conflicted advisors," *Kensington*, 368 F.3d at 311; *see also* Fed.R.Civ.P. 53(b)(3)(B) (waiver of special master's disqualification permitted only upon court approval after receiving sworn conflict disclosures). Those requirements were never satisfied here. The March 2025 disclosures fell well short of what Section 455(e) demands. And the VPs, who "only discovered later" the advisors' extensive and ongoing business relationships, *Kensington*, 368 F.3d at 307, could not have knowingly consented to those conflicts.

Second, the Special Master's "retention agreements with his Advisors," which allowed "the Advisors to represent—in unrelated matters—entities that were, are, or might become involved in this Sale Process," JA10428 (Disqualification Opinion), do not effectuate a waiver. As the court noted, "Weil's retention letter was not shared with" the VPs, so they could not have had actual knowledge of its contents. *Id.* n.10. The court tried to paper over that problem with the remarkable holding that the VPs had "constructive knowledge" of Weil's conflicts because "[r]easonable attorneys should have expected" such an arrangement. *Id.* To the contrary, reasonable

63

attorneys would assume that judicial officers would scrupulously avoid such conflicts because of the obvious risks they would pose to the integrity of the judicial proceedings. In all events, "nothing short of actual knowledge" suffices. *Kensington*, 368 F.3d at 314-15.

As for Evercore, although its retention letter was at least public, JA10428 (Disqualification Opinion), the VPs never consented to the letter's boilerplate attempt to prospectively immunize future conflicts, *see Kensington*, 368 F.3d at 311. In fact, the VPs objected to Evercore's engagement, JA10428 (Disqualification Opinion), because the letter disclosed a contingency arrangement tied to the sale outcome that constituted a "conflict of interest," JA2738-2739 & n.1 (VPs' Response to Proposed Order). The court faulted the VPs for not *also* objecting to Evercore's "'current[]' and 'future'" relationships with involved entities. JA10429 (Disqualification Opinion). But that silence cannot reasonably be treated as informed consent given that Evercore concealed the relevant facts about its financial interests.

Finally, even if consent to a judicial officer's conflicts could be derived from a generic prospective waiver coupled with only constructive knowledge, the absence of screening procedures would preclude waiver here. Evercore's purported advance waiver expressly required "customary information barriers" to be "created and maintained." JA3261 (Proposed Engagement Letter). Those safeguards are what any "[r]easonable attorneys should have expected" in Weil's engagement as well.

JA10428 n.10 (Disqualification Opinion); *e.g.*, Model Rules of Pro. Conduct r. 1.0(k). But Weil admitted that "no ethical screens exist in connection with Weil's representation of the Special Master," JA9708 (Letter), and multiple Weil lawyers representing Elliott or the Bondholders represented the Special Master too, JA12833-12845, 12895-12909 (Tables). Evercore also provided no evidence it ever instituted any screens, even though its employees worked for both the Special Master and the Bondholders. JA8970 (Status Report); JA8985 (Status Report); JA12917-12922 (Tables); JA10394 (Disqualification Brief). The VPs could not have anticipated that the advisors would maintain "no ethical screens" at all, JA9708 (Letter); JA12912 (Letter), and thus they could not have consented to these compromised proceedings.

### F.    The Sale Order Must Be Vacated.

Because the Special Master and his advisors "should have been recused" from these proceedings, "any work produced" by them "must also be 'recused'—that is, suppressed." *Kempthorne*, 449 F.3d at 1269 (citation modified). "[O]nly suppression can ensure neither the [parties] nor the [Court] will rely" on their work "in the future, to the detriment of the 'public's confidence in the judicial process.'" *Id.* at 1272 (citation omitted). Here, the Special Master's recommendations—the product of "input" from his advisors "received *ex parte* and therefore untested by the adversary process," *id.* at 1271—determined the entire sale process. That created risks of

"injustice to the parties," "injustice in other cases" (including by encouraging advisors not to "promptly disclose" conflicts), and "undermining" of "the public's confidence in the judicial process." *Selkridge*, 360 F.3d at 171 (citation omitted). And for the reasons explained above, the district court's de novo review cannot eliminate the conflicts' harmful effects. *See* pp. 56-57, *supra*.

## III.   DEFECTS IN THE SALE PROCESS REQUIRE VACATUR.

The Special Master's conflicted process, which favored Elliott and the Bondholders at the expense of the junior creditors and the VPs, unsurprisingly involved significant errors and resulted in a sale price far lower than could otherwise have been obtained. That is yet another reason to vacate the final order.

Delaware law, which governed the sale, requires that attached shares be "sold at public sale to the highest bidder." 8 Del. C. § 324. The district court erred by approving the sale at a grossly inadequate price—and that shortfall was the foreseeable consequence of material and avoidable defects in the process. A properly conducted sale process would very likely yield a higher price.

### A.    Standard Of Review.

An order confirming a forced sale pursuant to Delaware law is reviewed for abuse of discretion. *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994).

**B.    The Sale Price Is Grossly Inadequate.**

1.  A forced sale should be "set aside" "when the sales price is so *grossly* inadequate that it shocks the conscience of the court." *Id*. at 419.  "If the fair market value of the property is over twice the sales price, the price is considered to be grossly inadequate, shocking 'the conscience of the court,' and justifying the setting aside of the sale." *Id.* (citation omitted).  "[M]arket value" is "commonly understood" to be "the very *antithesis* of forced-sale value," *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537-38 (1994), because market value is "the price which would be agreed upon by a *willing seller* and a willing buyer," *Poole v. N.V. Deli Maatschappij*, 243 A.2d 67, 70 n.1 (Del. 1968) (emphasis added).  The 50% rule of thumb thus recognizes "the realities of forced sale" by assuming the attainable forced-sale price may be "substantially below the fair market value"—but it also sets a floor to ensure fairness to the judgment debtor and creditors.  *Girard Tr. Bank v. Castle Apartments*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977).

2.  The $5.892 billion sale price is grossly inadequate because it is far less than 50% of the fair market value of the PDVH shares, and in all events it shocks the judicial conscience.  At the process's outset, the Special Master's own advisor, Evercore, valued CITGO at $13.2 billion, using the DCF methodology favored by this Court and Delaware courts.  JA295-296, 372 (Sale Opinion).  The VPs' expert valued CITGO at $18.6 billion.  JA352.  But even using just Evercore's valuation,

Elliott's bid represents just 44% of fair market value. That fails the "50% test" and is "grossly inadequate" under Delaware law, "justifying the setting aside of the sale." *Burge*, 648 A.2d at 419.

The court dismissed the vast shortfall by attacking Evercore's valuation as "outdated" and purportedly "contain[ing] errors." JA372 (Sale Opinion). In so doing, the court followed the Special Master's lead; after the $5.892 billion Elliott bid came in, he disavowed Evercore's valuation at the sale hearing. JA9584-9585 (Post-Hearing Response Brief). If the Special Master viewed the valuation as outdated or inaccurate, he should have directed Evercore to update it, but he did not. Moreover, the court never explained what those "errors" consisted of, except to assert that CITGO underperformed Evercore's earnings projections in 2023-25. JA372. A business's value, however, does not automatically decline with earnings, particularly in cyclical industries, and Evercore's own analyses show that refining-company values have been steady or *increased* since Evercore's valuation, even as those companies suffered similar earnings declines. JA10591-10648. In all events, the Special Master's disavowal of his own valuation to push through his preferred Elliott bid is yet another indication of a badly conflicted process.

3. Even accepting the district court's "conclu[sion] that the fair market value of the PDVH Shares is under $10 billion," JA390 (Sale Opinion), the sale price still shocks the conscience. Even when the price is "not grossly inadequate under the

50% test," courts may deem it "grossly inadequate" and "set aside" a sale. *Burge*, 648 A.2d at 419. Here, under any valuation, Elliott's bid is *billions* of dollars below fair market value—a shortfall greater than the total value of many large corporations. No court has ever approved that sort of breathtaking deficit. The district court itself noted that CITGO is a functioning, solvent, multibillion-dollar company whose value is in "a different galaxy than the values of the properties typically at issue in one of these sales." JA396-397. But the court drew the wrong inference from that observation. The sale's astonishing destruction of value renders the price grossly inadequate without regard to the 50% rule of thumb.

Moreover, CITGO is the crown jewel of a foreign sovereign in the throes of humanitarian, political, and economic crises. JA421 (Sale Opinion). It unquestionably shocks the conscience to approve a fire sale that destroys billions of dollars of value for a foreign sovereign and its people.

### C.    The Grossly Inadequate Sale Price Is The Inevitable Consequence Of Errors In The Sale Process.

Delaware courts reject a forced sale where "there was 'some defect or irregularity in the process or mode of conducting the sale'" that prejudices interested parties. *Burge*, 648 A.2d at 419 (citation omitted). Here, the court and the conflicted Special Master committed grave, prejudicial errors—including legal errors—in designing and implementing the sale process.

1. First, the court and Special Master did not run a "public sale," as required by Section 324—which had the effect of further weakening bids and, ultimately, the sale price. "The key element … in a public sale is the opportunity for competitive bidding." *Shields v. Bobby Murray Chevrolet, Inc.*, 261 S.E.2d 238, 240 (N.C. Ct. App. 1980). That is the very point of requiring a public sale. *Porter v. Graves*, 104 U.S. 171, 173 (1881).

Notwithstanding Section 324's clear mandate, the district court and Special Master implemented a process in which the "terms of each bid"—namely, the *price*—"were not disclosed" to bidders. JA388 (Sale Opinion). "A sale by sealed bids is not a public sale." *Offredi v. Huhla*, 60 A.2d 779, 781 (Conn. 1948). That approach denied bidders the price information necessary to compete head-to-head during each bidding round, which inevitably suppressed the sale price.

The court attempted to justify the sealed bids by asserting that the sale was nonetheless "public" because participants "knew" that bids would be confidential; the VPs "were offered access to all bids" as long as they gave up "their right to put in their own bid later in the process"; "the process of selling a company like CITGO is simply too multifaceted and complex" to "allow every detail of every bid to be made publicly-available"; and the Special Master's recommendations were public, such that a bidder could offer an unsolicited bid after seeing the recommended bid.

JA388 (Sale Opinion).  Those are non sequiturs.  Of course the sale process necessarily involved certain confidential information—but the court did not explain why bid *prices* had to be kept confidential from other bidders.  Indeed, that the court thought the sale was too "complex" to comply with Delaware law's value-maximizing public-sale requirement only confirms that the sale process was not designed to maximize value.  And the public nature of the Special Master's recommendations hardly solved the problem, as the secrecy prevented competition *during* bidding rounds, thereby lowering the bids from which the Special Master chose his recommended bid.

2.  The court also violated Section 324(a)'s requirement that the shares be "sold … to the highest bidder."  That straightforward command ensures that the sale "satisf[ies] the debt" to the greatest extent possible.  *Id.*  Yet after finding that Gold Reserve's "$7.9 billion" bid was "[t]he highest-priced Qualified Bid" and was "capable of being timely consummated," the court chose Elliott's $5.892 billion bid, thereby sacrificing over $2 billion in payments to creditors (and concomitant discharges of the VPs' debts).  JA321-322, 353 (Sale Opinion).  Although Gold Reserve's bid raised other concerns, the court's justifications for deviating from the highest-bid requirement do not pass muster.

First, the court asserted that Gold Reserve's bid lost "committed financing" after the court allowed the Special Master to choose his advisors' client Elliott instead.  JA407-410 (Sale Opinion).  But Section 324's requirement to choose the "highest bidder" would be toothless if it could be evaded by such circular reasoning.

Second, the court asserted that Elliott's bid "is the best bid" because of its "high degree of closing certainty," "[l]argely as a result of" Elliott's agreement to pay "$2.125 billion to the Bondholders."  JA413-415 (Sale Opinion).  But Section 324 required the court to select the "highest" bid, not the "highest *and best* bidder" (a standard used in *other* statutes).  *Cf., e.g.*, 9 Del. C. §§ 8753, 4535.  That distinction is "significant[]," *State ex rel. King v. Lyons*, 248 P.3d 878, 896 (N.M. 2011), and indicates that the court should have focused on "the largest amount bid" by price, *Johnson v. Craddock*, 365 P.2d 89, 95 (Or. 1961); *see United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).

Even assuming the court could consider bid characteristics beyond price, the court failed to perform any meaningful analysis.  The court asserted that the "expected value" of Elliott's bid was greater than that of Gold Reserve's.  JA349 (Sale Opinion).  But to compare expected values, the court would have had to "discount" the price of each "by the probability" that it would not close.  *In re Xonics Photochem., Inc.*, 841 F.2d 198, 200 (7th Cir. 1988); *see In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996); JA350.  Rather than do so, the court simply asserted that the

closing probability of Gold Reserve's bid was "much lower than 75%" (without specifying the number), such that the expected value of Elliott's bid is "clearly greater" (without specifying its closing probability). JA351 n.9. Such vague, un-quantifiable assertions cannot justify a two-billion-dollar difference in price.

3. The district court and Special Master also placed undue emphasis on the Bondholders throughout and failed to resolve the resulting bid-depressing uncertainties.

The validity of the Bondholders' interest in CITGO Holding is hotly contested in the Bondholder litigation. But despite making resolution of the Bondholders' contested claims a de facto requirement of the sale process, JA398 (Sale Opinion); *see* pp. 11-12, *supra*, the court and Special Master refused to wait for the Notes' validity to be adjudicated. JA417-418; *see Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 209 (1865) ("postpon[ing] the sale" may be appropriate when circumstances are "likely" to reduce value). That decision forced bidders to "bet[]" on whether the Notes would be upheld, JA416, even as the Special Master and his advisors—who received *tens of millions* of dollars in fees from Bondholders and affiliates—insisted that bids propose a settlement with the Bondholders. JA9594-9602 (Post-Hearing Response Brief). As the Special Master himself admitted, that kept bidders away, further depressing the sale price. JA9584, 9589-9591.

Ultimately, Elliott offered a bid that diverted over $2 billion to the Bondholders. JA416 (Sale Opinion). That bid, as the court acknowledged, could represent a "fundamental injustice" if the Bondholders' interest is invalid. JA5878-5879 (Stalking Horse Order); JA344 (Sale Opinion). But the court nonetheless approved the sale to Elliott, even knowing that the Southern District's decision in the Bondholders' favor is subject to de novo, expedited appellate review. If the Second Circuit holds the Notes invalid, allowing Elliott's bid to close would (as the court put it and as several creditors argued) "unjustly transfer $2.125 billion to holders of invalid Bonds, money that could and should be used to pay more" creditors. JA416; Dkt.2366_at_14; Dkt.2240_at_2. And if the Notes are invalid, the court's justification for approving the lower Elliott bid—greater "closing certainty," JA413-414—evaporates. This Court should therefore consider the Second Circuit's forthcoming decision in evaluating Elliott's grossly inadequate bid. *Cf. United States v. Wilson*, 601 F.2d 95, 98-99 (3d Cir. 1979).

### D.    Rerunning The Sale Process Likely Would Yield A Higher Bid.

When "gross inadequacy is established, the Court is usually justified in inferring that a resale would correct the situation." *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947). That inference is amply warranted here given the disqualifying conflicts of interest and the many errors that plagued the sale process and contributed to the grossly inadequate price. In addition,

a new process could not only improve bids by avoiding prior mistakes, but would also occur after the Bondholder litigation is resolved, lifting a major cloud of uncertainty.

## CONCLUSION

The sale order should be vacated and the case remanded for further proceedings.

Dated:  January 8, 2026                    Respectfully submitted,

                                           */s/ Donald B. Verrilli, Jr.*
George M. Garvey                           Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP                 Elaine J. Goldenberg
350 South Grand Avenue                     Ginger D. Anders
  50th Floor                               Xiaonan April Hu
Los Angeles, CA 90071                      Kyle A. Schneider
(213) 683-9100                             Nicole R. Allicock
                                           Andrew J. Slottje
                                           MUNGER, TOLLES & OLSON LLP
                                           601 Massachusetts Ave. NW
                                             Suite 500E
                                           Washington, DC 20001-5369
                                           (202) 220-1100
                                           Donald.Verrilli@mto.com

                                           *Counsel for the Bolivarian Republic of
                                           Venezuela*

Joseph D. Pizzurro                         Nathan P. Eimer
Kevin A. Meehan                            Daniel D. Birk
Juan O. Perla                              EIMER STAHL LLP
CURTIS, MALLET-PREVOST,                    224 South Michigan Avenue
COLT & MOSLE LLP                           Suite 1100
101 Park Avenue                            Chicago, IL 60604
New York, NY 10178                         (312) 660-7600
(212) 696-6000                             NEimer@eimerstahl.com
jpizzurro@curtis.com
                                           *Counsel for PDV Holding, Inc., and
*Counsel for Petróleos de Venezuela,       CITGO Petroleum Corporation*
S.A.*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this Brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: January 8, 2026                    Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Counsel for the Bolivarian Republic
of Venezuela

77

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) as modified by this Court's December 19, 2025 Order (25-3347 Dkt.136), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 16,988 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

3.     The electronic copy of the Brief has been scanned for viruses and none were detected.

4.     The text of the electronic copy of the Brief is identical to the text in the paper copies.

Dated: January 8, 2026              Respectfully submitted,

                                    */s/ Donald B. Verrilli, Jr.*
                                    Donald B. Verrilli, Jr.
                                    Counsel for the Bolivarian Republic
                                    of Venezuela

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2026, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.


Dated: January 8, 2026                   Respectfully submitted,

                                         */s/ Donald B. Verrilli, Jr.*
                                         Donald B. Verrilli, Jr.
                                         Counsel for the Bolivarian Republic
                                         of Venezuela

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that the text of the electronic Brief filed through the CM/ECF system is identical to the text in the paper copies dispatched on January 8, 2026, by Federal Express Overnight delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.


Dated: January 8, 2026                    Respectfully submitted,

                                          */s/ Donald B. Verrilli, Jr.*
                                          Donald B. Verrilli, Jr.
                                          Counsel for the Bolivarian Republic
                                          of Venezuela