Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453, 25-3494,
25-3563, 25-3564

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL CORPORATION, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the District of Delaware

# BRIEF FOR APPELLEE AMBER ENERGY INC.

ANDREW J. ROSSMAN
SUSHEEL KIRPALANI
DAVID M. COOPER
OWEN ROBERTS
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016

JOHN BASH
MATTHEW R. SCHECK
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701

PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JEFFREY C. THALHOFER*
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Amber Energy Inc.*
*(additional counsel on inside cover)*

February 9, 2026

MICHAEL A. BARLOW
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, DE 19801

ROY T. ENGLERT, JR.
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW
Washington, DC 20006

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Amber Energy Inc. hereby certifies as follows:

Amber Energy Inc. is wholly owned by funds affiliated with Elliott Investment Management L.P.  There is no publicly held corporation that owns 10% or more of Amber's stock.  Amber is not the parent of any publicly owned company, and does not own 10% or more of the outstanding shares of any publicly owned company.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................. v

INTRODUCTION ................................................................................................. 1

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................. 4

STATEMENT OF THE CASE................................................................................ 4

    A.   The Attachments............................................................................... 4

    B.   The Sale Process............................................................................... 6

    C.   The Disqualification Motions......................................................... 10

    D.   The Sale Hearing ............................................................................ 12

    E.   The District Court's Decisions ....................................................... 14

           1.   The district court denies the disqualification motions............. 14

           2.   The district court approves Amber's bid.................................. 16

SUMMARY OF ARGUMENT.............................................................................. 18

ARGUMENT ....................................................................................................... 21

I.      The District Court Did Not Abuse Its Discretion In Attaching The
      Shares ...................................................................................................... 21

    A.   Standard of Review ........................................................................ 21

    B.   The District Court Correctly Rejected the VPs' State-Law
         Argument as Barred by Collateral Estoppel and Untimely................ 21

    C.   The District Court Correctly Concluded That Federal Law
         Governs the Alter-Ego Inquiry for All Aspects of Execution ........... 24

           1.   Federal law controls whether a foreign sovereign and its
               instrumentality are alter egos .................................................. 24

2.    Rule 69 confirms that federal common law controls whether a foreign sovereign and its instrumentality are alter egos for *all* aspects of execution ...................................... 28

II.    The District Court Did Not Abuse Its Discretion In Denying Appellants' Disqualification Motions ........................................................ 32

   A.    Standard of Review ........................................................................... 32

   B.    The District Court Did Not Abuse Its Discretion in Denying the Disqualification Motions as Untimely and Waived ..................... 32

   C.    The District Court Did Not Abuse Its Discretion in Denying the Disqualification Motions on the Merits ....................................... 38

      1.    The district court did not abuse its discretion in concluding that the impartiality of the Special Master and his advisors could not reasonably be questioned .............. 38

      2.    The district court did not abuse its discretion in concluding that the Special Master and his advisors had no disqualifying interest ............................................................ 42

   D.    Disqualification Would Not Affect the Sale Order ............................ 43

III.    The District Court Properly Carried Out The Years-Long Sale Process ................................................................................................ 45

   A.    Standard of Review ........................................................................... 45

   B.    The District Court and the Special Master Ran a Fair, Transparent, and Exhaustive Public Sale ........................................... 45

   C.    The District Court Acted Well Within Its Discretion in Selecting Amber's Bid ...................................................................... 46

      1.    The district court did not abuse its discretion in considering both price and likelihood of closing .................... 47

      2.    The district court did not abuse its discretion in rejecting Gold Reserve's bid because it faced a significant likelihood of not closing and was ultimately not viable .................................................................................... 48

3.      The district court did not abuse its discretion in concluding that the combination of price, value, and certainty in Amber's bid made it superior to Gold Reserve's bid ........................................................................ 51

4.      The district court correctly found that the 50% test does not apply and is easily satisfied here in any event ................... 54

D.      The District Court Did Not Abuse Its Discretion in Rejecting Appellants' Requests for More Delay ....................................................... 56

CONCLUSION ................................................................................................. 57

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011) .......................................................................32

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)........................................................................24

*Burge v. Fidelity Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) ...............................................................54

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  333 F.Supp.3d 380 (D. Del. 2018) ............................................... 4, 22

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) .......................................................... *passim*

*Deibler v. Atl. Props. Grp., Inc.*,
  652 A.2d 553 (Del. 1995) ............................................................ 54, 56

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009).........................................................26

*Edmondson v. Lilliston Ford Inc.*,
  2024 WL 5155557 (3d Cir. Dec. 18, 2024) .....................................21

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
  12 F.3d 1270 (3d Cir. 1993)............................................................25

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983)..................................................................... *passim*

*Fletcher v. Conoco Pipe Line Co.*,
  323 F.3d 661 (8th Cir. 2003)...........................................................38

*Geyer v. Ingersoll Publ'ns Co.*,
  621 A.2d 784 (Del. Ch. 1992)..........................................................29

*Girard Tr. Bank v. Castle Apartments, Inc.*,
  379 A.2d 1144 (Del. Super. Ct. 1977) .......................................... 54, 56

*Goldman Sachs & Co. v. Athena Venture Partners, L.P.*,
   803 F.3d 144 (3d Cir. 2015) .................................................37

*Hercaire Int'l, Inc. v. Argentina*,
   821 F.2d 559 (11th Cir. 1987) ..............................................31

*In re Cap. One 360 Sav. Acct. Int. Rate Litig.*,
   2024 WL 3463952 (E.D. Va. July 18, 2024) .......................42

*In re Kensington Int'l, Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ......................................... *passim*

*In re Placid Oil Co.*,
   802 F.2d 783 (5th Cir. 1986) ...............................................42

*In re Sch. Asbestos Litig.*,
   977 F.2d 764 (3d Cir. 1992) ................................................44

*Jones v. Pitt. Nat'l Corp.*,
   899 F.2d 1350 (3d Cir. 1990) ..............................................41

*Lewis v. United Joint Venture*,
   691 F.3d 835 (6th Cir. 2012) ...............................................21

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988) ....................................................... 43, 45

*Mackey v. Lanier Collection Agency & Serv.*,
   486 U.S. 825 (1988) .............................................................30

*Martin v. Monumental Life Ins. Co.*,
   240 F.3d 223 (3d Cir. 2001) ................................................38

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   73 F.4th 157 (3d Cir. 2023) .................................................22

*Peacock v. Thomas*,
   516 U.S. 349 (1996) .............................................................28

*Rubin v. Islamic Republic of Iran*,
   583 U.S. 202 (2018) .............................................................27

*Selkridge v. United of Omaha Life Ins. Co.*,
  360 F.3d 155 (3d Cir. 2004) .......................................................... 44, 45

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
  531 U.S. 497 (2001) ........................................................................ 32

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ........................................................................ 24

*TMR Energy Ltd. v. State Prop. Fund*,
  411 F.3d 296 (D.C. Cir. 2005) ........................................................ 26

*United States v. Ciavarella*,
  716 F.3d 705 (3d Cir. 2013) ............................................................ 32

*United States v. Hallinan*,
  75 F.4th 148 (3d Cir. 2023) ............................................................ 46

*United States v. Nobel*,
  696 F.2d 231 (3d Cir. 1982) ............................................................ 36

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
  965 F.2d 1375 (5th Cir. 1992) ........................................................ 25

*Weinstein v. Islamic Republic of Iran*,
  831 F.3d 470 (D.C. Cir. 2016) ........................................................ 29

*Wolverine World Wide, Inc. v. Am. Ins. Co.*,
  2019 WL 11680205 (W.D. Mich. May 9, 2019) .............................. 42

**Statutes and Rule**

8 Del. C. §324(a) .................................................................................. 47

28 U.S.C. §1610(b) .............................................................................. 30

28 U.S.C. §455(b)(4) ...................................................................... 42, 43

Fed. R. Civ. P. 69(a)(1) ................................................................ 28, 29, 30

**Other Authorities**

Dep't of the Treasury, General License No. 5 (July 19, 2018),
  https://perma.cc/PJ3W-QT8Q ........................................................ 51

Executive Order 13835 (May 21, 2018),
     https://perma.cc/EUV6-RDCY ............................................................51

Letters, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
     No. 1:17-mc-00151-LPS (D. Del.), Dkt. 2585, 2594, 2611, 2619 ....................53

**INTRODUCTION**

After more than eight years of litigation, four appeals, four mandamus petitions, a sale process involving outreach to over 100 bidders, and a five-day hearing with live testimony, the district court issued a 162-page opinion and order approving the sale of the shares of PDV Holding, Inc. ("PDVH"), the indirect parent of Citgo Petroleum Corporation ("CITGO"), to Amber Energy Inc. ("Amber"). That order is the result of countless hours of work by the court and the parties, and a crucial step toward partial satisfaction of the immense judgments Venezuela owes its creditors. Dozens of parties participated in "one of the most, if not the most, widely publicized judicial sales ever held," where "[e]very move by the Special Master was scrutinized," and "[e]very party had ample opportunity to object." JA.10443. The district court found that Amber's bid not only delivered the greatest combination of price and certainty, but was the only viable bid. The attempts by appellants—recalcitrant debtors (the Venezuela parties, or "VPs") and non-viable bidders (Gold Reserve Ltd. ("Gold Reserve") and XYQ US, LLC ("XYQ"))—to undo the entire process and force everyone to start from scratch are meritless.

In 2017, Appellee Crystallex International Corporation ("Crystallex") initiated this proceeding to satisfy its confirmed $1.2 billion judgment against Venezuela by attaching and selling the shares of PDVH. PDVH is a wholly owned subsidiary of Venezuela's state-owned alter ego Petróleos de Venezuela S.A.

1

("PDVSA").  After extensive litigation, the district court granted the writ of attachment, this Court affirmed, and the Supreme Court denied certiorari.  The district court, assisted by a Special Master recommended by the VPs, then conducted a sale of the attached shares to satisfy approximately $20 billion of judgments registered by Crystallex and other creditors.  After years of work, the court approved the sale of the shares to Amber in late 2025, bringing the creditors one step closer to obtaining at least partial satisfaction of their massive judgments.

The district court came nowhere near abusing its discretion in approving that sale order.  The VPs, which have resisted this effort to satisfy adjudicated debts at every turn, first try to relitigate the attachment, contending that the court should have applied Delaware rather than federal law to determine whether Venezuela and PDVSA are alter egos for execution purposes.  That argument is collaterally estopped by this Court's decision affirming the attachment.  It is also untimely, as the VPs failed to raise it when the district court asked them to identify their remaining challenges to the attachment.  And it is wrong, as precedent confirms that federal law controls whether a foreign sovereign and its instrumentality are alter egos in this context, as in all others.  The overriding federal interest that the Supreme Court has held compels application of federal law when a United States court assesses liability and immunity from jurisdiction and execution in this sensitive foreign-relations context does not disappear when it comes to effectuating execution.

2

To the contrary, there would be little point in applying a federal test for those antecedent inquiries if the differing laws of 50 states would supersede it when it comes time to execute the judgment that federal law permits.

Appellants next contend that the district court abused its discretion in denying their fourth and fifth motions to disqualify the Special Master and his advisors. But the court did not err, let alone abuse its discretion, in finding Appellants' latest disqualification motions—filed on the eve of the sale hearing—untimely, largely waived, and meritless. Despite explicit instructions to raise any further disqualification issues within days at most, Appellants waited (at least) six months after learning of the purported conflicts to seek disqualification, rendering their arguments untimely and largely waived. And the court was well within its discretion to conclude that the purported conflicts—that the firms at which the Special Master's advisors work represent parties to the sale process in wholly unrelated matters—provide no basis for disqualification of any advisor, let alone for disregarding the district court's independent rulings and forcing the parties to redo the entire sale process.

Finally, Appellants' challenges to the sale itself afford no reason to discard years of painstaking work. The district court ran a fair, transparent, and thorough public sale that included dozens of rounds of briefing and argument and culminated in a meticulous opinion endorsing Amber's bid. Appellants cannot overturn that

3

opinion by second-guessing the court's assessment of competing bids (including its dispositive finding that Gold Reserve's bid was not even viable), or by inventing rigid state-law requirements for judicial sales that Delaware law does not impose. This Court should affirm.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Amber adopts the VPs' statement of related cases and proceedings. *See* VP.Br.2-3.

## STATEMENT OF THE CASE

### A.    The Attachments.

In June 2017, Crystallex registered a $1.2 billion judgment against Venezuela. JA.1456. Crystallex alleged that Venezuela and PDVSA were alter egos, and moved to attach PDVSA's shares of PDVH, a Delaware corporation that owns CITGO. JA.1458; JA.268. PDVSA intervened and moved to dismiss.

The district court denied PDVSA's motion to dismiss and granted Crystallex's motion to attach the shares. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F.Supp.3d 380 (D. Del. 2018) ("*Crystallex I*"). Applying federal law set out in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), to determine whether Venezuela and PDVSA were alter egos "for purposes of either jurisdiction or attachment and execution," the court agreed that they were and granted the writ of attachment. *Crystallex I*, 333 F.Supp.3d at 396; *see id.* at 424.

This Court affirmed.  The Court first explained that it had two distinct sources of jurisdiction: "jurisdiction to review the District Court's denial of PDVSA's motion to dismiss as an immune sovereign … under the collateral order doctrine," and jurisdiction to review "the grant of Crystallex's motion for a writ of attachment" "because it amounted to a final judgment."  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 136 (2019) ("*Crystallex II*").  The Court then held that federal law applies both to "the shifting of substantive liability" and "to extend[ing] a district court's jurisdiction over a foreign sovereign to reach an extensively controlled instrumentality."  *Id.* at 138.  Accordingly, "so long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country."  *Id.* at 139.  The Court readily concluded that Venezuela and PDVSA are alter egos and "affirm[ed]" the issuance of the writ of attachment, *id.* at 152, leaving "nothing left to do but execute," *id.* at 136.

Dozens of other creditors registered their own judgments and moved for writs of attachment.  JA.285.  The district court allowed them to participate in the sale process and established a priority "waterfall," ultimately totaling over $20 billion in unpaid judgments.  JA.288; JA.4189; JA.4392-94.

## B.     The Sale Process.

1.  Selling an unwilling sovereign's multi-billion-dollar refining business is an inherently complex task, and the court faced particular challenges here.  First, the VPs are not only unwilling sellers, but aggressive litigants bent on "resist[ing] the sale" at every turn.  JA.10465.  They launched four separate efforts to disqualify the Special Master, *see infra* pp.10-12, filed five separate appeals from these consolidated cases, and objected to every bid the Special Master recommended. Second, certain PDVSA bondholders (the "2020s") hold roughly $3 billion in PDVSA debt that is senior to the creditors in this proceeding because it is secured by a pledged 50.1% of the shares in CITGO Holding—a PDVSA subsidiary closer than PDVH to CITGO in the organizational structure.  The 2020s thus could—and did—threaten to block any sale of PDVH's shares.  JA.13115-16.  Third, other judgment creditors brought collateral cases ("Alter Ego litigation") seeking to hold PDVH itself directly liable for Venezuela and PDVSA's debts, which far exceed PDVH's or CITGO's value.  JA.4550-51.

Given the complexity involved, all (including the VPs) agreed that the sale would require an experienced special master.  The VPs recommended Robert Pincus as "uniquely qualified" for the job, and the district court appointed him.  JA.9328. Pincus's role was not "adjudicative," JA.10454; it was "to assist with the sale," JA.2427.  The district court decided all aspects of the sale de novo.  JA.10454.  To

ensure fairness and transparency, the court also designated "Sale Process Parties"—Crystallex, PDVSA, PDVH, CITGO Holding Inc., and ConocoPhillips—that could consult with the Special Master and be heard by the court on every significant decision. JA.295; JA.307.

2.  In May 2021, the court approved the Special Master's retention of the firms Weil, Gotshal & Manges ("Weil") and Evercore Group L.L.C. ("Evercore") as advisors. The Special Master and his advisors—with the court's close supervision—designed a process to sell the shares at a public sale. JA.1685; JA.13158-59; JA.382. The Special Master proposed a Sale Procedures Order ("SPO") in August 2021, which was thoroughly litigated until the district court entered the sixth revised proposed SPO in October 2022. JA.3276-80; JA.10827. The SPO directed the Special Master to market the shares, solicit bids, select the best one, and advise the court on whether to approve that bid. JA.3276.

3.  The sale was extensively marketed. As the VPs' own expert conceded, "everybody out there in the world who would want to know about this, and had the means to buy a company like this, knew about it." JA.13103. The Special Master contacted 136 potential bidders, JA.389, 12 of whom expressed interest, JA.5904; JA.6531. Nine advanced to a second round, with six (including Amber) submitting qualified bids. JA.6532; JA.13162.

The Special Master initially focused on a bid led by Gold Reserve, a thinly

capitalized Bermudian claim-recovery company with a relatively low-priority $1.21 billion judgment. JA.13162. But Gold Reserve refused to close until the Alter Ego litigation concluded or to obtain committed financing beyond 12 months, not enough time to complete that litigation. JA.298. The Special Master thus recommended an Amber bid with a headline price of $7.3 billion cash, to be released from escrow upon the conclusion of both the Alter Ego litigation and litigation over the 2020s' pledge. JA.4554. The escrow drew criticism from creditors, which led Amber to propose (and the Special Master to recommend) a revised, escrow-free bid of $5.3 billion. JA.5049; JA.299. But continued creditor dissatisfaction ultimately led him to abandon that bid too. JA.300; JA.4554; JA.13194.

The district court directed the Special Master to propose new sale procedures and restart the bidding. JA.5524. The court articulated two "Evaluation Criteria" by which to judge bids: "price" and "certainty of closing." JA.5623. The court adopted a "non-exhaustive list of considerations" relating to "the certainty associated with a given bidder" and likelihood its bid would close, including risks from "the 2020[s] and the Alter Ego Claims." JA.5559.

With these marching orders, the Special Master invited "stalking horse" bids, which would set a baseline for bidders to beat during a "topping period." Amber and Gold Reserve both submitted bids, but the Special Master recommended a $3.7 billion bid from Red Tree, which dealt with the 2020s' through an agreement with a

supermajority of those bondholders.  JA.307-08.  The district court confirmed Red Tree as the stalking horse, concluding that its bid struck "the best balance of the Evaluation Criteria."  JA.5873.

Amber submitted a topping bid, but it was rejected because it was contingent on an as-yet-unconsummated settlement with the 2020s.  JA.319.  Gold Reserve submitted a putative $7.382 billion bid (comprising debt-financed cash for senior creditors and equity in new CITGO for Gold Reserve and other out-of-the-money creditors) that did not address the 2020s risk.  Nonetheless, the Special Master recommended Gold Reserve's bid based on the $3.5 billion delta over Red Tree's bid, albeit with significant trepidation about its closing risk.  JA.385; JA.5925.

Meanwhile, Amber finalized a Transactional Support Agreement ("TSA") with a supermajority of the 2020s.  JA.13120.  Amber agreed to buy the bonds for up to $2.125 billion upon closing its purchase of the PDVH shares, JA.8242; JA.8270, saving more than $700 million on their claims, eliminating closing uncertainty, and netting the VPs up to nearly $3 billion because Amber committed not to seek payment on the bonds.  JA.335; JA.338.  TSA in hand, Amber submitted its fifth bid.  JA.323-27; JA.7427.  The Special Master (with the court's blessing) pushed Amber to improve its bid, JA.323-24, and Amber offered Gold Reserve $75 million for partial writ extinguishment, took on additional closing obligations, and agreed to pay hundreds of millions in fees, including $105 million in break-up fees

to Red Tree and Gold Reserve.  JA.326; JA.338-39; JA.13121-23.

The Special Master and senior creditors backed Amber's final bid, concluding that it struck the right balance of price and certainty:  It extinguished $5.892 billion in writs, paid creditors $5.243 billion in cash and market-tested securities, dealt with the 2020s, and delivered up to nearly $3 billion in additional value to the VPs. JA.337-38; JA.7878; JA.7884.  And Amber's bid was *billions* higher than Red Tree's, the only other committed bid that addressed the 2020s.  JA.319-20.  Gold Reserve's bid, by contrast, would provide only $3.925 billion in cash, ignored the 2020s, and ultimately was not supported by committed financing (a baseline requirement for a qualified bid).  JA.339-41.

After the Special Master picked Amber's bid, JA.7395, Gold Reserve moved to strike it as violating a sale process "overbid" minimum provision.  JA.327.  Gold Reserve also slightly improved its own bid—though still without addressing the 2020s.  *Id*.  Unpersuaded, the Special Master recommended that the district court authorize and approve the sale to Amber.  JA.7426.

## C.    The Disqualification Motions.

Efforts by the VPs to disqualify the Special Master and his advisors "have been a feature of the Sale Process from its inception."  JA.281.  The first, in August 2021, was based on a "sale fee" provision in the Special Master's engagement letter with Evercore.  JA.281.  The district court rejected the argument that this contingent

fee somehow tainted the proceedings.  JA.3021.  Evercore's engagement letter also included an industry-standard provision disclosing that Evercore "may in the past have had, and may currently or in the future have, investment banking, investment management, financial advisory or other relationships with the Sale Process Parties and their affiliates [and] potential parties to any transaction and their affiliates." JA.3172-73.  No party objected to that provision.

The VPs brought two more disqualification motions in January 2023 and August 2024—both alleging improper communications between the Special Master and the Office of Foreign Assets Control ("OFAC").  JA.281-83.  Those motions were dismissed as untimely, waived, and meritless.  *Id.*  The district court nonetheless ordered the transcription of all *ex parte* OFAC meetings held after May 10, 2023, in the interest of maximum transparency.

In September 2025, days before the district court was to begin the sale hearing, the VPs launched a fourth attempt to disqualify the Special Master, and Gold Reserve filed a disqualification motion as well.  This time, Appellants argued that the Special Master's advisors, the Special Master himself, and (according to Gold Reserve) even the district court must be disqualified because the advisors' firms had advised Amber's affiliate Elliott Investment Management L.P. ("Elliott"), certain individual 2020s, and their affiliates on unrelated matters. JA.330; JA.10416-17.

The Special Master had disclosed that Weil and Evercore had such unrelated

representations six months earlier, in a March 2025 discovery response, JA.10421, and Evercore's retention agreement, which had been disclosed three-and-a-half years earlier, expressly permitted past, present, and future unrelated representations with parties to the sale process and their affiliates, JA.3172-73.  Appellants claimed, however, that they did not understand the full extent of those relationships until a September 2025 deposition.  And they claimed that those relationships necessitated disqualification under 28 U.S.C. §455(a) because they created an appearance of partiality.  JA.10418.  Gold Reserve further argued that the Special Master exhibited actual bias under §455(b)(1), while the VPs asserted that his advisors had a disqualifying interest under §455(b)(4) that also required disqualifying the Special Master.  *Id.*

The district court denied the motions without prejudice but allowed Appellants to renew them with full briefing.  JA.330.

### D.    The Sale Hearing.

The court held a five-day sale hearing, with testimony from eight fact and expert witnesses—including an Evercore witness who testified to the process of evaluating bids and pushing Amber for additional consideration, JA.13168-72—and more than 200 exhibits, including extensive expert reports.  The court heard days of argument and extensively considered Gold Reserve's bid, JA.339, but also learned why Amber's bid had overwhelming creditor support.

An Elliott representative testifying on behalf of Amber and Elliott described the complicated landscape Amber had to negotiate to resolve the risks from the 2020s and the Alter Ego litigation.  JA.13111-12; JA.13119-20.  Gold Reserve's CEO acknowledged that the 2020s posed serious risks, but argued they could not impede a sale, and that Gold Reserve could settle with them if necessary.  JA.13274. The court did not credit this testimony; to the contrary, his "testimony and Gold Reserve's actions (and inaction) … exacerbate[d] the skepticism the Special Master and Sale Process participants have expressed as to whether Gold Reserve could obtain the financing necessary to close."  JA.349.  Reinforcing those concerns, while the hearing was ongoing, the Southern District of New York granted summary judgment to the 2020s, holding their pledge enforceable and thus confirming the risk they posed to any sale they opposed.  JA.408.

At the conclusion of the hearing, the district court denied Gold Reserve's motion to strike Amber's bid, concluding that "nothing in any of [the SPO's provisions] limits the Special Master's discretion" to consider a bid with a headline price below the overbid minimum.  JA.13422.  Instead, the Special Master was to consider *both* price *and* certainty.  *Id.*  And while the court reserved judgment on whether to accept Amber's bid, it authorized the Special Master to terminate the provisional agreement with Gold Reserve and execute one with Amber to "align[] the paperwork" with his recommendation.  JA.409.  As the court observed, if that

13

ministerial action would impair Gold Reserve's bid, then that bid was "never one that was going to prevail on the merits anyway." *Id*. That caution proved prescient, as Gold Reserve soon lost its financing commitment. JA.410; JA.13825.

### E. The District Court's Decisions.

#### 1. The district court denies the disqualification motions.

After additional briefing and argument, JA.330, the district court issued a 51-page opinion denying Appellants' disqualification motions as untimely, waived, and meritless. On timeliness, the court reiterated that it had warned the parties to raise any further disqualification issues within "three days at most." JA.10420. Yet Appellants "did not alert the Court of potential issues for months," despite having "notice of the relationships they now attack for quite some time." *Id.*. And Appellants waived their arguments by declining to object to the advisors' engagement letters, which disclosed the possibility of relationships with interested parties on unrelated matters. JA.10428-30. Notably, the VPs did not object to that provision in Evercore's letter even as they objected to others. *Id*.

The court also rejected the motions on the merits, finding that a "reasonable lay observer with knowledge of all relevant facts would not have reason to question the impartiality of the Special Master or his Advisors." JA.10439. Given the limited universe of firms "qualified to provide the Special Master competent advice," the court explained, it was "inevitable that any financial or legal advisor … would have

14

represented" interested parties.  JA.10441.  And in "one of the most, if not the most, widely publicized judicial sales ever held," where "[e]very party had ample opportunity to object" and "[e]very move by the Special Master was scrutinized," JA.10443, including by the court de novo, those unrelated representations created no appearance of or actual bias.

As to the communications between Weil and Elliott that Appellants highlighted, the court found that they shared only established, publicly known sale procedures.  JA.10447.  Elliott thus did not have "any greater or specialized access … to the Special Master's Advisors than that available to any other bidder (or Sale Process Party)," *id*, and the record refuted Appellants' accusations of favoritism toward Elliott or the 2020s.  JA.10447-51.  The court also found no disqualifying financial interest under §455(b)(4), explaining that any interest Weil or Evercore might have in future fees in unrelated matters was "remote, contingent, and speculative."  JA.10457-58.

The court concluded that Appellants' view of the law would have foreclosed a fair and reasonable sale process.  JA.10464-65.  After all, "it is impossible to know at the start of a sale process which entities will want to participate in such a sale, nor who will present the highest bid at the conclusion of the sale—yet eliminating from the bidding any interested entity that has been represented by the Special Master's qualified Advisors would undermine, if not entirely defeat, the Court's goal, and

legal obligation, to conduct the sale in [a] manner maximizing value." JA.10464.

Observing that "failure is precisely what the Venezuela Parties have always desired," and "[f]ailure is also the result Gold Reserve currently prefers," the court rejected their late-breaking efforts to scuttle the sale. JA.10465.

### 2.    The district court approves Amber's bid.

After presiding over this litigation for more than eight years and the sale process for almost three years, the district court issued a 162-page opinion and sale order approving Amber's bid based on five key findings. JA.258. While Delaware law puts the burden on a sale's detractors, the court found Amber's bid supported regardless of who bore the burden. JA.378-80.

First, the court found that "the Sale Process was fair" to the VPs and "all other participants," "consistently generated competitive tension," and "was value-maximizing." JA.374-75. The VPs had "access to all bids, at all times," and "the Sale Process always included the opportunity for any bidder to submit an Unsolicited Competing Proposal after a final round bid was recommended and its terms made public, just as Amber Energy did." JA.388 (emphasis omitted).

Second, the court determined that "the fair market value of the PDVH Shares is under $10 billion." JA.352 (capitalization and formatting altered). The court heard competing valuation evidence, with the VPs' expert valuing the shares at a whopping $18.6 billion, JA.393-94, Red Tree's expert valuing them at $8.4-$8.6

billion, JA.390-91, and a preliminary Evercore 2023 evaluation valuing them at around $13 billion. JA.372. The court found Red Tree's expert "credible and persuasive," the VPs' expert neither, and the 2023 analysis "outdated." JA.372, JA.392-93. So even if (as Appellants claimed) Delaware law required a price of at least 50% of fair market value, Amber's bid passed that test. JA.397.

Third, the court found that the 2020s posed a significant risk, and that Amber's elimination of that risk "substantially and materially increases the certainty" of closing. JA.398-407. Meanwhile, "the record confirms that Gold Reserve does not truly have access to sufficient financing, at least at this time, to address the issue of the [2020s]." JA.411. The court dismissed Gold Reserve's contrary claims as "not credible" and "little beyond speculation." JA.412-13.

Fourth, the court found that Gold Reserve's bid was "no longer a Qualified Bid … and, consequently, is not one the Court could approve at this juncture, even if it wished to do so." JA.407. As the court explained, Gold Reserve's admission that it "no longer has committed financing" not only "is a sufficient basis … to reject [its] Bid as now non-qualifying," but confirms that it "never had a firm likelihood of closing." JA.410.

Fifth, the court found that Amber's bid provided the best combination of price and certainty. JA.413-16. As the court explained, Amber's bid extinguishes $5.892 billion in judgments and pays $2.125 billion to resolve the 2020s' litigation risk—

17

giving PDVSA "at least $3 billion" in additional debt relief.  JA.413-15.  So, "[a]ll told, … Amber's bid extinguishes nearly $9 billion in Venezuelan debt."  JA.414-15.  And "[w]hile the headline price of [Gold Reserve's] Bid, $7.9 billion, is higher than the headline price of the Amber Bid, which is $5.892 billion, the expected value of [Gold Reserve's] Bid is less than that of the Amber Bid, given the significantly greater non-closing risk associated with [Gold Reserve's] Bid."  JA.349.

The court denied the VPs' motion to stay the sale until the 2020s' claims are resolved on appeal, explaining that the parties are entitled to prompt resolution—especially when Crystallex has been waiting more than eight years to be paid.  JA.418.

## SUMMARY OF ARGUMENT

Appellants do not come close to demonstrating that the district court abused its discretion in entering the sale order.

First, the court correctly held that it could attach the shares because Venezuela and PDVSA are alter egos under federal law.  As the court explained, the VPs' argument that Delaware law determines whether Venezuela and PDVSA are alter egos for execution purposes is collaterally estopped by *Crystallex II*, which affirmed the validity of the attachment under federal law.  It is untimely because the VPs had many opportunities to raise it—including at the district court's express invitation.  And it is wrong.  The federal government's overriding interest in foreign affairs

compels a uniform federal rule of decision on whether a United States court will treat a foreign sovereign and its instrumentality as alter egos, and that interest persists throughout the litigation process, up to and including execution—as this Court already recognized in *Crystallex II*. There is no legal or practical basis to hold that PDVSA is the alter ego of Venezuela for all purposes *except* when its property will be used to satisfy a judgment. Rule 69 confirms the point: Federal courts borrow state *procedure* on execution; they do not abandon federal common law governing the substance of whether a foreign sovereign and its instrumentality are alter egos. That is why Appellants cannot cite *any* case applying state law to decide whether a foreign sovereign and its instrumentality are alter egos in the execution context (or any other context). Switching to state law at the very end of the process—when it actually matters in satisfying a judgment—would plainly frustrate the federal interest in applying uniform federal law to a question that implicates sensitive foreign-relations issues at every juncture.

Second, the district court did not abuse its discretion in rejecting Appellants' fourth and fifth disqualification motions as untimely, largely waived, and meritless. Appellants have long known that the Special Master's advisors could work for bidders on unrelated matters, and they had notice that such relationships existed *at the very latest* six months earlier. That made Appellants' arguments both untimely and waived, especially given the admonition to raise such concerns in a matter of

19

days, not months.  Regardless, the court was well within its discretion to conclude

that these unrelated representations did not give rise to an appearance of partiality or

financial or other interest.  There is no requirement that advisors avoid all work on

*unrelated* matters involving potential bidders.  An undertaking of this scope and

complexity *requires* advisors with substantial experience in similar transactions and

relationships with repeat players.  Indeed, it would not have been feasible to

foreclose unrelated representations here, as no one knew exactly what parties would

participate when Weil and Evercore were retained.  And any attempt to foreclose

such relationships would risk foreclosing bidders who could deliver the most value.

Even if the district court had somehow abused its discretion in rejecting

Appellants' belated disqualification motions directed to the advisors, any error

would be harmless given the independent review by the Special Master, the district

court, and ultimately this Court.  Considering those layers of unbiased review, and

the thousands of hours of work and years of hard-fought litigation that produced the

sale order, it would be patently unjust to vacate based on attenuated allegations of

partiality.

Finally, the court did not abuse its discretion in approving this fair, transparent,

and exhaustive public sale.  Ignoring the standard of review, Appellants claim the

court should have chosen Gold Reserve's bid over Amber's.  But Gold Reserve's bid

was doubly defective, as it ultimately lacked committed financing—so it was not

even *qualified*—and failed to address the 2020s.  The court prudently balanced price and certainty throughout, and Delaware law imposes no self-defeating obligation to accept a nominally higher but nonviable bid.

## ARGUMENT

## I.    The District Court Did Not Abuse Its Discretion In Attaching The Shares.

### A.    Standard of Review.

This Court, like other circuits, reviews orders granting writs of attachment for abuse of discretion.  *Edmondson v. Lilliston Ford Inc.*, 2024 WL 5155557, at *2 (3d Cir. Dec. 18, 2024); *accord Lewis v. United Joint Venture*, 691 F.3d 835, 839 (6th Cir. 2012) (collecting cases).

### B.    The District Court Correctly Rejected the VPs' State-Law Argument as Barred by Collateral Estoppel and Untimely.

The district court correctly decided that the VPs' argument that Delaware law should determine whether Venezuela and PDVSA are alter egos for execution purposes is collaterally estopped.  The VPs concede they are collaterally estopped if "the parties litigated, and the courts decided" the same issue that the VPs press here.  VP.Br.37 (formatting altered).  But they claim that the execution issue "was not litigated or decided" because (they say) *Crystallex I* and *II* addressed only *immunity* from execution, not whether Venezuela and PDVSA are alter egos for purposes of *actual* execution.  VP.Br.38-39 (formatting altered).

The VPs are wrong.  In *Crystallex I*, the VPs challenged *both* "whether the Court could exercise jurisdiction over PDVSA" *and* "whether PDVSA's assets could actually be attached and executed upon to satisfy the judgments against Venezuela." JA.224.  And "both for jurisdiction purposes and for the merits of the attachment motions," they insisted that the alter-ego question had to be resolved "in accordance with Delaware law."  JA.224.  The district court disagreed, concluding that federal law controls the alter-ego inquiry for both purposes.  JA.225; *see Crystallex I*, 333 F.Supp.3d at 396 & n.13.  The VPs' contrary assertion blinks reality.

The VPs next contend that *Crystallex II* could not have decided the issue, claiming that this Court "lacked jurisdiction" to rule on anything but immunity because jurisdiction rested on the collateral-order doctrine.  VP.Br.39-40.  But unlike *OI European Group B.V. v. Bolivarian Republic of Venezuela*, which relied solely on the collateral-order doctrine, 73 F.4th 157, 174-76 (3d Cir. 2023), *Crystallex II* reviewed the district court's "grant of Crystallex's motion for a writ of attachment under Federal Rule of Civil Procedure 69" as "a final judgment under 28 U.S.C. §1291," 932 F.3d at 136.  It then affirmed the attachment *on the merits* because "so long as PDVSA is Venezuela's alter ego under [federal law], the District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy

the judgment against the country." *Id.* at 139; *see id.* at 133, 152.  That binding decision resolves the issue and leaves no room for the VPs to relitigate it.[1]

Second, even if the VPs were not collaterally estopped, their argument is untimely.  *See* JA.104-09.  "[T]he proper time to have made these arguments" was "when the Court was evaluating Crystallex's motion to issue and serve the writ of attachment" nearly eight years ago.  JA.104.  Yet "notwithstanding th[e] Court's express inquiry" whether the VPs would press other challenges to the attachment, the VPs stood silent.  JA.105-07.[2]  The VPs call the district court's untimeliness ruling "impossible to square with [its] collateral estoppel ruling."  VP.Br.43.  In fact, it is the VPs' arguments that are inherently contradictory.  The district court thought (correctly) that the VPs had already litigated all of their state-law arguments in *Crystallex*.  The VPs now claim that they did not—but have no explanation for not raising those arguments at the time when the district court expressly invited them.

---

[1] For the same reason, as Crystallex explains, the VPs' Delaware-law argument is barred by the mandate rule.  Crystallex.Br.I.A.

[2] The VPs' ability to "challenge the writ on non-jurisdictional grounds" after *Crystallex I*, VP.Br.39, is therefore beside the point.  Even if the VPs *could* have pressed non-jurisdictional arguments that had already been resolved against them, they did not.  JA.226.

### C.    The District Court Correctly Concluded That Federal Law Governs the Alter-Ego Inquiry for All Aspects of Execution.

In any event, the district court correctly concluded that federal law governs whether Venezuela and PDVSA are alter egos for all aspects of execution.

#### 1.    Federal law controls whether a foreign sovereign and its instrumentality are alter egos.

The federal government has an overriding interest in "international disputes implicating … our relations with foreign nations." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981).  Given that interest, and the need for the Nation to speak with a single voice in its foreign relations, state law generally has little role to play in the context of international disputes involving foreign sovereigns.  Instead, most legal issues in that context are "intrinsically federal," requiring the "exclusion of state authority."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964).

In *Bancec*, the Supreme Court made clear that whether a United States court should treat a foreign sovereign and its instrumentality as alter egos is one such intrinsically federal question.  There, Cuba's state-owned bank Bancec sued Citibank, which sought to offset what it owed by the value of its assets that Cuba had expropriated.  462 U.S. at 613.  Although Bancec was formally a "separate juridical entity," Citibank argued that Bancec and Cuba were alter egos.  *Id.*  The

Court held that federal law "determines the effect to be given to Bancec's separate juridical status." *Id.* at 621.

The Court rejected Bancec's argument that Cuban law should control, as that "would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability." *Id.* at 622. It then rejected Bancec's argument that the forum state's law should control, because "matters bearing on the nation's foreign relations should not be left to divergent and perhaps parochial state interpretations." *Id.* at 622 n.11. Given "the importance of developing a uniform body of law," *id.*, the Court instead formulated a federal common-law standard, holding that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," unless the instrumentality "is so extensively controlled by its owner that a relationship of principal and agent is created" or treating the instrumentality as separate "would work fraud or injustice." *Id.* at 626-27, 629.

Although the alter-ego question in *Bancec* arose in a "determination of substantive liability," *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287 (3d Cir. 1993), the federal test *Bancec* established applies whenever a party "seeks to disregard a foreign government instrumentality," *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992). Courts thus have applied that federal-law test to FSIA jurisdiction, *Fed. Ins. Co.*, 12 F.3d at 1287,

attempts to treat a sovereign as its instrumentality, *Doe v. Holy See*, 557 F.3d 1066, 1078 (9th Cir. 2009), determinations whether instrumentalities are protected by the Due Process Clause, *TMR Energy Ltd. v. State Prop. Fund*, 411 F.3d 296, 301 (D.C. Cir. 2005), and more.

The VPs concede (as they must) that federal law governs liability and jurisdictional and execution immunity.  VP.Br.33, 38-40; *see Crystallex II*, 932 F.3d at 132, 134.  That leaves them arguing that the Supreme Court has required "a uniform body of law" to decide whether a foreign instrumentality can be brought into federal court and subjected to liability and execution, *Bancec*, 462 U.S. at 622 n.11, only to unleash an unpredictable patchwork of varying state approaches to revisit the alter-ego question for the final step of execution.  That would make the *Bancec* inquiry an enormous waste of time, as it would simply be a prelude to each state imposing its own potentially conflicting rules for determining alter-ego status before execution could proceed—even though the question whether a foreign sovereign and its instrumentality are alter egos remains a sensitive issue of foreign policy implicating distinctly federal concerns.

Even if *Crystallex II* did not estop that nonsensical argument, its logic would preclude it.  After all, *Crystallex II* rejected PDVSA's argument that the "post-judgment enforcement setting" somehow "restrain[s] the application of *Bancec*." 932 F.3d at 138-89.  It further explained that *Rubin v. Islamic Republic of Iran*, 583

U.S. 202 (2018), "all but confirm[s] that *Bancec* can indeed be used to reach the assets of a foreign sovereign's extensively controlled instrumentality through post-judgment attachment proceedings." *Id.* at 139. *Rubin* held that that 28 U.S.C. §1610(g) "abrogate[s] *Bancec*" with respect to terrorism-related judgments by making the property of a foreign instrumentality "subject to attachment" for such judgments "regardless of" whether the *Bancec* standard is met. 583 U.S. at 211. Section 1610(g) thus reflects Congress's understanding that, "in *ordinary* FSIA attachment proceedings—*i.e.*, those that do not involve judgments based on state-sponsored terrorism—the judgment holder may reach the assets of the foreign judgment debtor by satisfying the *Bancec* factors." *Crystallex II*, 932 F.3d at 139. The reason *Bancec* applied in *Crystallex II* is the same reason it applies here:  There must be a uniform federal rule for deciding the alter-ego status of an instrumentality of a foreign state.

The VPs argue that federal law applies only to "the attribution of liability among entities of a foreign state," not execution proceedings.  VP.Br.33 (emphasis omitted).  But nothing in *Bancec* suggests that the sensitive foreign-policy considerations that arise when a United States court decides whether a foreign sovereign and its instrumentality are alter egos are limited to the liability context—which is why (as the VPs concede) courts have routinely applied *Bancec* outside that context, *see* VP.Br. 33 n.8; *supra* pp.25-26.  Indeed, *Bancec* recognized that the alter-

27

ego question could arise in answering whether "property held by one agency is really the property of another," 462 U.S. at 628, and it plainly contemplated that federal law would resolve that question too. The VPs notably cite no cases from *any* context in which courts declined to apply federal law in determining whether a foreign sovereign and its instrumentality are alter egos. That silence speaks volumes.

>    **2.    Rule 69 confirms that federal common law controls whether a foreign sovereign and its instrumentality are alter egos for *all* aspects of execution.**

Federal Rule of Civil Procedure 69 further confirms that federal, not state, law determines whether a foreign sovereign and its instrumentality are alter egos for execution purposes. Under Rule 69, "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). Rule 69 thus instructs federal courts to borrow state *procedure* relating to judgment enforcement, ensuring "fast and effective" execution by permitting "any execution method consistent with the practice and procedure of the State in which the district court sits." *Peacock v. Thomas*, 516 U.S. 349, 359 & n.7 (1996). But Rule 69(a) does not "require that the Court apply the *substantive* law of the forum state"; instead, "the proper approach is to apply federal common law" to determine whether a foreign sovereign and its instrumentality are alter egos. JA.230. That makes sense: The overriding federal

interest is ascertaining whether a foreign sovereign and its instrumentality are alter egos hardly vanishes when it comes to execution itself.

The VPs claim that any distinction between procedure and substance in the execution context "is misconceived."  VP.Br.28.  But Rule 69 explicitly directs federal courts to state law only for "procedure on execution," not substance.  Fed. R. Civ. P. 69(a)(1); *see Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 480 n.18 (D.C. Cir. 2016) (Rule 69 "requires a preliminary determination" of whether a state law "is in fact procedural").  Whatever difficulties may arise in distinguishing rules that "might be termed 'substantive,'" VP.Br.28-29, from those that actually are, separating procedure from substance is the express command of both Rule 69 and the Rules Enabling Act.  And there is no difficulty here; whether a matter affecting the sensitive federal domain of foreign relations is substantive is not a close call.  In the universe of execution issues, "the effect to be given to [a foreign instrumentality's] separate juridical status," *Bancec*, 462 U.S. at 621, is as substantive as it gets.[3]

---

[3] Indeed, Delaware law recognizes a distinct alter-ego *claim*, and the test for alter-ego status is unquestionably substantive there.  *See, e.g.*, *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992).  It is nonsensical to treat the alter-ego question as substantive when it arises in a claim, but procedural when it arises in execution.

Distinguishing substance from procedure is particularly important where, as here, an overriding federal interest requires a uniform rule.  It would defy reason if, even though a foreign sovereign and its instrumentality are alter egos under federal law for all other purposes—including the specific purpose of executing a judgment against the former on the property of the latter, *see* 28 U.S.C. §1610(b)—potentially conflicting state rules governed the final act of execution.  The VPs say that Rule 69 nonetheless supersedes "federal common law doctrines" because it "has the force of a federal statute."  VP.Br.33.  But that is question-begging; Rule 69 adopts only state "procedure on execution," so it does not apply, let alone displace *Bancec*, on this substantive question.  Fed. R. Civ. P. 69(a)(1).[4]

The VPs argue that the alter-ego question is procedural because it addresses whether plaintiffs can "collect[] judgments otherwise obtained," rather than "creat[ing] rights and liabilities where none existed before."  VP.Br.29-30 (quoting *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 834 & n.10 (1988)).  But *Mackey* held a rule procedural because it "create[d] no substantive causes of action, no new bases for relief, or any grounds for recovery."  486 U.S. at 834 n.10.  Here, PDVSA's alter-ego status creates a basis for relief and recovery, and it will determine

---

[4] In any event, as *Crystallex* explains, *Bancec* implements a federal statute. Crystallex.Br.I.B.2.

the parties' rights and liabilities—including whether "Crystallex is … paid." *Crystallex II*, 932 F.3d at 149.

The cases on which the VPs rely in claiming otherwise are readily distinguishable. While they point to cases applying state law when "adjudicating judgment-enforcement suits against foreign states and instrumentalities," VP.Br.26, those cases did not address whether a foreign sovereign and its instrumentality should be treated as alter egos—a distinctly federal question that *Bancec* held is governed by federal law. *See* 462 U.S. at 621-22. And the attachment cases they cite that did address alter-ego issues involve neither foreign sovereigns nor their instrumentalities, so they raised no overriding federal interest requiring federal law. VP.Br.27. Conversely, courts addressing the execution question in the context of foreign instrumentalities have uniformly applied *Bancec*. *See Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563-65 (11th Cir. 1987); *Crystallex I*, 333 F.Supp.3d at 396 & n.13; JA.197.

At bottom, all roads lead to the federal common-law test that *Bancec* established. Indeed, even if Delaware law applied under Rule 69, Delaware choice-of-law principles would, "consistent with the Supremacy Clause," compel application of that federal-law standard. JA.234.[5] If Congress wanted to cabin

---

[5] The VPs failed to respond to that argument below, and so have forfeited any response. *See* JA.234.

*Bancec* (as it did in §1610(g)), it would need to "speak[] directly to [the] question" of foreign instrumentalities' alter-ego status. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). Rule 69 does not get the job done. Indeed, any construction of Rule 69 that would oust federal law in the sensitive foreign affairs context would raise serious questions under the Rules Enabling Act. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 503 (2001). That is why the VPs can cite no case holding that any Federal Rule of Civil Procedure displaces foreign-affairs-based federal common law in favor of state law.

## II.    The District Court Did Not Abuse Its Discretion In Denying Appellants' Disqualification Motions.

### A.    Standard of Review.

This Court reviews a decision denying a disqualification motion for abuse of discretion, recognizing that "the judge presiding over a case is in the best position to appreciate the implications of those matters." *United States v. Ciavarella*, 716 F.3d 705, 720 (3d Cir. 2013).

### B.    The District Court Did Not Abuse Its Discretion in Denying the Disqualification Motions as Untimely and Waived.

The district court found two "independent and sufficient" procedural grounds for denying Appellants' motions: "they are untimely" and "they are based on waived arguments." JA.10419. Neither was an abuse of discretion.

1. Having fielded several disqualification efforts, the district court warned that any further motion to disqualify was "an emergency that requires contacting the

32

Court … within a day, two days maybe, three days at most." JA.10420. Appellants nevertheless "did not alert the Court of potential issues for months." *Id*. The unrelated relationships Appellants challenge were first brought to their express attention in Evercore's engagement letter, publicly docketed in October 2022, which explicitly disclosed that Evercore may have "investment banking, investment management, financial advisory or other relationships" with bidders "from which conflicting interests or duties may arise." JA.3172-73. Though Appellants never requested Weil's engagement letter, it unsurprisingly contained a similar provision. *See* JA.10428 n.10. Appellants made no attempt to disqualify either firm on that basis—even though the VPs *did* attempt to disqualify Evercore based on a different provision in its engagement letter. JA.10428-29.

The prospect of unrelated relationships was again highlighted in March 2025, when Appellants learned that Weil and Evercore had "retention[s], in unrelated matters, by participants in the Sale Process." JA.10429. Appellants thus "learned of Evercore and Weil's representation of Elliott, the 2020s, and their affiliates by no later than March 24, 2025, almost six months before they raised concerns with the Court in September 2025." JA.10420. That protracted delay made the disqualification motions untimely. JA.10427.

As the court noted, "other important realities" supported that conclusion: This was the VPs' "fourth motion to disqualify the Special Master," "filed just days before

the start of the long-awaited Sale Hearing." JA.10426. While the court refrained from "any finding as to the motivations underlying" the motions, it recognized the need to discourage any strategic "concealment of an [asserted] ethical issue," particularly when "both the Venezuela Parties and Gold Reserve have every incentive to prevent" the sale. JA.10427; *see In re Kensington Int'l, Ltd.*, 368 F.3d 289, 294 (3d Cir. 2004). Indeed, Gold Reserve betrayed its gamesmanship at the sale hearing, where it contended that the court could and should proceed despite the alleged conflict—as long as it selected Gold Reserve's bid. JA.13046-47. *But see Kensington*, 368 F.3d at 312 (parties may not "call[] upon the court for hopefully favorable rulings, and then seek[] recusal when they are not forthcoming").

Appellants have no persuasive justification for their delay—and certainly cannot show an abuse of discretion. They complain that "neither the Republic nor PDVSA nor their counsel" received the March 2025 disclosures. VP.Br.60 (emphasis omitted). But it is undisputed that CITGO, PDVH, and Gold Reserve had access to the disclosures in March, and the remaining Appellants admit they knew of them by at least August 6, 2025, *see* JA.10393—still over a month before they sought disqualification. Appellants insist that "key facts justifying disqualification only came to light" at the September 2025 deposition. VP.Br.60; *see* GR.Br.54-55. But the district court, intimately familiar with the case, correctly concluded that any new facts were "cumulative of what [Appellants] had known since at least March"—

34

namely, that Weil and Evercore were free to continue and commence such representations. JA.10425.

Appellants suggest that it is the quantity, not the fact, of unrelated representations that matters. There is neither a workable standard nor authority for that suggestion. It is, moreover, impossible to square with their arguments that even small engagements mandate disqualification, GR.Br.46; *see* VP.Br.56 n.11, or their supposed concern over advisors' hopes for future fees, which exist independent of the volume of current representations. In short, if Appellants believed that the prospect of Weil or Evercore representing sale parties in unrelated matters warranted disqualification, the time to raise that issue was March 2025 at the very latest.

Grasping at another straw, Appellants suggest they did not know that Weil and Evercore had *ongoing* unrelated relationships until September 2025. VP.Br.60-61; GR.Br.54-55. That is incorrect; the March 2025 disclosure noted an ongoing relationship between Evercore and one of the 2020s. JA.10393. Regardless, the court did not abuse its discretion in concluding that the difference between ongoing and recently completed unrelated representations was not "materially new information," since any incentive to obtain future fees would be the same either way. JA.10425. Moreover, Appellants' failure to clearly request information regarding Weil's and Evercore's relationships with Elliott's and the 2020s' *affiliates* weighs

against Appellants' newfound position that any such relationships are material. JA.10420-25; *contra* VP.Br.61-62.

Citing *Kensington*, the VPs (but not Gold Reserve) urge this Court to ignore their delay because the district court did not explicitly find it strategic. VP.Br.62. But *Kensington* says that courts *can* overlook untimeliness, not that they *must*. 368 F.3d at 317; *see id.* at 312. The district court did not abuse its discretion in declining to do so.

2. Nor did the court abuse its discretion in finding that Appellants waived their right to seek disqualification under §455(a). Weil's and Evercore's industry-standard retention letters gave Appellants actual or at least constructive knowledge in 2022 of the unrelated relationships underlying their later motions. JA.10428 & n.10. After those relationships were disclosed again in March 2025, Appellants stayed silent for another six months. JA.10429. The court appropriately found that Appellants "intentionally and voluntarily relinquished their rights to" argue that those unrelated representations necessitated disqualification. JA.10429; *see United States v. Nobel*, 696 F.2d 231, 236-37 (3d Cir. 1982).[6]

---

[6] The VPs' reliance on §455(e) is meritless for the same reason: The "relevant facts" *were* disclosed. *Nobel*, 696 F.2d at 236; *see* JA.10429-30.

While Appellants complain that they only saw Evercore's retention letter, not Weil's, VP.Br.63; GR.Br.56, that does not excuse their waiver.[7]  Evercore's letter itself shows that such provisions are "industry standard," giving Appellants "at least constructive knowledge" that Weil's letter included one (which Appellants could have confirmed by asking).  JA.10428 n.10.  And the VPs offer no support for their *ipse dixit* assertion that "reasonable attorneys would assume" that advisors "would scrupulously avoid" even wholly unrelated representations of any potential sale participants—a group that was not even identifiable when the advisors were retained.  VP.Br.63-64.

Appellants are thus left arguing that "nothing short of actual knowledge" can suffice for waiver.  VP.Br.64 (quoting *Kensington*, 368 F.3d at 314-15; *see* GR.Br.56.  But *Kensington* explained that constructive knowledge can be "tantamount to actual knowledge," 368 F.3d at 314, and this Court subsequently held that constructive knowledge can give rise to waiver, *see Goldman Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 148-49 (3d Cir. 2015).

Finally, the VPs (but not Gold Reserve) assert that the "absence of screening procedures" should "preclude waiver."  VP.Br.64.  But the screening requirement

---

[7]   The VPs claim they "never consented" to Evercore's engagement letter. VP.Br.64.  But the question is not whether they "consented"; it is whether they waived or forfeited their disqualification arguments by not objecting earlier. JA.10428-30.

they cite appeared in a *different* provision of Evercore's retention letter, not the advance-waiver provision.    JA.3261; JA.10428.    That is unsurprising; "ethical screens were not required" vis-à-vis *unrelated* representations, because they do not give rise to a conflict.    JA.10455.    Appellants' attempts to avoid their waiver accordingly fail.

### C.    The District Court Did Not Abuse Its Discretion in Denying the Disqualification Motions on the Merits.

Even if Appellants' disqualification motions "were not untimely and, in part, waived," the district court did not abuse its discretion in concluding that "they lack merit."    JA.10430.

### 1.    The district court did not abuse its discretion in concluding that the impartiality of the Special Master and his advisors could not reasonably be questioned.

The district court acted well within its discretion in concluding that the Special Master and his advisors were not subject to disqualification under §455(a).    "The test for recusal under §455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the [Special Master's] impartiality might reasonably be questioned."    *Kensington*, 368 F.3d at 301.    The movant "carries a heavy burden of proof," *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003), especially "[a]fter a massive proceeding such as this," when the court has "invested substantial judicial resources" in the matter, *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001); *see* JA.10432.

Here, "a reasonable lay observer with knowledge of all relevant facts would not have reason to question the impartiality of the Special Master or his Advisors." JA.10439. It is undisputed that the Special Master was unconflicted, and that his advisors represented Elliott, the 2020s, and their affiliates only in unrelated matters. And any firms qualified to advise the Special Master would necessarily have relationships with at least some likely bidders—especially since no one knew, when the advisors were retained, exactly who would participate in the sale process. JA.10440-41. So long as those representations were unrelated to this matter, a reasonable observer with full knowledge would not perceive any appearance of bias. JA.10439-41.

Appellants invoke *Kensington*, *see* VP.Br.48, 52-53; GR.Br.42, but that case did not involve *unrelated* representations. The attorney advisors to the district court in that asbestos litigation were disqualified because they were simultaneously representing tort claimants *in other asbestos litigation*. 368 F.3d at 302. These "dual roles" created a "structural conflict of interests," because "many of the same legal issues … either have arisen or will arise" in both cases. *Id.* at 303-04. The situation here "is markedly different." JA.10453. Weil and Evercore "have no concurrent obligation in any other related matter to any participant in the Sale Process," and Appellants "have identified no overlapping issue between this case and the unrelated matters in which Weil and Evercore have represented Elliott, the 2020s, and/or their

respective affiliates." JA.10453. And the Special Master "d[id] not perform an adjudicative function," but simply assisted with the sale process—more like an auctioneer than a judicial officer. JA.10454. There is thus no "structural conflict of interests" here. 368 F.3d at 303.

Appellants fixate on an email exchange in which a Weil partner asked his colleagues advising the Special Master to speak to Elliott because the partner would "hate for [Elliott] to not want to work with us." JA.10444; *see* VP.Br.48-50; GR.Br.44-45. While the VPs try to spin the emails as showing that "the very lawyers representing the Special Master were … advising Elliott on how to maximize its chances in the sale process," VP.Br.50, the district court scrutinized those email exchanges and found that they reflected nothing "in any way improper." JA.10444. They instead showed only that the Weil advisors agreed "to talk to [Elliott], just as they talked to all potential bidders throughout the Sale Process." JA.10444. There is no indication that they did anything other than share information about the sale process that was publicly available to all participants. JA.10444. This was "entirely consistent with [their] obligations under the Sale Procedures Order" to make sure that bidders understood both the process "and the consequences … of selecting one permitted course of action" under that process "over another." JA.10446.[8]

---

[8] The VPs also suggest that Weil's and Evercore's "failure to disclose" all of their unrelated representations of affiliates suggests some conscious effort to "conceal"

Appellants also claim that "decisions made by the Special Master and his advisors" during the sale process suggest partiality.  VP.Br.50; *see* GR.Br.48-51.  But as the district court explained, their retelling "is selective and unconvincing." JA.10447 (capitalization altered).   The Special Master's decisions "cannot reasonably be viewed as evidencing favoritism towards Elliott or the [2020s]." JA.10447.  Elliott "lost more frequently than it prevailed" before the Special Master, including "at certain major points in the Sale Process."  JA.10442, 10448.  Indeed, the Special Master and his advisors recommended competing bids over Amber's bid *four separate times*, which cost Amber $30 million in topping fees, JA.6053, JA.6080, and increased Amber's unsolicited bid by another $275 million in August 2025 alone, JA.13122

That hardly suggests favoritism toward Elliott.  And when the Special Master did side with Elliott, his decisions were "reasonable and well-documented and, if raised to the Court, [were] the subject of litigation that the Court resolved on the merits." JA.10447; *see* JA.10448-51.  Appellants' disagreement with those decisions "certainly cannot be equated with the showing required [for] recusal."  *Jones v. Pitt. Nat'l Corp.*, 899 F.2d 1350, 1356 (3d Cir. 1990).

---

that information.  VP.Br.53-55.  But the district court did not abuse its discretion in refusing to draw that inference when Weil and Evercore provided all the information they reasonably understood the VPs' discovery sought.  JA.10420-25, 10458-59.

**2.    The district court did not abuse its discretion in concluding that the Special Master and his advisors had no disqualifying interest.**

The VPs (but not Gold Reserve) claim that the Special Master and his advisors should have been disqualified under §455(b)(4), based on "a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. §455(b)(4); VP.Br.57.  The district court correctly rejected that argument.

It is undisputed that neither the Special Master nor his advisors have any financial or other interest in the sale.  JA.10457.  And the advisors' "alleged interest in generating more fees from representing the Special Master, Elliott, and the [2020s]" is not a "financial interest in the subject matter in controversy"—and is "remote, contingent, and speculative" in any event.  JA.10457 (quoting *In re Placid Oil Co.*, 802 F.2d 783, 787 (5th Cir. 1986)); *see, e.g.*, *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 2024 WL 3463952, at *3 (E.D. Va. July 18, 2024) (no disqualification where special master worked at law firm that represented defendant's subsidiary); *Wolverine World Wide, Inc. v. Am. Ins. Co.*, 2019 WL 11680205, *2 (W.D. Mich. May 9, 2019) (no disqualification where special master worked at law firm that represented party in unrelated disputes).  Indeed, the VPs cite no case suggesting that §455(b)(4) requires disclosure whenever a special master's advisor advises a party or its affiliates *in entirely unrelated matters*—a rule

42

that would make it impossible to hire qualified advisors in highly complex matters like this one. *See* JA.10441.[9]

The VPs briefly assert that Weil's and Evercore's purported hope of future fees from Elliott and the 2020s constitutes a disqualifying "interest that could be substantially affected by the outcome of the proceeding." VP.Br.59 (quoting 28 U.S.C. §455(b)(4)). But that "is, again, too remote, contingent, and speculative to give rise to a need to disqualify"—and, again, would effectively bar all experienced advisors. JA.10458.

### D.    Disqualification Would Not Affect the Sale Order.

Even if Appellants could show that the district court abused its discretion in refusing to disqualify the Special Master and his advisors eight years into the sale process (they cannot), there still would be no reason to vacate the sale order and start over. Violations of §455 are subject to "harmless error" analysis, in which courts must "consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862, 864 (1988). Those factors weigh heavily against a do-over here.

---

[9] Even if the advisors had disqualifying financial interests, unrelated representations cannot be imputed to the district court or the Special Master under §455(b)(4). *See* Crystallex.Br.III.B.2.a.

To begin, a violation is harmless if "impartial decision makers" can "independently approve the orders at issue." *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 171 (3d Cir. 2004).  Here, any purported appearance of bias was eliminated by two levels of unbiased review: the Special Master, who was recommended by the VPs themselves (and who Appellants do not contend was himself conflicted in any way), *see* JA.10415, and the district court, *see* JA.10442 (noting that "[e]ach of the Special Master's major decisions was scrutinized by … the Court itself"); JA.10454 ("All of [the Special Master's] work is subject to the Court's de novo review[.]").  Moreover, this Court will provide yet another layer of neutral review.  *See Selkridge*, 360 F.3d at 171; *In re Sch. Asbestos Litig.*, 977 F.2d 764, 786 (3d Cir. 1992).

Appellants assert that de novo review is insufficient because the complexity of the sale process purportedly left the district court "limited to choosing between complex agreements."  VP.Br.57; *see* GR.Br.51-53.  That ignores the record, which confirms that the court "did not always accept the Special Master's recommendations."  JA.10442.  Indeed, Appellants point to nothing that the Special Master (or his advisors) did, or should have done, that would have changed the district court's de novo review and approval of the sale—nor could they, given that the last two bids were Amber's and Gold Reserve's, and Gold Reserve's was not viable, lacking both a solution to the 2020s' claim and committed financing when

the sale order was entered. *See infra* pp.48-51. And Appellants' claim that *nothing* can "prevent the diminished confidence in the courts caused by conflicted judicial officers," VP.Br.56, is refuted by the very precedent establishing a harmless-error standard. *See, e.g.*, *Liljeberg*, 486 U.S. at 862; *Selkridge*, 360 F.3d at 171.

## III.    The District Court Properly Carried Out The Years-Long Sale Process.

### A.    Standard of Review.

The district court's sale order, like its attachment and disqualification rulings, is reviewed for abuse of discretion. *See* VP.Br.66; GR.Br.26; XYQ.Br.5.

### B.    The District Court and the Special Master Ran a Fair, Transparent, and Exhaustive Public Sale.

Appellants' makeweight attacks on the exhaustive, transparent, and successful sale process all but ignore the deferential standard of review and come nowhere near establishing an abuse of discretion.

The VPs' argument that the district court "did not run a 'public sale'" because bid prices were revealed after each bidding period, rather than contemporaneously, fails thrice over. VP.Br.70-71. It is forfeited, as they did not timely object to this long-disclosed aspect of the sale procedures. It is supported by no relevant authority requiring intra-bid price disclosure. And it is belied by the fact that the bidders were permitted to submit unsolicited bids after learning the price of a recommended bid (which Amber and two other bidders did). JA.13168. Indeed, *because* bidders did not immediately know the details of other bids, the Special Master successfully

pressed Amber to improve its unsolicited bid, JA.13122, leading Gold Reserve to improve its bid too, JA.327. That is the epitome of the "head-to-head" competitive bidding that the VPs claim was lacking. VP.Br.70.

Gold Reserve's contention that Amber's bid violated the SPO's "overbid" term fares no better. GR.Br.37-40. That provision gave the Special Master "discretion to lower or raise the overbid minimum throughout the process, … for reasons including that 'the evaluation criteria include criteria other than price.'" JA.5639. Reading that provision to bar bids with higher certainty and a lower headline price would frustrate the weighing of "criteria other than price," *id.*—conflicting with both the provision's text and "every other portion of any other order that Gold Reserve has pointed to," all of which reflected "the fundamental fact of this process that all bids are being evaluated both on price and certainty." JA.13422. This Court gives "great deference" to a district court's interpretation of its own orders, *United States v. Hallinan*, 75 F.4th 148, 152 (3d Cir. 2023), and there is no basis to reject the court's understanding of its interim order here.

### C. The District Court Acted Well Within Its Discretion in Selecting Amber's Bid.

The district court's selection of Amber's bid—over a bid with no financing and massive closing risks—was not remotely an abuse of discretion.

### 1. The district court did not abuse its discretion in considering both price and likelihood of closing.

The district court explained from the start that bids would be evaluated based on both price and certainty, *see supra* pp.8, 46, and it did not abuse its discretion in rejecting Appellants' argument that certainty is irrelevant.

Nothing in Delaware law suggests that a court determining the "highest bidder" under 8 *Del. C.* §324(a) must ignore likelihood of closing. That provision states that attached shares may "be sold at public sale to the highest bidder … to satisfy the debt." *Id*. Appellants focus on the word "highest," but the same sentence explains that the goal is to "satisfy the debt." *Id*. A bid that does not close cannot satisfy any debt.

Appellants know it is absurd to argue that a court must choose the bid with the highest headline price regardless of whether it has any chance of closing, so they add a gloss, insisting that a court must choose the highest among "qualified" bids. GR.Br.28-35; VP.Br.71-74; XYQ.Br.7-8; *see* JA.12418. But there is no textual or logical reason to conclude that a court can set criteria other than price to *screen* bids, but cannot weigh those same considerations in choosing among them. Appellants' just-so theory is crafted solely to bless Gold Reserve's bid, which never even had the highest headline price—as illustrated by Blue Water Venture Partners, LLC's similarly unqualified $10 billion bid. JA.353. Put simply, the value of a bid comes from both price and certainty of closing, and the "highest" bid is the one with the

best combination of the two.  JA.413-16.

> **2.    The district court did not abuse its discretion in rejecting Gold Reserve's bid because it faced a significant likelihood of not closing and was ultimately not viable.**

Appellants' arguments about the definition of "highest" are ultimately academic because Gold Reserve's bid was "no longer viable, and even if it were, it does not offer an attractive or workable alternative to the Amber Bid."  JA.413.  The district court acted well within its discretion in accepting the only remaining qualified bid.

1.  The district court found Gold Reserve's bid non-viable because it did not have committed financing—as Gold Reserve's counsel subsequently admitted. JA.407-13; JA.5639-40; JA.13825 ("That committed financing is not in effect as of today, Your Honor.").  That deficiency alone was "a sufficient basis for the Court and the Special Master to reject [Gold Reserve's] Bid as now non-qualifying." JA.410.  Gold Reserve's empty assurance that it "remains capable of following through on its bid," GR.Br.35, is no replacement for committed financing.  Because Amber's bid was the *only* qualified bid at the time of the sale order (and remains the only qualified bid today), the district court acted well within its discretion by accepting it.

Gold Reserve complains that its funding collapsed only because the court terminated its provisional agreement.  GR.Br.34-35.  But, as the court explained,

that was merely a "ministerial act" to "align[] the paperwork with the Special Master's actual updated recommendation." JA.409. Nothing prevented Gold Reserve from keeping financing in place—just as Amber secured its financing before *it* had a signed SPA. That Gold Reserve's financing proved "vulnerab[le] to even this mere ministerial act" simply "confirm[ed] the precarious nature of th[at] Bid, from which it ha[d] apparently suffered all along." JA.409-10. Appellants fail to mention, let alone contest, this finding.

2. The record also amply supports the district court's finding that, even if Gold Reserve's bid "remained a Qualified Bid, its financing structure is not sufficient to realistically deal with the risk posed by the [2020s], a risk that has only become more pronounced after [the Southern District of New York's] summary judgment ruling." JA.413.

Appellants do not even attempt to argue that Gold Reserve's prior financing could have resolved the 2020s risk. *See* JA.413. They instead try to re-frame Amber's successful settlement as allowing the 2020s to "jump in front of the attached creditors." GR.Br.33. That gets matters backward. The 2020s were a gating risk for *any* sale. By reaching a settlement that discounted their claims by over $700 million, Amber's bid eliminated that risk and freed up funds for the attachment creditors. JA.414. Likewise, Gold Reserve's assertion that the court "functionally threw out the approved procedures for addressing the risk posed by the

49

[2020s]," GR.Br.37, rewrites history.    Everyone understood "the reality that a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the [2020s]."  JA.5875.  Amber's bid did; Gold Reserve's did not.

3. Appellants fall back on their arguments that the 2020s could not have interfered with Gold Reserve's now-defunct bid.  The record belies those arguments.

First, XYQ claims that there was no evidence that the 2020s would block closing.  XYQ.Br.11-12.  But the 2020s clearly stated that, "[i]f the circumstances ever warranted," they would "seek and … obtain an injunction … to protect [their] rights."  JA.13434.  And Gold Reserve's CEO admitted that the 2020s "most likely w[ould] try to block" any sale of the PDVH shares that (like Gold Reserve's bid) did not address their bonds.  JA.13309; *see* JA.13115-16.

Second, XYQ speculates that the Southern District of New York would not grant injunctive relief.  XYQ.Br.12-13.  But "Gold Reserve has put forth no basis whatsoever to believe" that a court that had "just weeks ago upheld the validity of the [2020s'] rights under the pledge—would now allow the value of those same bonds to be eviscerated by staying the [2020s'] exercise of their rights."  JA.401.  And even without injunctive relief, there was a substantial risk that the 2020s would block closing by voting their shares against a Gold Reserve sale.  JA.400.

Third, XYQ speculates that OFAC might prevent the 2020s from exercising or preserving their rights.  But XYQ relies on OFAC's suspension of General

License No. 5, which provides a limited exception to a prohibition imposed by an entirely different Executive Order.[10]  Appellants do not explain how that order would or could bar the 2020s from voting their shares or seeking judicial relief.  Besides, OFAC has expressly stated that it "will not take enforcement action" against those exercising the 2020s' rights; and in any event, OFAC could lift that suspension at any time, so the suspension "does not mean the risk posed by the [2020s] can rationally be ignored."  JA.399.

### 3. The district court did not abuse its discretion in concluding that the combination of price, value, and certainty in Amber's bid made it superior to Gold Reserve's bid.

The district court acted well within its discretion in concluding that Amber's bid "yields the greatest value and is the best bid, overall, that has ever been submitted during the course of this judicial sale."  JA.413.

1. Amber's settlement with the 2020s under the TSA fully resolves their claims.  XYQ asserts that the TSA is a "contingent framework," XYQ.Br.13, but the court found that it "is reasonably certain to settle the [2020s'] claims," JA.407.[11]  XYQ asserts that "Section 9.02 of the Indenture requires issuer consent to release

---

[10]    *See* Dep't of the Treasury, General License No. 5 (July 19, 2018), https://perma.cc/PJ3W-QT8Q; Executive Order 13835 (May 21, 2018), https://perma.cc/EUV6-RDCY.

[11] XYQ briefly mentions supposed "exit ramps" in the TSA, XYQ.Br.13-14, but does not explain how these standard provisions imperil the agreement. *See* JA.0404-07.

collateral," XYQ.Br.14., but as the court explained, Section 9.02(a) "is inapplicable to the actions contemplated by the TSA," JA.404, because it governs amendments to the Indenture, JA.5393, and the TSA does not require any such amendment. JA.403-04. XYQ also asserts that Section 9.02(a) applies to "any 'amendment, supplement or waiver [that] may release any Lien on Collateral,'" XYQ.Br.15, but that language comes from Section 9.02(*b*), which requires only "consent of the holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes." JA.5393. The TSA easily clears that bar. Moreover, the Security Agreement, not the Indenture, governs releases of collateral, and it requires consent only of the collateral agent. JA.5457-58.

2. As for XYQ's argument that Amber's bid carries greater regulatory risks, the uncontested facts show that "Amber's SPA contains a 'hell or high water' provision … requiring Amber to make all efforts to obtain the necessary approvals," including divestments, and that Elliott's purported "significant equity holdings in the energy and refining industry" present no significant risk because "each ownership stake identified … refers to holdings of no more than 4-6% of the pertinent entity." JA.407 n.28. Indeed, Elliott has already received approvals from Mexico, Morocco, Turkey, and the European Union—the very jurisdictions XYQ suggested would pose problems. *See* Letters, *Crystallex Int'l Corp. v. Bolivarian*

*Republic of Venezuela*, No. 1:17-mc-00151-LPS (D. Del.), Dkt. 2585, 2594, 2611, 2619.

3. The record also amply supports the court's finding that "the expected value of the [Gold Reserve] Bid is less than that of the Amber Bid, given the significantly greater non-closing risk associated with the [Gold Reserve] Bid." JA.349. At least one of three scenarios had to happen for Gold Reserve's bid to close: "(i) the [2020s] will lose on appeal, (ii) [Gold Reserve] will somehow come up with the financing to reach a settlement with the [2020s], or (iii) Gold Reserve is correct that OFAC action is required in order for the [2020s] to exercise their rights and the [2020s] will be unable to obtain such OFAC approval." JA.351. The court concluded that "[t]here is no record basis to find that there is at least a 75% likelihood that one or more of these premises will turn out to be correct," leaving the expected value of Gold Reserve's bid lower than Amber's. *Id*. Appellants quibble with the numbers, VP.Br.72-73, but as the court found, the expected values were not close, JA.351 & n.9. Given Gold Reserve's lack of financing and failure to address the 2020s, there was simply *no* reasonable likelihood it could close.

4. XYQ suggests that the court should have considered the value of a potential later transaction if Gold Reserve's bid were accepted but failed to close. XYQ.Br.17-19. Appellants failed to raise that argument (or present any evidence about such a potential later transaction) below, forfeiting it. In any event, rank

speculation about the value of a potential transaction (versus a fully committed bid) does not begin to show an abuse of discretion.

### 4. The district court correctly found that the 50% test does not apply and is easily satisfied here in any event.

On thorough review of the evidence, the district court rightly concluded that Amber's bid provided fair value. JA.397. As the VPs recognize, a judicial sale may be set aside only when "the sales price is so *grossly* inadequate that it shocks the conscience of the court." VP.Br.67 (quoting *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994)). Appellants do not come close to showing that Amber's bid meets that demanding standard.

To start, Delaware law does not impose a blanket rule prohibiting any sale at a purchase price below 50% of fair market value. JA.395-97. As the Delaware Supreme Court has explained, "[t]he 50% test is not the sole touchstone." *Burge*, 648 A.2d at 419; *see, e.g.*, *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 559-60 (Del. 1995). The VPs rely on *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144 (Del. Super. Ct. 1977), VP.Br.67, but *Girard* recognized that the 50% rule "may be unrealistic in the case of property whose price is great or usefulness is limited." 379 A.2d at 1146.[12] As the district court found, the shares here are

---

[12] *Girard* also noted that "where the standard has been applied, there usually has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale." *Id.* Neither condition obtains here.

"incontestably a different galaxy than the values of the properties typically at issue" in cases applying a 50% test. JA.396-97.

Even if the 50% test applied, the court reasonably found that Amber's bid passes. The court examined differing valuations and credited Red Tree's expert's thorough "analysis, which is the product of multiple calculations and reasoned, well-supported, and standard methodological choices, credible and persuasive." JA.392. Appellants do not even *mention* that analysis, let alone attempt to show any abuse of discretion in adopting it. And accepting that $8.4 to $8.6 billion valuation, Amber's bid clears the 50% hurdle with room to spare. Amber's bid "extinguishes approximately $5.892 billion of Attached Judgments and provides judgment-debtor PDVSA over $8.8 billion in overall debt relief," and thus "exceeds the 50% threshold and cannot, under any view, be deemed grossly inadequate under Delaware law." JA.397.

The VPs abandon their expert's $18.6 billion valuation, instead relying on Evercore's 2023 preliminary valuation of approximately $13 billion. VP.Br.67-68. But that valuation was "outdated," "contain[ed] errors," and was "not a fair measure of the value of the PDVH Shares today." JA.372. Among other things, CITGO far underperformed Evercore's projections; "market multiples changed"; and Evercore had not accounted for contingent liabilities (like the 2020s' rights). JA.372. The VPs never engage with those factual findings. Regardless, Amber's bid provides

$8.8 billion in debt relief, so it far exceeds a 50% threshold even under Evercore's inflated valuation.  JA.397; *see Deibler*, 652 A.2d at 559-60 (value inuring to benefit of debtor, not just purchase price, should be considered); *Girard*, 379 A.2d at 1146-47 (same).  The VPs simply ignore much of that value.  VP.Br.68-69.

### D.    The District Court Did Not Abuse Its Discretion in Rejecting Appellants' Requests for More Delay.

Finally, the district court did not abuse its discretion in declining to stay the sale until all appeals in the 2020s' litigation are exhausted.  VP.Br.73-74.  The court properly refused to "shirk its obligation to the parties to resolve their dispute in a timely fashion, which is itself an especially weighty concern given that Crystallex came to this court with a judgment entitling it to payment more than eight years ago."  JA.418.  And Amber's bid eliminates the risk on which the stay request is predicated—at a $730 million discount that would likely be impossible to replicate now that the 2020s prevailed in district court.  JA.412 n.31.  The court acted well within its discretion in choosing a certain, fair, and substantial recovery over uncertainty and more delay.

# CONCLUSION

This Court should affirm.

Respectfully submitted,

s/Paul D. Clement

ANDREW J. ROSSMAN
SUSHEEL KIRPALANI
DAVID M. COOPER
OWEN ROBERTS
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016

JOHN BASH
MATTHEW R. SCHECK
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701

MICHAEL A. BARLOW
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, DE 19801

PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JEFFREY C. THALHOFER*
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

ROY T. ENGLERT, JR.
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW
Washington, DC 20006

*Counsel for Amber Energy Inc.*

February 9, 2026

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the lead attorney whose name appears on the foregoing brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit and is presently a member in good standing of the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 12,994 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement