Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494, 25-3563 & 25-3564

# In the United States Court of Appeals for the Third Circuit

CRYSTALLEX INTERNATIONAL CORPORATION, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

Appeal from the United States District Court for the District of Delaware, Nos. 17-mc-151, 19-mc-79, 19-mc-290, 19-mc-342, 20-mc-257, 21-mc-18, 21-mc-46, 21-mc-481, 22-mc-68, 22-mc-69, 22-mc-131, 22-mc-156, 22-mc-263, 22-mc-264, 22-mc-347, 22-mc-453, 22-mc-464, 23-mc-298, 23-mc-340, 23-mc-378, 23-mc-379, 23-mc-397 (Stark, J.)

## APPELLANT VENEZUELA'S MOTION TO HOLD APPEAL IN ABEYANCE

Daniel Pulecio-Boek
Dominic E. Draye
Nicholas LeFevre
GREENBERG TRAURIG, LLP
2101 L Street NW
Washington, DC 20037
(202) 331-3100
drayed@gtlaw.com

*Counsel for Appellant Bolivarian Republic of Venezuela*

TIDEWATER INVESTMENT SRL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

OI EUROPEAN GROUP B.V.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

NORTHROP GRUMMAN SHIP SYSTEMS INC.,
*Plaintiff-Appellee,*
v.
MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

ACL1 INVESTMENTS LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

RUSORO MINING LTD,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

RED TREE INVESTMENTS LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

KOCH MINERALS SARL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS GULF OF PARIA B.V.,
*Plaintiff-Appellee,*
v.
CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,
*Defendants-Appellants*.

---

XYQ US, LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

GOLD RESERVE INC.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

VALORES MUNDIALES S.L., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

RUDI LOVATI, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

## INTRODUCTION

This litigation asks whether the sale of CITGO to satisfy judgments against the Republic of Venezuela and Petróleos de Venezuela ("PDVSA") was lawful. It was not, for reasons explained in Appellants' briefs. Now, in light of recent developments, a creditor-forced sale is also counterproductive.

For years, the lawful government of Venezuela was unable to participate in litigation against it or to defend the interests and assets of the country. Since 2019, the so-called "National Assembly of 2015" purported to represent the Republic, including in this litigation. That changed with the United States' recognition of President Delcy Rodriguez's government on March 5, 2026.

Crucially, this is the first time in recent history that Venezuela can attempt to restructure its liabilities and pay creditors. Under the so-called "National Assembly," creditors accumulated tens of billions of dollars of judgments against the Republic, PDVSA, and other state-owned entities, and the creditors seized CITGO. With no viable strategy of any kind, and no control over the country's resources, the so-called "National Assembly" had neither the authority nor the ability

to pursue any restructuring. Moreover, the U.S. sanctions crippled the Venezuelan economy, reducing all available sources of government revenue.

The recognition of President Rodriguez's government on March 5, 2026, marked a paradigmatic change in the Venezuela-U.S. relationship. More importantly, the Venezuelan economy has now begun to recover. As a result, Venezuela is re-entering the international oil and financial markets and attempting to restructure its debts and pay creditors.

Two primary factors have contributed to this new reality. First, the legitimate government with control of Venezuela's natural resources now has the ability to act in U.S. courts. The government can create restructuring strategies and manage its resources to generate income. Second, Venezuela and the U.S. government are working together closely, including to develop Venezuela's natural resources and infrastructure. Venezuela's economy and its development are a key component of U.S. foreign policy. Indeed, the relationship between Venezuela and the United States today is unlike any time in recent decades. The Executive Branch of the United States recognizes President Rodriguez's government as a complete reset of state-to-state diplomatic

relations, with both countries jointly working "to promote stability, support economic recovery, and advance political reconciliation in Venezuela." U.S. Statement of Interest, *Stansell v. FARC*, 1:16-mc-00405-LSG-SN, Dkt. 621-1 at 3 (S.D.N.Y. Mar. 11, 2026) (stating the U.S. Department of State's official posture toward Venezuela).

The reestablishment of the Venezuela-U.S. relationship includes the U.S. government beginning to issue general licenses that lessen some of the previous restrictions that handcuffed the Venezuelan economy. Those licenses create the opportunity for Venezuela's natural resources and assets to develop more broadly and generate meaningful income.

CITGO is a crucial component of the Venezuelan economy. It was built to refine Venezuela's heavy crude, which now, for the first time in almost a decade, it can start to access. It is the country's most meaningful international, revenue-generating asset. As such, the grossly undervalued sale of CITGO for the benefit of a few parties (chiefly Crystallex, which will take over $1 billion of the sale price) is unnecessary and at cross-purposes with both the new Venezuelan reality and the paradigmatic change in Venezuela-U.S. relations.

Importantly, CITGO is a vastly more valuable asset than it was when Amber purported to buy it. Indeed, CITGO's value has drastically increased over the past year. Even without being able to access Venezuelan heavy crude (as it now can), the company predicts an EBITDA of $5.8 billion for full-year 2026 with over $5 billion in available cash on hand. *CITGO Reports Strong Second-Quarter 2026 Financial and Operational Results*, CITGO Petroleum Corp. (Aug. 13, 2026), https://tinyurl.com/yc5becfp [hereinafter "*CITGO Reports Strong Second-Quarter Results*"]. Those results mean CITGO's expected earnings for the year are essentially the same as Amber's headline $5.9 billion bid to buy the company—an unconscionable windfall for Amber, and one obtained while CITGO was operating outside the oversight of the Venezuelan government. Rather than potentially facilitate that windfall, the Court should allow CITGO's booming business to restore the fiscal balance required to place the restructured debt on a sustainable path. To that end, the Republic has hired restructuring advisors to formulate a plan for reorganization.

The Republic asks that the Court hold this appeal in abeyance with updates on the debt-restructuring process at six-month intervals. Courts

routinely hold lawsuits in abeyance when presidential administrations change in the United States. *See, e.g., Utah v. EPA*, No. 23-1157, 2025 WL 1354371 (D.C. Cir. May 2, 2025). The latest political developments in the Venezuela-U.S. relationship are far more extreme and deserve the same response as a matter of comity and deference to the Executive Branch's conduct of foreign affairs.

## FACTUAL BACKGROUND

The United States formally recognized President Rodriguez's government on March 5, 2026. President Rodriguez's recognition marked the first time since 2019 that the legitimate government of Venezuela could participate in U.S. litigation. *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938) (noting that the State Department's recognition of a foreign government decides who may litigate for a foreign state). Prior to the 2026 recognition, a sham "interim" government initially led by Juan Guaido—illegal under Venezuelan law—purported to represent the Republic, including in this litigation. But that so-called government exerted no power in Venezuela, had no control over its natural resources, and lacked the authority to attempt any type of restructuring.

Now, the Venezuelan and U.S. governments are diligently working to achieve several important goals. Among those is creating a robust economic recovery in Venezuela for the benefit of its people. *Stansell*, Dkt. 621-1 at 3. Step one of that recovery was "recognizing Delcy Rodriguez as the sole Head of State, able to take action on behalf of Venezuela." *Id.* Step two is ongoing sanctions relief from the United States, which will enable Venezuela's economy to gradually recover and restructure its debts. Indeed, the U.S. Secretary of Energy recently stated during a visit to Caracas that the U.S. government does not intend to "sit on [its] hands" with respect to Venezuela's debt restructuring and will push for a fast economic recovery in Venezuela. *See* "*Cure for Socialism: Wright Meets Venezuelan Rodriguez; 65B Barrels + $100B Energy*," The Econ. Times (Sep. 3, 2026), https://tinyurl.com/3873568h. The U.S. Secretary of State likewise stated that "debt restructuring is key" for "Venezuela to be successful." *See Trump and Rodriguez Talked Venezuela Debt, Path to Elections*, Bloomberg (Sep. 23, 2026), https://tinyurl.com/mr3mhx8r.

The actions of the U.S. Executive Branch since January 2026 reflect the paradigmatic shift in bilateral relations and partially lessen the

previous restrictions that prevented Venezuela from meaningfully participating in the international oil and financial markets. For example:

- On January 9, 2026, the President signed Executive Order 14373, creating a dedicated custodial account for oil-sale proceeds belonging to the Republic and PDVSA that is immune to attachment. *Executive Order 14373*, White House (Jan. 9, 2026), https://tinyurl.com/27nhtp9b.
- On January 29, 2026, OFAC issued General License No. 46, supporting the sale of Venezuelan oil, with proceeds deposited in the accounts under Executive Order 14373. *General License No. 46*, Off. of Foreign Assets Control (Jan. 29, 2026), https://tinyurl.com/yectfbhv.
- On March 18, 2026, OFAC issued General License No. 52, supporting transactions with PDVSA on similar terms. *General License No. 52*, Off. of Foreign Assets Control (Mar. 18, 2026), https://tinyurl.com/y7dbhj67.
- On March 27, 2026, OFAC issued General License No. 55, lessening sanctions on the Venezuelan mineral sector.

*General License No. 55*, Off. of Foreign Assets Control (Mar. 27, 2026), https://tinyurl.com/mrx2w9ps.

- On April 14, 2026, OFAC issued General License No. 56, supporting "all transactions . . . that are ordinarily incident and necessary to engaging in commercial-related negotiations of contingent contracts with the Government of Venezuela," provided that they include a contingency for OFAC approval. *General License No. 56*, Off. of Foreign Assets Control (Apr. 14, 2026), https://tinyurl.com/mu96t4jr.
- The same day, OFAC issued General License No. 57, lessening sanctions on transactions involving the central bank of Venezuela and the three largest public banks in the country. *General License No. 57*, Off. of Foreign Assets Control (Apr. 14, 2026), https://tinyurl.com/mvjr7jw3.
- On May 5, 2026, OFAC issued General License No. 58, authorizing the provision of legal, financial advisory, and consulting services to the Republic in connection with a potential debt restructuring. *General License No. 58*, Off. of

Foreign Assets Control (May 5, 2026), https://tinyurl.com/h2vwed2z.

- On June 18, 2026, OFAC issued General License No. 24A, supporting the Republic's engagement in transactions related to telecommunications and common carriers. *General License No. 24A*, Off. of Foreign Assets Control (June 18, 2026), https://tinyurl.com/4jfmrbs4.
- On June 25, 2026, OFAC issued General License No. 60, supporting all transactions related to earthquake relief efforts. *General License No. 60*, Off. of Foreign Assets Control (June 25, 2026), https://tinyurl.com/3jewtfcu.

The succession of OFAC licenses has provided gradual relief to Venezuela's economy and has provided a path to enable it to restructure and honor its debt that was previously impossible. The progress toward sanctions relief also confirms that the United States is opening a new era of diplomatic relations with Venezuela and supports its economic recovery.

Within this new landscape, President Rodriguez is tirelessly working to resolve Venezuela's sovereign debt. On May 13, 2026, her

government identified restructuring as a central focus of its agenda and promised to engage creditor groups in an open, continuous, and proactive process. *The Bolivarian Republic of Venezuela Announces the Initiation of a Comprehensive Public Debt Restructuring Process*, Off. of the Vice President of the Econ. (May 13, 2026), attached as **Exhibit A** [hereinafter "*Restructuring Announcement*"]. Through restructuring, the Republic desires to re-engage Venezuela with the international financial system and normalize its institutions. *Id.*

The Republic's efforts toward restructuring are more than just words; they also include concrete steps. The Republic formally announced Centerview Partners as its financial advisor for restructuring in May 2026. *Id.* The Republic's retention of Centerview Partners followed the United States' issuance of General License No. 58, which as noted above, addresses Venezuela's ability to retain "legal, financial advisory, and consulting services in connection with potential debt restructuring." *General License No. 58*, *supra*.

Moreover, as mentioned above, CITGO's value has drastically increased. Its 2026 earnings are projected to be $5.8 billion, itself almost equal to Amber's headline bid. And the company expects to hold $5.7

billion in cash by the end of the year. *See CITGO Reports Strong Second-Quarter Results*, *supra.* With CITGO holding that amount of cash, Amber is effectively purchasing CITGO for the price of its $2.1 billion payment to the Bondholders. In return, it is receiving a company worth many times that amount. Such a windfall benefits one party—Amber—at the expense of everyone else. CITGO is Venezuela's most valuable international asset and an engine for generating billions in dividends. Venezuela intends to use that money to fuel its economic recovery, which in turn will allow Venezuela to address its sovereign debt.

## ARGUMENT

A federal appellate court has "inherent" power to hold a case in abeyance, which is "preserved in the grant of authority" in the All Writs Act. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Whether to hold a case in abeyance is a matter of discretion, "which must take into account the optimal use of judicial resources as well as the 'competing interests' of the parties." *Utah*, 2025 WL 1354371, at *1 (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). For stay motions involving foreign sovereigns, the inquiry includes the additional consideration of

international comity. *See Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 75 (3d Cir. 1994) (explaining that comity "force[s] courts in the United States to tailor their remedies carefully to avoid undue interference with the domestic activities of other sovereign nations").

Here, both considerations favor staying this appeal. Venezuela's economic recovery is central to the renewed Venezuela-U.S. bilateral relationship. Moreover, President Trump has summarized American foreign policy as aiming to give Venezuela a "clean slate." *See* Ernest Scheyder, *Trump Moves to Block Courts from Seizing Venezuelan Oil Revenue in US Accounts*, Reuters (Jan. 12, 2026), https://tinyurl.com/5fkbn33e.

A forced sale of CITGO, Venezuela's most valuable foreign asset, disserves those goals. Even if the Republic prevails in this appeal (as it should), the litigation is a costly and distracting process for a country working hard to revitalize its economy and address its sovereign debt. Holding this appeal in abeyance will avoid disrupting the restructuring process, while simultaneously conserving judicial resources on a dispute that will likely be significantly impacted by restructuring before the

parties exhaust their appeals.

Against the President's foreign policy power and Venezuela's new ability to participate in the international oil and financial markets, there are no compelling reasons to foreclose an orderly reorganization. If prior filings are any indication, the Court can look forward to an argument about years of nefarious tactics, leveled against a government that the United States has recognized for all of six months. What actually animates Crystallex is its privileged position at the front of the line. If the unlawful forced sale were to proceed, Crystallex will recover its entire judgment against the Republic, plus interest, before anyone else gets a dime. An orderly process that considers other creditors is obviously less appealing for Crystallex. *In re Crystallex Int'l Corp.*, 11-14074-LSS, Dkt. 524 at 9 (Bankr. D. Del.) ("Crystallex's major, if not only, asset is an arbitration claim (now judgment) against the Bolivarian Republic of Venezuela . . . .").

Amber's interests are equally unsympathetic. It advocated for the district court to sell CITGO for a fraction of what it is worth. Now, CITGO has increased dramatically in value thanks to the changed policy of the United States. Amber would now be purchasing the company for

roughly the amount of cash that CITGO has on hand plus readily available credit, meaning that Amber could repay itself immediately with CITGO's cash and own Venezuela's largest foreign asset for very little out of pocket. Not only does that highlight the flaws in the district court's valuation, *see* OB 66–74, but it also militates in favor of an abeyance. Amber's interest in a windfall pales in comparison to the Republic's interest in retaining its refining company, which was engineered specifically to refine Venezuelan heavy crude that it can now access again and which is dramatically increasing in value.

### 1. International Comity Strongly Favors an Abeyance

International comity is an overarching consideration for all matters involving a foreign sovereign. "Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983). Domestic courts thus give "effect to executive, legislative, and judicial acts of a foreign nation," unless "acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3d Cir. 1994) (citations omitted). Among other benefits, comity

principles allow foreign sovereigns to settle claims brought in U.S. courts. *See, e.g.*, *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1239 (11th Cir. 2004). It is also a basis for staying judicial proceedings. *See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 855 (2d Cir. 1997) (agreeing international comity favors a six-month stay); *Hamilton Reserve Bank, Ltd. v. Democratic Socialist Republic of Sri Lanka*, 2023 WL 7180683, at *6 (S.D.N.Y. Nov. 1, 2023) (staying proceedings for six months to facilitate a sovereign debt restructuring).

*Pravin* is the principal authority for comity-based stays involving sovereign debt. There, the Second Circuit considered whether international comity required an indefinite stay to allow Peru to restructure its debt. *Pravin*, 109 F.3d at 854. The court held that restructuring implicated comity principles because it is an "act[] by a foreign government that ha[s] extraterritorial effect in the United States." *Id.* It then balanced two competing U.S. policies to determine whether a stay was appropriate. *Id.* at 855. The first identified policy was the United States' interest in encouraging foreign debt resolutions. *Id.* The second policy was its "interest in ensuring the enforceability of

valid debts . . . [and] the continuing enforceability of foreign debts owed to United States lenders." *Id.*

Applying those principles, the court found a six-month stay was an appropriate exercise of discretion because it gave foreign sovereigns time to effectuate their restructuring plan while also promoting voluntary resolution of the matter. *See id.*; *see also In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (stating the Third Circuit favors settlement of "complex cases where substantial judicial resources can be conserved by avoiding formal litigation"). But for indefinite stays, like the one Peru requested, the court reached a different conclusion. The court found that the U.S. policy of ensuring debt enforcement outweighed comity concerns when a sovereign seeks an open-ended stay. *Pravin*, 109 F.3d at 855. It reasoned an indefinite stay would effectively deny the creditors their right to enforce their debts. *Id.*

This case is markedly different from *Pravin*. There, Peru had already obtained multiple stays due to restructuring and was seeking an indefinite delay because its process "had no obvious (and reasonably proximate) termination" date. *Id.* at 854–55. No similar concerns exist

here. The Republic has just begun its restructuring efforts and has publicly committed itself to engaging creditor groups in an open, continuous, and proactive process. *See Restructuring Announcement*, *supra.* And the Republic is not seeking an indefinite abeyance. An abeyance with periodic status reports every six months will allow the Republic and its advisors to build on its economic revitalization and implement a restructuring plan. And, if the Court ever determines that the process has stalled, it can reassess the abeyance.

*Pravin* is also different because the United States affirmatively "declined to submit a statement of interest," which meant the Second Circuit had to independently balance the U.S. policy interests. 109 F.3d at 854. Courts give great weight to State Department statements of interest when resolving comity-based stays. *See, e.g.*, *Hamilton Reserve Bank, Ltd.*, 2023 WL 7180683, at *5–6. Here, the U.S. Executive Branch has adopted a foreign policy supporting Venezuela's work on restructuring its sovereign debt by issuing General License No. 58. A temporary stay will advance the Venezuela-U.S. relationship and their common interests. *See Philadelphia Gear Corp.*, 44 F.3d at 191. International comity strongly favors granting the Republic's request.

### 2. Conservation of Judicial and Party Resources Favors an Abeyance

For claims not involving a foreign state, the primary basis for granting a stay on appeal is the advancement of judicial economy. "It is a cardinal virtue of Article III courts to avoid unnecessary decisions and to promote voluntary resolutions where appropriate." *Center for Biological Diversity v. EPA*, 56 F.4th 55, 71 (D.C. Cir. 2022); *Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008) ("An order granting a motion to hold a petition for review in abeyance stays all proceedings in our court unless we direct otherwise."). This is especially true in "complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re General Motors Corp.*, 55 F.3d at 784.

The issues in this case are complicated. The central question of whether Federal Rule of Civil Procedure 69 relies on state or federal law to permit attachment of assets held by a separate entity is a matter of first impression in this Circuit. *But see* RB at 7–8 (collecting cases from other circuits holding that state law controls). Likewise, "[e]ach § 455(a) case is extremely fact intensive and fact bound." *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995). An abeyance therefore serves judicial economy by avoiding the unnecessary resolution of complex issues in a

case that might well become moot. Appellees have previously argued that they are prejudiced by the length of these proceedings. Dkts. 262 at 8; 267 at 2. But that inconvenience does not overcome the time and effort wasted should restructuring occur. What's more, Appellees' prejudice pales in comparison to the harm Venezuela would face in its efforts to address its debt if it loses the refining business that is central to its economic recovery.

The 30 million people of Venezuela, who have shouldered more than their share of hardship, deserve a chance to rejoin the world economy. Their welcome reception should not be a looting by a Canadian litigation company and other international investors, all of whom made investments with eyes wide open and then litigated against the illegal National Assembly of 2015 to reap a windfall. Rarely do the equities tip so conspicuously in one direction.

## CONCLUSION

Separation of powers, comity, judicial economy, and the balance of hardships all favor an abeyance in this matter. To mitigate any prejudice to Appellees, the Republic will provide periodic updates to the Court, which Appellees are free to argue show inadequate progress. The

Republic is certain those arguments will be difficult to make, however, as it works with the United States to continue alleviating sanctions and generating revenue to address its sovereign debt and start down the path to rebuilding prosperity.

Respectfully submitted October 1, 2026.


*/s/ Dominic E. Draye*
Daniel Pulecio-Boek
Dominic E. Draye
Nicholas LeFevre
GREENBERG TRAURIG, LLP
2101 L Street NW
Washington, DC 20037
(202) 331-3100
drayed@gtlaw.com

*Counsel for Appellant Bolivarian Republic of Venezuela*

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 3,510 words, excluding the parts of the motion exempted by Rule 32(f).
2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.
3. As required by L.A.R. 31.1(c), Windows Defender (Antivirus Version 1.435.25.0) ran on this document and found no viruses.

/s/ *Dominic E. Draye*
Dominic E. Draye

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on October 1, 2026. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Dominic E. Draye*
Dominic E. Draye