Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453, 25-3494, 25-3563, 25-3564

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

CRYSTALLEX INTERNATIONAL CORPORATION, ET AL.,
*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

On Appeal from the U.S. District Court for the District of Delaware

# APPELLEE AMBER ENERGY INC.'S RESPONSE TO APPELLANTS' MOTION TO HOLD APPEAL IN ABEYANCE

ANDREW J. ROSSMAN
SUSHEEL KIRPALANI
DAVID M. COOPER
OWEN ROBERTS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016

JOHN BASH
MATTHEW R. SCHECK
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701

PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JEFFREY C. THALHOFER*
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Amber Energy Inc.*
*(additional counsel on inside cover)*

October 8, 2026

MICHAEL A. BARLOW
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, DE 19801

ROY T. ENGLERT, JR.
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW
Washington, DC 20006

## INTRODUCTION

On its face, Venezuela's latest bid to delay this litigation makes little sense. The district court's order approving the sale that Venezuela wants to prevent has not been stayed, so that sale can close seven days after OFAC issues a license approving it, which could happen any day. It thus has been and remains entirely possible that Amber Energy Inc.'s ("Amber's") purchase of the attached shares at issue will close before this Court has an opportunity to resolve this appeal—which is why Venezuela successfully asked this Court to expedite its appeal. Of course, if and when the OFAC license issues, Venezuela will undoubtedly rush back to this Court and demand that it stay the closing and at long last decide on an emergency basis an appeal that has been fully briefed since March. Venezuela has already done so once; that stay motion is, ironically, being held in abeyance at Venezuela's encouragement, and Venezuela has tellingly not sought to renew it. But Venezuela assuredly will re-seek a stay whenever it believes that doing so is in its interest, in hopes that it can persuade this Court to backload appellate review after the issuance of the OFAC license that puts closing mere days away.

It is thus plain what Venezuela really seeks: to put this Court on standby as its break-glass-in-case-of-emergency option. Venezuela wants the right, but not the obligation, to litigate the merits of its appeal. It undoubtedly intends to exercise that right if Amber secures OFAC approval, in an emergency stay posture that could

further delay closing and would further strain judicial resources. But it hopes to secure the ultimate relief it wants (i.e., avoiding the sale) without ever having to prevail on the merits. After all, as Venezuela knows (but did not tell this Court), the complex financing arrangements underlying the transaction the district court approved are set to expire in April 2027. The chance that those deadlines could be further extended is vanishingly small. So granting the indefinite (but no shorter than six months) abeyance that Venezuela seeks could end up preventing the sale from happening through mere delay—without Venezuela ever persuading any court that it is entitled to relief on the merits.

That gambit is perhaps understandable given the daunting standards of review, Venezuela's extensive waiver problems, and the weakness of its complaints about the merits of the district court's process and reasoning. But it is not how the appellate process—let alone an expedited appeal—is supposed to work. If Venezuela truly thinks that it has a legally viable basis to stop the sale, then it should welcome the chance to persuade this Court on the merits of its appeal. This Court should not countenance an effort to achieve through delay what Venezuela has never been able to secure on the merits.

Venezuela's assertion that international comity and U.S. foreign policy demand its untenable approach is exactly wrong. The United States is fully capable of protecting its own foreign policy interests: The sale requires approval through the

OFAC process, and the United States will not grant an OFAC license unless the Executive Branch determines that it is in the national interest. The only thing that could risk taking that decision *out* of the government's hands would be further delaying resolution of these proceedings. This Court should not sanction that result. The best way for this Court to account for and accommodate the international policy issues Venezuela raises is to decide the legal issues before it and trust that the United States government is fully capable of protecting its own foreign policy interests

## BACKGROUND

Nearly a decade ago, in June 2017, Crystallex registered a $1.2 billion judgment against Venezuela. JA.1456. After dozens more creditors registered judgments, the district court set out on a years-long journey to design and run a massively complex judicial sale. That massively complex process took far longer than it should have because Venezuela, bent on "resist[ing] the sale," did everything in its power to delay and disrupt the sale at every turn. JA.10465.

This appeal, the *fifth* in this massive, long-running saga, was expedited by this Court (ironically, on Venezuela's motion) in December of 2025 after Venezuela encouraged the Court to expedite in lieu of staying the underlying sale order it is appealing. Dkt.111. Though briefing was completed in early March, the case was not set for argument until August 10. Dkt.238. Correctly suspecting that Venezuela planned to use its regime change earlier in the year as an excuse to belatedly replace

its counsel on the eve of argument and seek more delay, Crystallex moved for an order requiring Venezuela to identify its counsel. Dkt.252. Soon after, Venezuela's counsel moved to withdraw, and its new counsel asked for a 60-day continuance of oral argument to "allow the Republic and its newly retained counsel to become familiar with the issues in this appeal and decide which, if any, positions to revise or abandon." Dkt.257 at 3. This Court granted that motion over Amber's and Crystallex's objections, rescheduling argument for October 21. Dkt.270. Having secured the delay it wanted, Venezuela then proceeded to inform the Court that it did not intend to revise or abandon *any* of its prior positions and would stand by its previously filed briefs without so much as a change in punctuation. Dkt.274.

Now, with oral argument looming once more, Venezuela belatedly asserts that things have changed fundamentally and seeks further delay. This time, Venezuela asks this Court to hold this appeal in abeyance *indefinitely*, with status reports every six months. The purported basis for this eve-of-argument request is a vague and largely aspirational attempt at a global restructuring, which was first announced back in May. Mot.17. That inchoate restructuring effort is not only old news, but would be an exceedingly complex endeavor that would require dealing with debt orders of magnitude beyond anything at issue in these proceedings. Most remarkable of all, Venezuela asserts that it intends to use CITGO and its "booming business" to support this inchoate restructuring—but then refuses to make any commitment to

use CITGO or anything else to pay off the numerous judgments that those assets have been attached to satisfy. Mot.4; *cf. Crystallex*, 932 F.3d at 149 (recognizing that "[a]ny outcome where Crystallex is not paid means that Venezuela has avoided its obligations").

**ARGUMENT**

Venezuela's motion to hold its appeal in indefinite abeyance is a transparent attempt to win by delay what it has been unable to win in the courts and will almost certainly be unable to win on appeal. Although Venezuela is silent about the consequence of its requested six-month delay, it knows full well that it may be able to run out the clock on the sale it attacks on appeal if it can stall until the transaction agreements expire in April 2027. This blatant effort to circumvent judicial review on the merits is reason enough to reject Venezuela's late-breaking request. But the delay Venezuela seeks is all the more unwarranted because what it is *really* most likely to accomplish is to force this Court to resolve this case on a highly expedited basis—at Venezuela's request, no less—should an OFAC license issue in the coming months. This Court should deny Venezuela's last-ditch attempt to further postpone resolution of proceedings that all parties have previously—and rightly—agreed should be resolved as expeditiously as possible.

## I. Venezuela's Motion Is Yet Another Attempt To Secure Delay In Hopes Of Preventing The Sale The District Court Approved.

Though Venezuela's counsel—and its government—has changed, its litigation tactics remain the same. This motion, filed less than three weeks before the scheduled oral argument date in this appeal, is a classic example of Venezuela's persistent efforts to delay resolution of these proceedings as long as possible, in hopes of putting off indefinitely the sale it opposes by frustrating the financing on which that court-approved sale depends. *See, e.g.*, JA.10426 (recognizing that Venezuela and PDVSA "have repeatedly, and candidly, made clear that their goal is to prevent the closing of any sale of the PDVH Shares"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2024 WL 2804668, at *4 (D. Del. May 31, 2024) (recognizing that Venezuela's litigation efforts were "designed with at least a partial goal of further delaying these proceedings."). Venezuela's penchant for seeking delay on the eve of a hearing is so well established that Crystallex *predicted* months ago that Venezuela would delay informing this Court of a change in counsel to spring a last-minute extension request, Dkt.252—which is precisely what Venezuela then did, despite ultimately telling this Court that neither its change in government nor its change in counsel altered its arguments in the least. Dkts.254, 255, 257, 274.

Venezuela's current motion is just its latest and greatest effort to achieve by delay what it cannot achieve on the merits. Venezuela claims that its request for an abeyance is based on its decision to pursue a global restructuring—a decision that

its own exhibit indicates was made in *May*, well before Venezuela told this Court in July that it stood by its prior briefs filed under the *ancien regime*. *See* Mot. Ex. A. Venezuela makes no attempt to explain why it chose not to file its motion until just a few weeks before oral argument. That strategic dilatoriness on Venezuela's part is itself sufficient reason to deny its late-breaking request.

The real motivation behind Venezuela's motion is obvious. As Venezuela is well aware, postponing the sale by six months would make it impossible to complete the transaction the district court approved, which would effectively give Venezuela the relief it seeks (and cannot obtain) on the merits of its appeal. That sale depends on financing commitments and a restructuring support agreement with the PDVSA bondholders that will expire by April 2027. *See* JA.8258, JA.8630, JA.8694-96. Those agreements have already been extended repeatedly, and any further extension would require unanimous consent from the relevant parties, which cannot realistically be obtained.[1] *See* JA.7940, JA.8258. Once those agreements expire, the sale the district court approved will no longer be possible—effectively overturning the order approving it via delay, and nullifying the years of effort and

[1] The PDVSA bondholders, for example, have since secured a huge victory in another court confirming the validity of their pledge and permitting them to exercise their rights over the CITGO Holding shares. *See* JA.408. Given that victory, there is no realistic possibility that the PDVSA bondholders would unanimously agree to extend the existing restructuring support agreement at its current price.

tens of millions of dollars of cost that the parties and the court devoted to the complex sale process. This Court should not countenance Venezuela's effort to obtain by delay the very outcome that the district court rejected on the merits and that faces multiple obstacles in this Court.

Nor should the Court grant an abeyance that is far more likely to impede orderly resolution of these proceedings than to aid it. Though Venezuela originally asked this Court to stay the sale order pending resolution of its appeal, it quickly reversed course and agreed that expedited resolution was the better path. So the district court's order approving the sale remains in effect, and the only thing standing in the way of consummating the sale is the necessary OFAC license. That is why Venezuela agreed that the Court should resolve its appeal on an expedited basis: Prompt resolution is the best way to ensure that these proceedings do not remain ongoing if and when an OFAC license issues. If this Court puts these proceedings on indefinite hold, and OFAC then grants a license, the sale could close as quickly as seven days after the license issues. Venezuela and the other appellants notably do not suggest that they would stand down if a license issued. They instead undoubtedly would rush back here and demand that the Court immediately stay the sale order, forcing the Court to resolve their appeal on a highly expedited emergency basis in the wake of the OFAC approval. Venezuela should not be permitted to park

this appeal now only to demand later that the Court instantly slam on the accelerator. That approach has nothing to recommend it for anyone but Venezuela.

## II. Delaying Resolution Of This Appeal Would Undermine The United States' Foreign Policy Interests.

Venezuela contends that further delay is warranted by international comity and U.S. foreign policy interests, relying extensively on what Venezuela describes as a "paradigmatic change in the Venezuela-U.S. relationship" based on the recognition of President Delcy Rodríguez's government. Mot.2. But as Venezuela recognizes in the first sentence of its motion, the legal issues in this case have nothing to do with any change in U.S. foreign policy toward Venezuela; Venezuela itself identifies the principal issue as involving the scope of Federal Rule of Civil Procedure 69 and the ultimate question as simply "whether the sale of CITGO to satisfy judgments against the Republic of Venezuela and Petróleos de Venezuela ('PDVSA') was lawful," as the district court held. Mot.1.

Those legal issues have not changed based on recent events in Caracas (as Venezuela's decision to stand pat on its previous briefs makes crystal clear). And legal issues aside, to the extent those events have influenced the United States' assessment of whether this sale serves its foreign policy interests, the Executive Branch will make that determination in the OFAC process—a process in which both Amber and Venezuela can be heard, and that exists precisely to ensure that significant foreign transactions will not harm U.S. policy interests.

Because the sale transaction "cannot occur until OFAC has specifically licensed" it, there is exactly *zero* chance that the sale will proceed if the Executive Branch determines that it would undermine international comity or U.S. foreign policy.[2] JA.275; *see Crystallex*, 932 F.3d at 151 (recognizing that the OFAC process provides "an explicit mechanism to account for" any "short- or long-term U.S. foreign policy interests"). By contrast, if this Court grants the abeyance Venezuela requests, it will deprive the United States of any possibility of having this appeal resolved before making a final licensing decision. An abeyance would create a very real risk that the transaction could collapse even after OFAC has granted a license, as Venezuela would inevitably try to slow-roll the emergency proceedings long enough to kill the transaction, rendering the license meaningless. Indeed, Venezuela's allies have already previewed that strategy by trying to supplement the record with a host of facts that are utterly irrelevant to the issues on appeal. Dkts.293-1, 295. To avoid the extraordinary and irreparable harm that would befall Amber and the Creditors, this Court would be forced to either deny any future stay

[2] Venezuela's extensive reliance on *Pravin* is remarkably misplaced for that reason, as that case underscored that stays should *not* be issued when they could frustrate U.S. foreign policy. *See* Mot.15-17 (discussing *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir. 1997)). Given that Venezuela seeks an "open-ended stay" that could do exactly that, and the United States has thus far "declined to submit a statement of interest" supporting Venezuela, *Pravin* weighs strongly against Venezuela here. *Contra* Mot.15-17.

motion outright based on, among other things, Venezuela's tactical delay or effectively decide the merits of the case on a highly expedited basis. That not only would frustrate the Executive Branch's prerogative to decide for itself whether a transaction serves U.S. policy interests, but would strongly dissuade other potential purchasers from investing the same years of effort and millions of dollars that Amber invested to pursue a transaction only to have Venezuela postpone it to death.

In short, expeditiously resolving this appeal is the best way to ensure that the Executive Branch can determine whether and how quickly the sale should occur. The Executive Branch, like all other interested parties, is best served by securing this Court's resolution of the legal challenges to the sale order as soon as possible. Appropriate deference to the political branches on questions of foreign policy thus weighs strongly in favor of denying Venezuela's motion and proceeding to resolve this appeal expeditiously.[3]

[3] All of that said, Venezuela's self-serving representations about U.S. support for its plans to reclaim CITGO are not borne out by the facts on the ground. Venezuela insists that permitting it to redirect CITGO toward a "global restructuring" (which it conspicuously declines to explain how it legally could do with the attachments in place) would further U.S. policy interests. But less than one month ago, OFAC expressly refused to authorize "[a]ny transaction to affect or alter the governance of [PDVH], Citgo Holding, Inc., or CITGO Petroleum Corporation, including the appointment, removal, or replacement of any director, officer, or other corporate governance official," OFAC General License No. 52C (Sept. 14, 2026)—which includes any effort by Venezuela to take any of those steps.

## III. Venezuela's Remaining Arguments Are Likewise Meritless.

Venezuela's remaining arguments are even less persuasive. It claims that an abeyance will promote judicial economy, Mot.18-19, but that is exactly backwards: This case has already consumed massive judicial resources and time, in no small part because of Venezuela's protracted efforts to delay and disrupt the proceedings. *See, e.g.*, JA.10465. Further delay would only force the parties and the courts to expend even more effort on the case—particularly when the appeal is already set for oral argument in less than two weeks. Moreover, if this Court were to grant an abeyance and OFAC were then to grant the necessary license before April 2027, Venezuela undoubtedly would demand that immediate resolution of its appeal in an emergency stay posture, dramatically increasing the burden on the parties and this Court. On top of that, Venezuela would inevitably try to use that time crunch to achieve still more delay, in hopes of forcing the sale to collapse completely, thereby wasting *all* of the immense effort that the parties and the courts have put into one of the most complex judicial sale proceedings in history. Judicial economy thus weighs heavily in favor of resolving this appeal as expeditiously as possible.

Finally, Venezuela's self-serving claims that Amber's interests in the sale are "unsympathetic" because Amber purportedly "advocated for the district court to sell CITGO for a fraction of what it is worth," Mot.13-14, rehash the very merits arguments Venezuela wants this Court to put off resolving. As the district court

determined in its meticulously detailed 162-page opinion, the sale process was fair to all participants and "value-maximizing," JA.374-75, and Amber's bid provided billions in value and the best combination of price and certainty, JA.413-16. Some of that certainty takes the form of the concrete financing and support arrangements set to expire in April. As Amber has explained in its briefing on the merits, Venezuela's contrary arguments rest on (among other flaws) substantially inflated valuations. *See* Amber.Br.45-56; JA.372.

Implicitly recognizing as much, Venezuela tries to supplement the record on appeal, claiming that CITGO has risen in value since the district court approved the sale. Mot.4, 10-11, 13-14. But that is irrelevant to whether that order properly approved the sale. It also ignores the real-world dynamics impacting the complex sale process the district court had to oversee. After all, anyone willing to purchase CITGO would have to be willing to take on the risk that its value might *fall* dramatically after a sale was approved. One need look no further than intervening political events that have taken place (and not just in Venezuela) to appreciate the volatility of the situation. That likely explains why no one else was willing or able to make a bid superior to Amber's: Both bidders and their financers understood that they were dealing with a situation in which much could change in favorable or unfavorable ways very quickly, and that they would be stuck with their offer either way. Venezuela's claim that Amber would somehow reap a "windfall" if the sale

closes, Mot.14, thus does not comport with reality. And the notion that this Court should instead give Venezuela the benefit of that purported windfall, by allowing Venezuela to continue delaying the court-ordered sale while also making no promise to ever pay its creditors, cannot be taken seriously.

## CONCLUSION

This Court should deny the motion to hold this appeal in abeyance.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JEFFREY C. THALHOFER*
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

ROY T. ENGLERT, JR.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
2000 K Street NW
Washington, DC 20006

ANDREW J. ROSSMAN
SUSHEEL KIRPALANI
DAVID M. COOPER
OWEN ROBERTS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016

JOHN BASH
MATTHEW R. SCHECK
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701

MICHAEL A. BARLOW
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 220
Wilmington, DE 19801

*Counsel for Amber Energy Inc.*

October 8, 2026

## CERTIFICATE OF COMPLIANCE

This document complies with the requirements of Fed. R. App. P. 32(a) because it has been prepared in 14-point Times New Roman font.

This document complies with L.A.R. 31.1(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement