GIBSON DUNN

Miguel A. Estrada
Partner
T: +1 202.955.8257
M: +1 202.250.4300
mestrada@gibsondunn.com

October 28, 2026

Patricia S. Dodszuweit
Clerk of the Court
U.S. Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Re: *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494, 25-3563, 25-3564

Dear Ms. Dodszuweit:

Pursuant to Federal Rule of Appellate Procedure 28(j), Crystallex respectfully submits the Second Circuit's decision in *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2026 WL 3210845 (2d Cir. Oct. 27, 2026), which unanimously affirmed the Southern District of New York's decision that the 2020 Bonds and associated pledge of 50.1% of the shares of CITGO Holding, Inc. are valid under Venezuelan law.

The Second Circuit rejected the Venezuela Parties' argument that the 2020 Bondholders' indenture and pledge were "national public interest contracts" under the Venezuelan Constitution that required approval by the National Assembly and held that "the notes and collateral are valid under the ordinary application of Venezuelan law." *MUFG Union Bank*, slip op. at 51. The Second Circuit also rejected Venezuela's assertion that the district court should have given effect under the act-of-state doctrine to resolutions of the National Assembly purporting to repudiate the 2020 Bondholders' indenture and pledge, because the act-of-state doctrine does not require U.S. courts to accept as valid acts of a foreign state that seek

GIBSON DUNN



to have extraterritorial effect and the relevant transactions "took place entirely outside of Venezuela." *Id.* at 60.

The Venezuela Parties and Gold Reserve have argued in these appeals that, "[i]f the Second Circuit holds the Notes invalid," it would undercut Judge Stark's finding that the Amber bid has the greatest certainty of closing and mean that the approved sale would unjustly transfer funds to "holders of invalid Bonds." Venezuela Opening Br. 74; *see* Gold Reserve Opening Br. 20-21 (similar). Events occurring after a ruling could not impeach its correctness, but now that the Second Circuit has confirmed the validity of the 2020 Bonds no one can doubt that Judge Stark correctly required bidders to account for this risk. The decision also confirms that, far from being unjust, Amber's transaction provides an additional $3 billion in value to the Venezuela Parties, which must be considered in their challenges to the transaction's fairness. Crystallex Br. 64 (citing *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 559-60 (Del. 1995)).

Respectfully submitted,

*/s/ Miguel A. Estrada*

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
*Counsel for Plaintiff-Appellee Crystallex International Corp.*

cc: All counsel of record (via ECF)

Compliance Statement: I certify that this letter complies with the word limit of Federal Rule of Appellate Procedure 28(j) because it contains 339 words.

# Exhibit A

25-2652
*Petróleos v. MUFG*

# In the
# United States Court of Appeals
# For the Second Circuit

---

August Term, 2025

(Argued: May 14, 2026 Decided: October 27, 2026)

Docket No. 25-2652

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., PDV HOLDING, INC.,

*Plaintiffs-Counter-Defendants-Appellants*,

–v.–

MUFG UNION BANK, N.A., GLAS AMERICAS LLC,

*Defendants-Counter-Claimants-Appellees.*[*]

---

Before: NARDINI, LEE, and ROBINSON, *Circuit Judges*.

---

In 2016, Venezuela's state-owned oil company, Petróleos de Venezuela, S.A ("PDVSA"), offered a bond swap ("Exchange Offer") through which holders of unsecured notes due in 2017 (the "2017 Notes") could exchange their notes for new, secured notes due in 2020 (the "2020 Notes"). PDVSA pledged as collateral a controlling interest in CITGO Holding, Inc., which it owned through a series of

[*] The Clerk's office is respectfully directed to amend the caption as reflected above.

subsidiaries. Holders representing 39.4% of the outstanding principal on the 2017 Notes accepted the Exchange Offer. In October 2019, PDVSA defaulted when it failed to make scheduled principal and interest payments on the 2020 Notes, thereby raising the possibility that holders of the 2020 Notes might be able to proceed against the controlling interest in CITGO pledged as collateral in the Exchange Offer. All of these events occurred against the backdrop of domestic political turmoil in Venezuela and changes in the U.S. recognized leadership of the country and, in turn, of state-owned PDVSA.

In this action, Plaintiffs-Appellants PDVSA, PDVSA Petróleo, S.A., and PDV Holding, Inc. (collectively, "the PDV Entities") sought a declaration that the Exchange Offer, including the 2020 Notes and the pledge of collateral comprising a controlling interest in CITGO, was void and is thus unenforceable, and they sought to enjoin enforcement of the 2020 Notes and pledge. They argue that under Article 150 of the Venezuelan Constitution, PDVSA lacked authority to execute the transaction without approval of Venezuela's National Assembly. And they contend that various resolutions passed by the National Assembly in 2016 and 2019 expressly *disapproved* of the transaction and thereby constituted sovereign acts that rendered the bond exchange void under the act-of-state doctrine. Creditor Defendants-Appellees disagreed.

On certified questions from this Court, the New York Court of Appeals determined that, under New York law, the validity of the Exchange Offer is determined by Venezuelan law. On remand, the United States District Court for the Southern District of New York (Failla, *J.*) concluded on summary judgment that (1) Article 150 of the Venezuelan Constitution does not invalidate the Exchange Offer, and (2) the act-of-state doctrine, which bars courts from invalidating certain official acts of foreign sovereigns, does not apply. The court entered a partial final judgment. This appeal followed, and we AFFIRM.

---

IGOR V. TIMOFEYEV, Paul Hastings LLP, Washington, D.C. (Kurt W. Hansson, James L. Ferguson, Zachary D. Melvin, Paul Hastings LLP, New York, NY, *on the brief*), *for Plaintiffs-Counter-Defendants-Appellants* Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.

MICHAEL J. GOTTLIEB, Willkie Farr & Gallagher LLP, Los Angeles, CA (Erica L. Ross, Samuel G. Hall, Kristin E. Bender, Willkie Farr & Gallagher LLP, Washington, D.C.; Aaron E. Nathan, Willkie Farr & Gallagher LLP, New York, NY; Alyxandra Vernon, Willkie Farr & Gallagher LLP, San Francisco, CA, *on the brief*), *for Plaintiff-Counter-Defendant-Appellant* PDV Holding, Inc.

MASHA G. HANSFORD, Davis Polk & Wardwell LLP, Washington, D.C.[†] ( Jeffrey J. Recher, Paul A. Paterson, S. Conrad Scott, Joshua A. Altman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Kannon K. Shanmugam,[‡] Austin W. Piatt, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Christopher J. Clark, Andrew J. Rodgers, Brian T. Burns, Clark Smith Villazor LLP, New York, NY, *on the brief*), *for Defendants-Counter-Claimants-Appellees*.

Adeel Mohammadi, Munger, Tolles & Olson LLP, Los Angeles, CA; Donald B. Verrilli, Jr., Ginger D. Anders, Nicole R. Allicock, Munger, Tolles & Olson LLP, Washington, D.C., *for Amicus Curiae* Bolivarian Republic of Venezuela, *in Support of Plaintiffs-Counter-Defendants-Appellants*.

---

[†] Attorney Masha G. Hansford signed the brief for Defendants-Counter-Claimants-Appellees when she was with Paul, Weiss, Rifkind, Wharton & Garrison LLP in Washington, D.C., but joined Davis Polk & Wardwell LLP in Washington, D.C. prior to the oral argument.

[‡] Attorney Kannon K. Shanmugam joined Davis Polk & Wardwell LLP in Washington, D.C. after the brief was filed and before the Court's oral argument.

ROBINSON, *Circuit Judge*:

In 2016, Venezuela's state-owned oil company, Petróleos de Venezuela, S.A ("PDVSA"), offered a bond swap ("Exchange Offer") through which holders of unsecured notes due in 2017 (the "2017 Notes") could exchange their notes for new, secured notes due in 2020 (the "2020 Notes"). PDVSA pledged as collateral a controlling interest in CITGO Holding, Inc., which it owned through a series of subsidiaries. Holders representing 39.43% of the outstanding principal on the 2017 Notes accepted the Exchange Offer.

In October 2019, PDVSA defaulted when it failed to make scheduled principal and interest payments on the 2020 Notes, raising the possibility that holders of the 2020 Notes might be able to assert their interest in the collateral on those notes: a controlling interest in CITGO. All of these events occurred against the backdrop of domestic political turmoil in Venezuela and changes in the U.S. recognized leadership of the country and, in turn, of state-owned PDVSA.

In this action, Plaintiffs-Appellants PDVSA, PDVSA Petróleo, S.A., and PDV Holding, Inc. (collectively, "the PDV Entities") seek a declaration that the Exchange Offer, including the 2020 Notes and the pledge of an interest in CITGO as collateral, was void and is thus unenforceable, and they seek to enjoin

enforcement of the 2020 Notes or execution against any claimed security interest in CITGO.

The PDV Entities argue that PDVSA lacked authority to execute the Exchange Offer because Venezuela's National Assembly did not approve the transaction as required under Article 150 of the Venezuelan Constitution, which requires National Assembly approval for "national public interest contracts." VENEZUELA CONST. Article 150, App'x 442.[1] And they contend that various resolutions passed by the National Assembly in 2016 and 2019 expressly *disapproved* of the Exchange Offer and thereby constituted sovereign acts that rendered the transaction void under the act-of-state doctrine. The creditors, Defendants-Appellees in this appeal, disagreed.

On certified questions from this Court, the New York Court of Appeals determined that, under New York law, the validity of the Exchange Offer is determined by Venezuelan law. On remand, the United States District Court for the Southern District of New York (Failla, *J.*) concluded on summary judgment that (1) Article 150 of the Venezuelan Constitution does not invalidate the Exchange Offer, and (2) the act-of-state doctrine, which bars courts from

[1] All translations from the original Spanish texts throughout this opinion have been provided by the parties.

invalidating certain official acts of foreign sovereigns, does not apply. The court entered a partial final judgment. This appeal followed, and we AFFIRM.

## BACKGROUND[2]

### I. Factual Background

*A. The Parties*

Appellant PDV Entities comprise the issuer, guarantor and pledgor in connection with the 2020 Notes. PDVSA, Venezuela's wholly-state-owned oil company, issued the 2020 Notes. PDVSA Petróleo S.A., a wholly owned subsidiary of PDVSA incorporated in Venezuela, is the guarantor of the 2020 Notes. PDV Holding, Inc. is a wholly owned subsidiary of PDVSA incorporated in Delaware with its principal place of business in Texas. PDV Holding is the sole owner of CITGO Holding, Inc., which in turn owns CITGO Petroleum Corporation, a refiner and marketer of petroleum products in the United States. PDV Holding, as pledgor, pledged 50.1% of its equity interest in CITGO Holding as security for the 2020 Notes. Non-parties CITGO Holding and CITGO Petroleum are incorporated in Delaware and maintain their principal places of business in Texas.

[2] This account is drawn from the summary judgment record and is essentially undisputed.

Appellees are MUFG Union Bank, N.A. and GLAS Americas LLC (collectively, "Creditors"). MUFG Union Bank is a federally chartered national banking association with offices in New York City. It serves as the Trustee for the 2020 Notes. GLAS Americas is a New York limited liability company that serves as the Collateral Agent for the 2020 Notes.

*B. The Venezuelan Constitution*

Two related provisions of the Venezuelan Constitution frame the central issue in this appeal. Article 150 requires National Assembly approval of "national public interest contracts." As relevant to this case, the provision reads:

> The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law.
>
> No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

VENEZUELA CONST. Article 150, App'x 442. Article 187 enumerates some of the powers of the National Assembly, including the power to authorize the National Executive to execute contracts of national interest. The relevant portion states:

> It is the role of the National Assembly to: . . . Authorize the National Executive to enter into contracts of national interest, in the cases established by law. Authorize contracts of municipal, state and national public interest,

Case: 25-2652, 10/27/2026, DktEntry: 125.1, (8 of 60)

> with States or official foreign entities or with companies not domiciled in Venezuela.

VENEZUELA CONST. Article 187(9), App'x 442–43. The terms "contracts of national public interest" and "contracts of national interest" are not defined. *Id.*

*C. The Exchange Offer*

In 2007, PDVSA issued $3 billion in notes, with periodic interest payments through the term of the notes, and the entire principal amount due in April 2017. In 2010 and 2011, PDVSA issued a combined $6.15 billion in notes that similarly provided for periodic interest payments, with the principal due in installments on set dates in 2015–2017. Together these notes comprise the 2017 Notes. The 2017 Notes were denominated in U.S. dollars.

After the 2017 Notes were issued, crude oil prices fluctuated, dropping significantly from 2014 to 2016. PDVSA's credit ratings by Moody's, Fitch, and S&P likewise deteriorated between the time the 2017 Notes were issued and 2016. As of September 2016, the outstanding principal balance on the 2017 Notes exceeded $7 billion. In September 2016, the PDVSA Board approved the Exchange Offer: a proposed bond exchange through which holders of the 2017 Notes could tender their notes in exchange for new notes with the principal due in 2020—that is, the 2020 Notes. In contrast to the unsecured 2017 Notes, pursuant to the

Exchange Offer the 2020 Notes were to be secured with a 50.1% equity interest in CITGO Holding.

PDVSA's Board approved the Exchange Offer on September 7, 2016, in accordance with applicable corporate formalities, including approval by PDVSA's sole shareholder, the Venezuelan Government, on September 8, 2016. The PDVSA Petróleo Board and PDV Holding Board likewise approved the guarantee and CITGO pledge, respectively. PDVSA announced the Exchange Offer in a September 16, 2016, offering circular filed with the U.S. Securities and Exchange Commission. The offer expired on October 21, 2016.

Noteholders representing approximately 39% of the aggregate outstanding principal on the 2017 Notes accepted the offer. The Exchange Offer closed, and PDVSA issued the 2020 Notes on October 28, 2016. The relevant documents for the closed transaction, referred to collectively as the "Governing Documents," are the 2020 Notes, the Indenture,[3] and the Pledge Agreement ("the Pledge").[4]

---

[3] The Indenture was executed by (i) PDVSA, as issuer, (ii) PDVSA Petróleo, as guarantor, (iii) MUFG Union Bank, as trustee, (iv) GLAS Americas, as collateral agent, (v) Law Debenture Trust Company of New York, as registrar, transfer agent, and principal paying agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg paying agent.

[4] The Pledge Agreement was between PDV Holding as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, GLAS Americas as collateral agent, and MUFG Union Bank as trustee.

Beneficial owners of the 2017 Notes who accepted the Exchange Offer were required to tender their 2017 Notes through one of two European clearing banks or the Depository Trust Company ("DTC"), incorporated and with a principal place of business in New York. The 2020 Notes issued in exchange for 2017 Notes were issued through a number of Global Notes registered in the name of Cede & Co. as nominee of the DTC. Cede & Co. is a general partnership organized under New York law with its principal place of business in New York, New York. The 2020 Notes are deposited in New York with the Law Debenture Trust Company of New York, as custodian for the DTC, the depository under the Indenture. The collateral security interest in 50.1% of CITGO Holding is held by GLAS as a physical stock certificate in a vault located in New York.

*D. Political Turmoil in Venezuela*

The Exchange Offer and its aftermath played out in the context of intense political conflict within Venezuela. Prior to 2015, the President of Venezuela was Nicolás Maduro. Following the elections of December 2015, the country's legislature, the National Assembly, was controlled by a coalition of opposition parties. Maduro and the National Assembly hotly disputed their respective constitutional powers.

In early May 2016, Maduro declared a "State of Exception and Economic Emergency" and claimed a number of powers, including the right to unilaterally execute public interest contracts. In response, the National Assembly passed the May 2016 Resolution.

The May 2016 Resolution explicitly invoked the National Assembly's powers under Articles 150 and 187 of the Venezuelan Constitution, and (1) rejected the provision of Maduro's emergency decree that purported "to authorize the National Executive to sign contracts of public interest, without the approval of the National Assembly"; (2) "warn[ed] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void"; (3) "remind[ed] that . . . contracts of national . . . public interest concluded by . . . the National Executive . . . without the approval of the National Assembly . . . shall be null and void in their entirety"; and (4) instructed that the resolution be circulated to foreign embassies to inform them about the nullity of public interest contracts executed without legislative approval. App'x at 646–48.

Then in September, shortly after PDVSA announced the Exchange Offer, the National Assembly passed a resolution "categorically" rejecting the pledge of a controlling interest in CITGO as collateral. App'x 114–16. The September 2016 resolution invoked the National Assembly's authority under Article 187 of the

Constitution and specifically its power to obtain information about transactions that commit PDVSA's assets as collateral, and resolved in relevant part:

> First. To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral.
>
> Second. To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.
>
> Third. To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela.
>
> Fourth. To urge Petróleos de Venezuela S.A. to present the Country with a plan for the refinancing of its financial commitments and a recovery plan for the oil industry over the short- and medium-term.

App'x 115.

After the Exchange Offer was completed, the political turmoil in Venezuela continued. Maduro claimed he won the country's presidential election in 2018, but the National Assembly disputed the legitimacy of that election. On January 15, 2019, it declared that Juan Guaidó—the National Assembly President—would assume the role of Interim President of Venezuela. After Juan Guaidó was sworn

in as Interim President, U.S. President Donald Trump recognized Guaidó as Interim President, calling the National Assembly the "only legitimate branch of government duly elected by the Venezuelan people." App'x 2048. The U.S. National Security Advisor likewise described the 2018 Venezuelan presidential election as "not free, fair or credible." App'x 2055.

In the months following the election fallout, the National Assembly took two more steps relevant to this appeal. In February 2019, it enacted a statute under which Interim President Guaidó appointed a new *ad hoc* board of directors for PDVSA ("Ad Hoc Board"). The Ad Hoc Board was recognized in the United States as the governing body of PDV Entities.

In October 2019, the National Assembly passed a resolution purporting to "ratify" that the 2020 Notes violated the Venezuelan Constitution. App'x 124. The October 2019 Resolution states that the National Assembly had, in the September 2016 Resolution, "rejected the collateral of 50.1% of the shares in [CITGO.]" App'x 122. It further notes that, "following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution." App'x 124. Accordingly, the National Assembly resolved, among other things: "[t]o

ratify that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly." App'x 124.

Though the Ad Hoc Board appointed by Guaidó made the scheduled payment on the 2020 Notes in April 2019, it reserved its rights and stated that the payment "cannot be regarded as a ratification or confirmation by the National Assembly or by the Government of the Acting President Juan Guaidó of the validity of the 2020 PDVSA Bond in accordance with Venezuelan Law." App'x 2013. In October 2019, PDVSA did not make its scheduled principal and interest payments, leading to this lawsuit.

## II. Procedural Background

The PDV Entities sued the Creditors in October 2019, seeking declarations that the Governing Documents—the 2020 Notes, Indenture, and Pledge Agreement, were invalid, illegal, null and void *ab initio*—meaning from the outset, and they thus are unenforceable. The PDV Entities also sought an injunction to prevent the Creditors from enforcing any remedies under the Governing Documents or exercising any rights or remedies under the Indenture or Pledge Agreement arising from the default. The Creditors counterclaimed, seeking their

own declaratory judgment that the Governing Documents were enforceable, and raising, among others, breach-of-contract claims.

*A. PDVSA I*

The parties then filed cross-motions for summary judgment. The PDV Entities asserted the Governing Documents were invalid for two reasons. First, they asserted that the district court was required by the act-of-state doctrine to accept and give effect to the acts of the National Assembly purporting to reject and invalidate the use of CITGO as collateral for the Exchange Offer. Second, they argued that New York choice-of-law principles required the district court to apply Venezuelan law to determine the validity of the 2020 Notes and that the Notes were void under Venezuelan law because the Exchange Offer was a national public interest contract and PDVSA issued the Exchange Offer without National Assembly approval. *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 261 (S.D.N.Y. 2020) ("*PDVSA I*").

Because the PDV Entities raised the act-of-state doctrine, the court invited the U.S. Government to submit its views to the court as to whether "recognition of the National Assembly's denunciation and invalidation of the 2020 Notes would

be consistent with the law and policy of the United States." *Id.* at 268.[5] The U.S. Government declined to take a position because, in its view, there were "unresolved questions of fact and of Venezuelan law antecedent to the possible applicability" of the act-of-state doctrine. App'x 3270. The Government noted that it was effectuating its foreign policy interests in part through the Office of Foreign Asset Control's implementation of the U.S. Sanctions regime.[6]

The district court ruled for the Creditors on both issues. It first concluded that the act-of-state doctrine did not apply. *See PDVSA I*, 495 F. Supp. 3d at 270. It reasoned that the three resolutions were "official acts of a foreign sovereign," namely, Venezuela. *Id.* at 271. But it concluded that, to the extent the resolutions sought to invalidate the 2020 Notes and Pledge, any resulting taking took place outside of Venezuela. *Id.* at 280. Accordingly, there was no basis for mandatory

---

[5] In quotations from caselaw, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

[6] In 2018, President Trump issued Executive Order 13835 prohibiting transactions "related to . . . the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest." Prohibiting Certain Additional Transactions with Respect to Venezuela, 83 Fed. Reg. 24001, § 1(a)(iii) (May 21, 2018). The Office of Foreign Assets Control has repeatedly extended the effective date of a license that would allow transactions relating to the sale or transfer of CITGO shares in connection with the 2020 Notes notwithstanding this Executive Order. It most recently postponed the effective date of such license until November 5, 2026. U.S. Department of the Treasury, Office of Foreign Assets Control, *Venezuela Sanctions, 595. What does Venezuela-related General License 5Z authorize?* (Sept. 16, 2026), https://perma.cc/W9FT-DK5Q. Accordingly, at least until November 5, 2026, the Executive Branch has constrained Creditors' ability to execute on any judgment against the CITGO shares without further license.

application of the act-of-state doctrine. *Id.* at 281. Given that the United States expressly declined to take a position on the matter and the substantial U.S. interests "in stabilizing financial markets, protecting the expectations of creditors, and maintaining New York's status as a preeminent global commercial center," the district court concluded that "the law and policy of the United States" did not support permissive application of the doctrine. *Id.* at 282–83.

As to the argument that the Exchange Offer and resulting Governing Documents were void under Venezuelan law, the district court concluded that New York choice-of-law rules required application of New York law, not Venezuelan law. *Id.* at 283. The court ruled that any failure to comply with Article 150 of the Venezuelan Constitution was thus "irrelevant" to the enforceability of the Governing Documents. *Id.* at 292. The district court certified partial summary judgment in favor of the Creditors. *Id.* at 293.

*B. PDVSA II*

Following the PDV Entities' appeal to this Court, we issued a decision certifying questions to the New York Court of Appeals. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 475–76 (2d Cir. 2022) ("*PDVSA II*"). We explained that the "resolution of the New York choice-of-law issues is a necessary antecedent to the potential application of the act-of-state doctrine in this case," and

that we could not predict with confidence whether, under New York choice-of-law principles, New York or Venezuelan law applies in assessing the validity of the Governing Documents. *Id.* at 466, 474. We thus certified to the New York Court of Appeals two questions regarding New York choice-of-law principles in this context. *Id.* at 475–76.

*C. PDVSA III and IV*

The New York Court of Appeals accepted the certification request and answered the questions. It held that "[m]atters going to the validity of the security at issue here, that is the 2020 Notes, are governed by the law of Venezuela—i.e., the local law of the issuer's jurisdiction under UCC 8-110(a)(1)." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 473 (2024) ("*PDVSA III*"). It thus concluded that "determining whether the securities issued by these Venezuelan entities are valid requires analysis of article 150 and related provisions of the Venezuelan Constitution." *Id.* at 477.

We accordingly vacated the district court's judgment and remanded for the court to evaluate in the first instance the validity of the Governing Documents under Venezuelan law. *Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 268 (2d Cir. 2024) ("*PDVSA IV*"). We also declined to take up the PDV Entities' act-of-state argument. *Id.* at 269. We noted only, in accord with *PDVSA*

*II*, that the district court need not consider the act-of-state doctrine if the Exchange Offer was invalid under Venezuelan law. *Id.* at 270.

*D. PDVSA V*

On remand, both parties filed with the district court supplemental materials in support of their respective motions for summary judgment. The Bolivarian Republic of Venezuela (the "Republic") filed another amicus, or friend-of-the-court, brief as well. And the district court solicited updated input from the United States.

In its ruling on the parties' motions, the district court made two key determinations. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023, 2025 WL 2675871, at *1 (S.D.N.Y. Sept. 18, 2025) ("*PDVSA V*"). First, it concluded that the Governing Documents are valid under Venezuelan law. *Id.* at *27. Following a 2002 decision of the Constitutional Chamber of the Venezuelan Supreme Tribunal of Justice, the district court explained that only contracts entered into by "competent organs of the National Executive," could be national public interest contracts. *Id.* at *16. It then explained that PDVSA is part of the Decentralized Public Administration of Venezuela and thus is not among the entities subject to the relevant Article 150 stricture. *Id.* at *18–20. In reaching this conclusion, the court declined to give conclusive weight to the Republic of

Venezuela's position that the Governing Documents were national public interest contracts. *Id.* at *24–25. Second, the court again ruled that the act-of-state doctrine does not apply. *Id.* at *29.

The district court thus entered partial summary judgment for the Creditors and certified that judgment as final.[7] The PDV Entities appealed.[8]

---

[7] This is not the only litigation involving PDVSA's interest in CITGO. In 2019, the Third Circuit approved the issuance of a writ of attachment in favor of a creditor of Venezuela who sought to collect its arbitration award against Venezuela by executing against PDVSA's ownership interest in PDV Holding. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019). Since 2020, the District of Delaware (Stark, *J.*) has "undertaken the challenging and complex task of developing and implementing a process for the sale of a multi-billion-dollar oil company [PDV Holding] owned by a foreign state unwilling to part with it, where the asset is subject to U.S. sanctions." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. MC 17-151, 2025 WL 3281353, at *59 (D. Del. Nov. 25, 2025). Most recently, that court approved a Special Master's recommendation for the sale of PDV Holding and resolution of the claims of Crystallex and the various other judgment creditors who have sought to execute against those assets. *Id.* at *60. The plan commits over $2 billion to extinguish at least two-thirds of the 2020 Notes. *Id.* The district court's approval of the sale is on appeal to the Third Circuit, with oral argument set for October 21, 2026.

[8] Since that time, the United States arrested and indicted former President Maduro and subsequently recognized the government of former Vice President Delcy Rodríguez. Neither the United States, nor the now recognized government of President Delcy Rodríguez, has filed anything with this Court indicating that the changed diplomatic relations between the United States and Venezuela should impact our analysis as to PDVSA's position in this litigation. Nor has either government offered any information as to whether the friend-of-the-court brief filed by the Bolivarian Republic of Venezuela at a time when the National Assembly was recognized as the "only legitimate branch of government duly elected by the Venezuelan people," App'x 2048, reflects the position of the currently recognized Venezuelan government. Thus, for purposes of this decision, we assume without deciding that these more recent events have no bearing on our analysis.

## DISCUSSION

As they did before the district court, the PDV Entities argue that the Governing Documents, including the 2020 Notes, are void under Article 150 of the Venezuelan Constitution because the National Assembly did not approve the transaction. And the PDV Entities contend that even if the documents were not void, the act-of-state doctrine obliges us to give effect to the National Assembly's resolutions as acts of a foreign sovereign.

We review without deference the district court's ruling on a motion for summary judgment. *See NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010). Summary judgment is proper when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

### I. Validity of the Governing Documents under Venezuelan Law

The district court's decision about the meaning of foreign law is a question of law, which we review without deference to the district court. *In re Vitamin C Antitrust Litigation*, 8 F.4th 136, 142 (2d Cir. 2021). In interpreting and applying Venezuelan law, we "may consider any relevant material or source," Fed. R. Civ. P. 44.1, including the expert reports and declarations submitted by the parties to the district court and arguments by amici. *See Animal Science Products, Inc. v. Hebei*

*Welcome Pharmaceutical Co. Ltd.*, 585 U.S. 33, 42 (2018). We "accord respectful consideration" to a foreign government's statement of the meaning of its laws, but we are "not bound to accord [it] conclusive effect." *Id.* at 36.

The parties have made extensive submissions in this case, including dueling expert reports and declarations, primary source materials, and volumes of academic writings on the meaning of "national public interest contracts" in the Venezuelan Constitution. The PDV Entities put forth Professor Allan R. Brewer-Carías, one of the drafters of Article 150, and Professor José Araujo-Juárez, an author of a treatise on Venezuelan administrative law. The Creditors put forth Professor Doe and Dr. Roe, whose identities are known to the Court but withheld in the interest of their safety. *PDVSA V*, 2025 WL 2675871, at *8. Considering these sources, we examine the structure of the Venezuelan government and law, post-1999 decisions of the Constitutional Chamber specifically addressing Article 150, other potentially relevant statutes, past National Assembly practice with respect to PDVSA contracts, and the views of the Republic of Venezuela.

*A. Structure of Venezuelan Government and Law*

The Bolivarian Republic of Venezuela "is a federal, decentralized State," with power distributed between municipalities, states, and the nation. VENEZUELA CONST. Articles 4, 136, App'x 962, 965. The national power is "divided

into Legislative, Executive, Judicial, Citizen, and Electoral Powers." VENEZUELA CONST. Article 136, App'x 965. Within the national executive power, there is a "Central Public Administration" and the "Decentralized Public Administration." The Central Public Administration consists of the "organs" of government itself such as the President, Ministers, and agencies, while the Decentralized Public Administration is made of "entities" such as public corporations and state-owned enterprises. All parties here agree that PDVSA is a distinct entity within the Decentralized Public Administration.

Venezuela has a civil law legal system, with a Constitution, statutes, and regulations. If there are conflicts, the Constitution supersedes statutes, and statutes supersede regulations. The current Constitution was adopted in 1999. It provides that the Constitution is "the supreme law and the foundation of the legal system," such that all "persons and bodies that exercise Public Power are subject to this Constitution." VENEZUELA CONST. Article 7, App'x 962.

In Venezuela, in accord with the civil law tradition, most judicial decisions are not authoritative or binding sources of law with precedential effects for future cases. However, the Constitution itself contains an exception to this rule: the Supreme Court of Justice "shall be the supreme and ultimate interpreter of the Constitution and shall see to the uniform interpretation and application thereof,"

and "[i]nterpretations established by the Constitutional Chamber concerning the contents or scope of Constitutional rules and principles are binding on the other Chambers of the Supreme Court of Justice and on any other courts of the Republic." VENEZUELA CONST. Article 335, App'x 972.

This power to create binding precedent was established for the first time in the 1999 Constitution; previously, no judicial decisions from Venezuelan tribunals were precedential. Under this 1999 Constitution, the decisions of the Constitutional Chamber have precedential weight in the other five chambers of the Supreme Tribunal of Justice and in any other court in Venezuela.

### B. *Article 150 and the Constitutional Chamber*

The text of the Venezuelan Constitution alone does not definitively resolve the dispute before us. As noted above, Article 150 provides in relevant part:

> The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law.
>
> No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

VENEZUELA CONST. Article 150, App'x 442. *See also* VENEZUELA CONST. Article 187(9), App'x 442–43 (providing that the role of the National Assembly includes

authorizing "contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela").

Neither Article 150 nor Article 187(9) defines "public interest contract," and neither provision on its face explains what makes a public interest contract a "*national* public interest contract" such that National Assembly approval is required when such contract is executed with foreign states, official entities, or companies not domiciled in Venezuela. Venezuela Const. Articles 150, 187(9), App'x 442–43 (emphasis added).

We thus review the relevant cases decided by the Constitutional Chamber post-1999 to evaluate the meaning of "national public interest contract" under the Venezuelan Constitution.

i. *Andrés Velásquez*

The key case at issue is *Andrés Velásquez*, which the Chamber quoted and relied on at length in each of the subsequent three cases discussed below. *See* El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2241 Andrés Velásquez y otros [Andrés Velásquez and others], Sept. 24, 2002 (Venez.); App'x 2101. In *Andrés Velásquez*, in 2002, the Constitutional Chamber considered a constitutional challenge to a provision of a Financial Administration Law that purported to allow the National Executive to enter into

financing agreements without obtaining specific prior approval from the National Assembly. The challenged law provided that the National Executive "shall proceed to perform public credit transactions . . . and shall periodically inform the National Assembly." App'x 2102. Because the law purported to require only after-the-fact notice to the National Assembly rather than specific prior approval, the plaintiffs challenged this law as unconstitutional under Articles 150 and 187(9) of the Venezuelan Constitution.

Considering these two provisions, the Constitutional Chamber explained that for national public interest contracts, the National Assembly's approval "must be granted prior to entering into the national . . . public interest contract . . . so that the contract to be entered into may be recognized as valid." App'x 2114–15. Considering the meaning of "national public interest contract" the Constitutional Chamber explained that Article 150 "clearly established the genus-species relationship that exists between the concept of public interest contract and the concepts of national, state and municipal public interest contracts in which the determining factor would be the participation of the Republic, the States or the Municipalities." App'x 2116. Focusing specifically on the meaning of *national* public interest contract, the Chamber stated, in its role as "maximum and ultimate interpreter of the Constitution," that "contracts concluded by the Republic

through the competent organs of the National Executive to do so and whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts." App'x 2116–17. It then explained that public credit transactions were "susceptible of being qualified as national public interest contracts" because they could involve contracts "by the Republic, with States, foreign official entities or companies not domiciled in Venezuela." App'x 2117.

Applying that rule to the case before it, the Constitutional Chamber concluded that the challenged law could not authorize transactions involving "national public interest contracts with States or foreign official entities or companies not domiciled in Venezuela" without prior National Assembly approval "since in those cases the application of the prior control or authorization by the National Assembly is inescapable." App'x 2119.

The parties intensely dispute the importance of this case. The Creditors say the rule from it is clear: "contracts concluded *by the Republic* through the competent organs of the National Executive" which also meet other criteria are national public interest contracts. Appellee's Brief at 21 (emphasis added) (citing App'x 2116–17). The implication, in Creditors' view, is that contracts concluded by

entities such as PDVSA, which is not a "competent organ[] of the National Executive," App'x 2116, cannot be national public interest contracts.

The PDV Entities, on the other hand, emphasize that *Andrés Velásquez* does not address contracts executed by state-owned enterprises in the Decentralized Public Administration. In the PDV Entities' view, the Chamber's emphasis in *Andrés Velásquez* on the participation of the Republic was focused on distinguishing *national* public interest contracts from *state* or *municipal* public interest contracts, and the Chamber's analysis does not exclude contracts executed by state enterprises from the universe of national public interest contracts. The PDV Entities further argue that the decision is not binding, or that it is not binding on this purported point of law.

From the decisions that follow, it is clear that the Constitutional Chamber treats the *Andrés Velásquez* decision as binding and authoritative on the core issue of the case—the meaning of national public interest contracts.[9] And we are

[9] Prior to this case, the PDV Entities' expert Professor Brewer-Carías also accepted that *Andrés Velásquez* was binding, and he argued that it "inconveniently restricted the notion of a 'public interest contract' . . . to cover only those contracts concluded by the Republic." Allan Randolph Brewer-Carías, *Nuevas Consideraciones Sobre el Régimen Jurídico de los Contratos del Estado en*

persuaded that the Constitutional Chamber determined that *national* public interest contracts are those executed by the Republic, or competent organs thereof, not by state-owned entities in the Decentralized Public Administration.

We are mindful of the risks of assigning too much significance to a single statement in a court decision, especially a translated statement. But the Chamber repeatedly includes language in the *Andrés Velásquez* decision that indicates that the Republic or an organ thereof, rather than an entity, must be a party for a contract to be a *national* public interest contract. For example, the Chamber states that: the approval of the National Assembly is required when "the Republic . . . through the National Executive, executes contracts with . . . companies not domiciled in Venezuela," App'x 2114; "the determining factor [is] the participation of the Republic," App'x 2116; and "contracts concluded by the Republic through the competent organs of the National Executive to do

*Venezuela*, VIII Jornadas Internacionales de Derecho Administrativo (2006), at Tr. Dkt. 84-9; *see also* Allan Randolph Brewer-Carías, *Sobre los Contratos del Estado en Venezuela*, 6 Revista Mexicana Statum Rei Romanae de Derecho Administrativo (2011), at Tr. Dkt. 84-10; Allan Randolph Brewer-Carías, *La Contratación Pública en Venezuela*, Tratado General de los Contratos Públicos (2013), at Tr. Dkt. 84-11; Allan Randolph Brewer-Carías, *Administrative Law in Venezuela* (2015), at Tr. Dkt. 84-12. The district court found Professor Brewer-Carías' explanation for his shifting position "difficult . . . to credit," but noted, as we do here, that the consistency of an esteemed scholar's position is not dispositive on the legal question before us. *PDVSA V*, 2025 WL 2675871, at *14; *see also Vitamin C Antitrust Litigation*, 8 F.4th at 142 (questions of foreign law reviewed without deference).

so . . . would be included within the species of national public interest contracts." App'x 2116–17.

The PDV Entities' expert, Professor Brewer-Carías explains a relevant terminological difference between "organs" and "entities." Organs are "the government itself, such as the various government ministries" which form the Central Public Administration, while entities are "public corporations and state-owned commercial enterprises" which form the Decentralized Public Administration. App'x 284. We are persuaded that when the Constitutional Chamber repeatedly used legal terms that exclude the Decentralized Public Administration, it did so advisedly.

In sum, *Andrés Velásquez* strongly suggests that only "organs" of the Republic, or the Republic itself—and not state-owned enterprises in the Decentralized Public Administration—may enter into national public interest contracts requiring National Assembly approval under the second clause in Article 150 of the Venezuelan Constitution. Subsequent Constitutional Chamber decisions applying Article 150 do not persuade us otherwise.

ii. *EDELCA*

The year following *Andrés Velásquez* the Constitutional Chamber decided the *Electrificación del Caroní C.A.*, or "EDELCA," case. *See* El Tribunal Supremo de

Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 953 EDELCA, Apr. 29, 2003 (Venez.); App'x 1106. In *EDELCA*, challengers sought nullification of two related agreements: (1) a memorandum of understanding between the governments of Brazil and Venezuela setting forth their joint agreement for the construction of a power line between the two countries, and (2) a contract between EDELCA, the Venezuelan state-owned enterprise, and two Brazilian companies detailing the parties' obligations with respect to the power line project. The challengers raised a host of regulatory, environmental and human rights arguments. Ultimately, the Constitutional Chamber concluded that it lacked authority to adjudicate the challenges.

However, in the course of its discussion the Chamber described the EDELCA contract as a "public interest contract." App'x 1119. In particular, the Chamber described the contract as having been enacted "in compliance with the Memorandum . . . [in which] both countries, by the body of the subscribing companies" agreed to construct a power line to allow Venezuela to supply electricity to towns and cities near the border. App'x 1119. It explained that the contract, "which is based on the international commitments signed by the National Executive," constituted a "*public interest contract*, since a high interest of the Republic [was] committed in the margin of its international relations with the

Federative Republic of Brazil for the supply of electricity." App'x 1119–20. The Chamber quoted at length from the *Andrés Velásquez* discussion of national public interest contracts and explained that EDELCA's public interest contract arose from the "convention generating obligations for the Republic in the exercise of its international representation." App'x 1120.

The PDV Entities contend that *EDELCA* establishes that a decentralized state-owned enterprise can enter into contracts of national public interest. In our view, the PDV Entities overread the *EDELCA* decision, which expressly relies on the EDELCA contract's relationship to the memorandum of understanding that was executed by the Republic itself and created "obligations for the Republic." App'x 1120. The EDELCA contract implemented obligations expressly incurred *by the Republic*, not just by the state-owned enterprise EDELCA. For that reason, the EDELCA contract is not analogous to the PDV Entities' pledge of a controlling interest in CITGO—even if CITGO is the foreign "crown jewel" of Venezuela's oil industry. Appellant's Brief 40.

iii. <u>*Attorney General II (Bandagro)*</u>

The parties have a similar dispute over the meaning of *Attorney General II (Bandagro)*. *See* El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1460 Banco de Desarrollo Agropecuario (Bandagro)

[Attorney General of the Republic II (Bandagro)], July 12, 2007 (Venez.); App'x 2153. In *Attorney General II (Bandagro)*, the Constitutional Chamber was asked to decide whether advice provided by the Attorney General, pursuant to the Venezuelan Constitution's requirement that the Attorney General be "consulted for the approval of national public interest contracts," was binding. *See* VENEZUELA CONST. Article 247, App'x 969. The matter arose because the Attorney General offered an opinion validating promissory notes allegedly issued by the Agricultural Development Bank (BANDAGRO) but later revoked that pronouncement following correspondence by the Ministry of Finance after a creditor sought to collect on the notes.

In its role as interpreter of the Constitution, the Constitutional Chamber first declared that once the Attorney General has issued its pronouncement regarding the national public interest contract, "the body which has sought its opinion[] is free to accept or not the content of the opinion." App'x 2170. It then turned to the case at hand. The court quoted at length from *Andrés Velásquez*, emphasizing in particular that "it is necessary, but not sufficient, that one of the parties in the contract is the Republic," App'x 2172, and cited the holding that only "contracts entered into by the Republic, through the bodies competent to do so," can be national public interest contracts, App'x 2173. Applying these principles to the

alleged BANDAGRO notes, the Chamber explained that "public credit operations," including promises to repay capital with interest, "may be classified as contracts of national public interest." App'x 2173. Answering the question before it, the Constitutional Chamber held that the Attorney General's position was only provided as "a genuine task of internal consultancy" rather than as a procedure which created rights in others. App'x 2175.

The parties' dispute turns on some of the assumptions made in the case, rather than its ultimate holding. The PDV Entities contend that the Constitutional Chamber assumed that the contracts entered into by BANDAGRO, a state-run enterprise, were national public interest contracts, such that the Attorney General would give advice on them pursuant to Article 247. *See* VENEZUELA CONST. Article 247, App'x 969. The Creditors contend that this assumption was appropriate because, in contrast to this case, the purported financial obligations at issue in *Bandagro* were "payable directly by the Republic." Appellee's Brief 35 (quoting App'x 4911).

The decision and record offer some support for Creditors' argument. In its opinion, the Constitutional Chamber indicated that the request to the Attorney General for advice was made by the "Ministry of Finance in the case of the collection" on the promissory notes, and it referred to the Attorney General as "a

body consultation of the Centralized National Public Administration." App'x 2170. Moreover, Creditors' expert provided copies of the purported notes in question reflecting, on their face, that they had "the explicit backing of the National Government of the Republic of Venezuela." App'x 1145.

For these reasons, *Bandagro* adds little to our analysis. By quoting at length from the same passage in *Andrés Velásquez* discussed above, the opinion reaffirms that the Constitutional Chamber views *Andrés Velásquez* as the foundational case on national public interest contracts. And the Constitutional Chamber's suggestion that the BANDAGRO notes were national public interest contracts is unremarkable insofar as the notes imposed direct obligations on the Republic's treasury—a factor that distinguishes *Bandagro* from the case before us.

iv. *Brigitte Acosta*

Finally, the parties debate the significance of *Brigitte Acosta*. *See* El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 618 Brigitte Acosta Isasis, July 20, 2016 (Venez.); App'x 2193. In that 2016 case, the Constitutional Chamber considered whether a financing agreement between the Venezuelan Central Bank and a foreign entity could be characterized as a

national public interest contract.[10] As it had in *EDELCA* and *Bandagro*, the Chamber quoted extensively from *Andrés Velásquez* in describing the necessary features of a contract of national public interest. The Chamber identified four essential elements "that impart to contracts a national public interest nature":

> 1. That they be executed by the Republic, through the bodies that compose the National Executive Branch that are competent in this matter.
>
> 2. That its object be crucial or essential for the achievement of the goals and fulfilment of the duties of the Venezuelan State.
>
> 3. That they satisfy the individual and coincidental interests of the national community, and not only of a particular sector of it, as in the case of state or municipal public interest contracts . . . .
>
> 4. That they imply assuming obligations whose payment is stipulated to be made in whole or in part over the course of several tax years following that in which the subject matter of the contract has taken place, in view of the implications the adoption of such commitments can generate in the economic and social life of the Nation.

App'x 2213.

---

[10] Neither party argues in its brief that the political context surrounding *Brigitte Acosta* should impact our analysis, though the PDV Entities' expert Professor Brewer-Carías points out that this decision was issued by the Constitutional Chamber following the Maduro regime's consolidation of power after the opposition won control of the National Assembly in December 2015. The Constitutional Chamber did not notify the National Assembly of the case, and it did not hear any argument opposing its eventual decision. *See Brigitte Acosta*, App'x 2193–205 (detailing the arguments of the present parties). According to Brewer-Carías, the Constitutional Chamber at the time "declared the unconstitutionality of practically all—yes, all—the statutes that have been sanctioned by the National Assembly elected on December 2015." App'x 309. We note the political context in which *Brigitte Acosta* was decided, but we assess the decision on its own terms.

Applying the first of these factors, the Chamber considered whether Central Bank was a body of the National Executive Branch competent to execute national public interest contracts. Considering the Constitution, the Bank's charter, and other laws illuminating the National Assembly's expectation of control and power over the Bank, as well as its past cases evaluating the legality of laws impacting control of the Bank, the Chamber concluded that the Bank was "a legal entity under public law, of constitutional status, endowed with autonomy for the exercise of the policies within its competency, which is neither part of the Central Administration nor the Functionally Decentralized Administration." App'x 2221–22. Instead, the Bank was "part of the so-called Administration with functional autonomy," requiring "a special regulation and organization" different from those "applicable to other public or private entities." App'x 2222. Because of the Bank's distinct role in the Venezuelan governmental structure, and in recognition of other legal checks on the Bank's actions, the Chamber concluded that the loan contract at issue was not a national public interest contract.

The PDV Entities contend that "[i]f *Andrés Velásquez* had limited national public interest contracts to contracts involving only the Republic, there would have been no need for the Constitutional Chamber to analyze whether a contract by the Central Bank of Venezuela was subject to National Assembly approval" and

the Constitutional Chamber would not have stressed that the Central Bank was "neither part of the Central Administration or the *Functionally Decentralized Administration*." Appellant's Brief 41 (citing App'x 2221–22).

We disagree. *Brigitte Acosta* offers nothing that changes our understanding of the Constitutional Chamber's ruling in *Andrés Velásquez*. The Chamber's detailed analysis of the unique role the Central Bank occupies within the Venezuelan governmental structure is not inconsistent with the underlying limitation that national public interest contracts are executed by the Republic, or competent organs thereof. And the PDV Entities ascribe undue significance to the Chamber's statement that the Central Bank was not part of "either the Central Administration [or] the Functionally Decentralized Administration." App'x 2221–22. We don't read the opinion as suggesting that if the Central Bank *were* part of the Decentralized Public Administration, it could execute national public interest contracts.

If anything, *Brigitte Acosta* supports the Creditors' position. Though the Central Bank apparently occupies a uniquely autonomous position in the Venezuelan governmental structure, many of the characteristics of the Bank the Chamber cited in concluding that its contracts were not national public interest contracts also describe PDVSA. For example, like the Central Bank, PDVSA is "a

legal entity under public law . . . endowed with autonomy" apart from the Republic. App'x 2221. And like the Bank, PDVSA has its own equity and assets, presumably also with the aim to achieve the "highest goals of the State." App'x 2215.

v. Other Courts' Decisions

The PDV Entities' reliance on decisions of courts *other than* the Constitutional Chamber is misplaced. In particular, the Supreme Court of Justice's 1999 decision in *Simón Muñoz Armas* (or, variously *Apertura Petrolera*) has no bearing on our analysis. *See* La Corte Suprema de Justicia [Supreme Court of Justice] No. 17-08-1999 Simón Muñoz Armas y otros [Simón Muñoz Armas and others], Aug. 17, 1999 (Venez.); App'x 4992. That case involved a challenge to the constitutionality of certain clauses contained in an Agreement of the Congress of the Republic that authorized "the concluding of association agreements" for hydrocarbon exploration. App'x 4999. In the course of its analysis applying the 1961 Venezuelan Constitution, the court concluded that the Agreement's legal nature was "that of an administrative contract, or a contract of public interest." App'x 5030. The PDV Entities argue that this decision thus supports the view that PDVSA can enter into contracts of public interest.

We are unpersuaded. As noted above, the Supreme Court of Justice that decided *Simón Muñoz Armas* did not have the constitutional power to issue precedential decisions. And the PDV Entities have not explained why a non-binding court decision regarding an "Agreement of the Congress," App'x 4993, authorizing joint ventures for hydrocarbon exploration that interprets "public interest contract" under the 1961 Constitution, which was not mentioned in any later related decisions, including *Andrés Velásquez*, should override the definition of "national public interest contract" set forth by the Constitutional Chamber in *Andrés Velásquez*.

In sum, *Andrés Velásquez* and its progeny reflect the binding conclusion of Venezuela's Constitutional Chamber that absent other factors noted above, the universe of entities that can execute national public interest contracts subject to the National Assembly approval requirement of the second clause of Article 150 does not extend to state-owned enterprises in the Decentralized Public Administration such as PDVSA.

### C. *Other Statutes*

The PDV Entities' strongest argument flows from a provision of the Hydrocarbons Law requiring National Assembly approval for the establishment of joint venture entities involving PDVSA or its subsidiaries. Hydrocarbons Law

Article 33, App'x 1731 ("The establishment of mixed enterprises . . . will require prior approval from the National Assembly."). The PDV Entities' expert explains that the National Assembly derives its constitutional authority to require National Assembly approval for the creation of "mixed enterprises" involving PDVSA from provisions in Articles 150 and 187(9) of the Venezuelan Constitution relating specifically to national public interest contracts. In particular, the *first* clause of Article 150 provides, "The execution of national public interest contracts shall require the approval of the National Assembly *in those cases in which such requirement is determined by law*." VENEZUELA CONST. Article 150, App'x 442 (emphasis added). *See also* VENEZUELA CONST. Article 187(9), App'x 442–43 ("It is the role of the National Assembly to . . . Authorize the National Executive to enter into contracts of national interest, *in the cases established by law*.") (emphasis added).

In the PDV Entities' telling, if the establishment of a joint venture involving PDVSA or its subsidiaries was not a national public interest contract, Articles 150 and 187(9) would not provide the authority for the requirement of National Assembly approval for such ventures under the Hydrocarbons Law Article 33. And if joint ventures involving PDVSA or its subsidiaries are national public interest contracts for the purposes of the *first* clauses in Articles 150 and 187(9), it cannot be the case that PDVSA is incapable of executing national public interest

contracts for purposes of the *second* clauses in each Article. *See* Venezuela Const. Article 150, App'x 442 ("No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly."); *see also* Venezuela Const. Article 187(9), App'x 442–43.

This argument has some force. In approving resolutions authorizing the formation or extension of enterprises in which PDVSA or its subsidiaries partner with other entities, even before the events giving rise to this litigation, the National Assembly regularly invoked its authority under Articles 150 and 187(9), in addition to Hydrocarbons Law Article 33. For that reason, the Creditors' suggestion at oral argument that the National Assembly's authority to enact Hydrocarbons Law Article 33 derives from sources *other than* Articles 150 and 187(9) is unpersuasive.

But the PDV Entities' argument requires us to extrapolate from the principle that the formation of a mixed enterprise to cultivate Venezuela's hydrocarbon resources, subject to Venezuela's operational control, constitutes a national public interest contract to PDVSA's proposed conclusion that contracts executed by PDVSA, acting on its own, can be national public interest contracts.

The "mixed enterprises" are apparently cultivated by the National Executive, and they are created subject to terms and conditions as approved by the National Assembly. *See, e.g.*, Official Gazette of the Bolivarian Republic of Venezuela, 388.432–33 (Sept. 28, 2011), App'x 4054–55 (describing the role of the National Executive body, via the Ministry of Energy and Petroleum working jointly with PDVSA, in cultivating strategic partners to develop production fields in the western region of Venezuela, and referencing agreements entered into between the Bolivarian Republic of Venezuela and a proposed Spanish partner that will form the basis of the proposed joint venture between that Spanish company and a PDVSA subsidiary); Official Gazette of the Bolivarian Republic of Venezuela 375.862 (April 15, 2010), App'x 4017 (describing proposed joint venture arising from selection competition overseen by the Ministry of Popular Power for Energy and Oil to select minority joint venture partners to carry out activities of exploitation and improvement of extra heavy crude oil in specified regions); Official Gazette of the Bolivarian Republic of Venezuela 375.088 (March 9, 2010) (describing joint effort of the Ministry of Popular Power for Energy and Oil and PDVSA to identify new business opportunities with strategic partners, and seeking modification of terms of prior approval of a specific joint venture), App'x 3964.

Especially in light of the above judicial authority, it doesn't necessarily follow that because the state-sanctioned creation of a "mixed enterprise[]" for the exploitation of Venezuelan hydrocarbon resources amounts to a national public interest contract, contracts executed by PDVSA in its own stead are likewise national public interest contracts.

The conclusion that they are *not* finds some support in the Financial Administration Law, which expressly exempts PDVSA from the requirement of National Assembly authorization for the "performance of public credit operations." *See* Financial Administration Law Article 98, App'x 3111 (requiring approval for debt contracts by "The Republic" and entities created thereby); Financial Administration Law Article 101, App'x 3112 (exempting from the provisions governing the public credit system "[b]usiness companies created . . . in accordance with the Organic Hydrocarbons Law," namely, PDVSA).

As the Creditors' expert contends, the PDV Entities' reading of Article 150 of the Venezuelan Constitution would effectively invalidate Article 101 of the Financial Administration Law in a large swath of circumstances. The argument goes like this: if PDVSA's issuance of bonds can constitute a national public interest contract, then Article 101 is unconstitutional to the extent that it exempts PDVSA from seeking National Assembly approval for credit transactions that

involve foreign counterparties. Because there is a long-standing practice of *not* seeking approval for PDVSA debt transactions, *see* § I.D., below, and because the Constitutional Chamber in *Brigitte Acosta* noted with approval the fact that the Central Bank was also exempt under Article 101 from seeking "authorization to carry out public credit operations," Article 101 must be constitutional even when public credit operations involve foreign counterparties. App'x 2223.

At the end of the day, none of these arguments based on other Venezuelan statutes trumps the Constitutional Chamber's analysis in *Andrés Velásquez*.

*D. Past National Assembly Practice*

Our conclusion that National Assembly approval was not required for the execution of the Governing Documents is consistent with PDVSA's and the National Assembly's past practice. The Creditors' expert opined, based on a review of PDVSA's (and subsidiaries') security filings and the Official Gazettes of the Republic from 1975 to 2020, that PDVSA has never subjected its past debt transactions to review by the National Assembly. App'x 884–85. The PDV Entities concede that the National Assembly never challenged PDVSA's issuance of the 2017 Notes: the $3 billion in notes issued in 2007 and the combined $6.15 billion in notes issued in 2010 and 2011. *See* App'x 2236–38. And they do not meaningfully dispute that the National Assembly had not previously asserted that PDVSA's

debt transactions with foreign counterparties require National Assembly approval. And in light of the above analysis, we're not inclined to accept Professor Brewer-Carías' assertion that the reason other debt transactions involving foreign counterparties were not challenged was because Presidents Chávez and Maduro were "aggressively flouting the constitutional checks placed on the National Executive." App'x 5506.

This history is, of course, not dispositive. There may be a qualitative difference between debt transactions generally, and debt transactions expressly secured by a controlling interest in CITGO. That's what makes this an especially challenging case. But the absence of any prior examples of PDVSA seeking National Assembly approval for transactions implicating only PDVSA's own assets presents challenges for the PDV Entities' position.

*E. Opinion of the Republic*

The Republic, as amicus to this Court, contends that the district court misread the *Andrés Velásquez* and other Constitutional Chamber decisions. The Republic argues, much like the PDV Entities, that *Andrés Velásquez* did not *limit* the universe of "national public interest contracts" to those executed by the National Executive, and it emphasizes that the case did not involve the contracting authority of Decentralized Public Administration entities like PDVSA. The

Republic argues that *EDELCA* clarified that a contract executed by a state-owned enterprise in the Decentralized Public Administration may be a national public interest contract based on the significance of the subject matter. It also contends that in *Brigitte Acosta*, if it was dispositive that the Central Bank was not part of the National Executive, the Chamber would have simply said so. Finally, the Republic contends that we should read the Constitutional Chamber decisions in light of the National Assembly's 2016 Resolutions asserting its prerogative under the Constitution to require PDVSA to secure its approval before making the Exchange Offer and entering into the Governing Documents.

As noted above, the Supreme Court has explained that "a federal court should accord respectful consideration to a foreign government's submission, but [it] is not bound to accord conclusive effect to the foreign government's statements." *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 585 U.S. 33, 36 (2018). Instead, we must "carefully consider [the Republic's] views about the meaning of its own laws," in the "spirit of international comity." *Id.* at 43.

Factors impacting the weight we assign to a foreign government's statement of its views include: "the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and

authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id.*

Because the Republic and the PDV Entities contend the district court gave the Republic's views short shrift, we address these considerations. First, there is no doubt that the Republic's submissions, both on this appeal, and throughout this case, have been clear and reasoned. The submissions discuss the relevant authorities, and they cite additional statements made by Carlos Vecchio, the Ambassador of the Bolivarian Republic of Venezuela to the United States of America. But for the reasons set forth above, the support for the Republic's views is mixed.

As to the context of the Republic's statements, we are mindful that when a foreign government "offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." *Id.*

We have no issue with the transparency of the Republic's legal system, and absent any argument to the contrary, notwithstanding recent changes in governance of the Republic, we do not question that the amicus brief submitted by the National Assembly on behalf of the Republic represents the views of the Republic on the issues in this case.

As to consistency with past positions taken by the Republic, the factor bears little weight either way. As noted above, there is no established past practice of subjecting PDVSA debt offerings to National Assembly scrutiny; on the other hand, there is no precedent for a debt offering secured by a controlling interest in CITGO.

Several additional factors impact our assessment of the Republic's position. First and foremost, as noted above, we conclude that the Republic's position is at odds with the rulings of its highest court. Our Supreme Court has offered a telling analogy: If the law of a state in this country is established by a decision of that state's highest court, that decision is "binding on the federal courts," whereas the views of that state's attorney general, "while attracting respectful consideration, do not garner controlling weight." *Id.* at 44. The Republic has a steep hill to climb in the face of the Constitutional Chamber's ruling in *Andrés Velásquez*. And we have considered and rejected the Republic's specific challenges to our understanding of *Andrés Velásquez* and its progeny above.

Moreover, though many different bodies and speakers who might plausibly speak for the Republic have opined that the Governing Documents were national public interest contracts, their underlying reasons have been varied. For example, the Republic's Amicus brief suggests that "the Republic does not have to be a party

Case: 25-2652, 10/27/2026, DktEntry: 125.1, Page 50 of 60

for a contract to be a national public interest contract," and that the "subject matter of the contract" must sufficiently implicate the national interest. Amicus at 17–18 (emphases omitted). By contrast, the Special Attorney General who investigated the Exchange Offer after the fact concluded that in light of PDVSA's "unique legal status" as the entity created to manage the domestic petroleum industry, "we should therefore conclude that the indenture is signed by the National Executive Branch, the first condition for classifying it as a national public interest agreement." App'x 2031. The lack of clarity as to whether the Governing Documents purportedly constitute a national public interest contract based solely on the importance of the subject matter, or whether PDVSA's status within the National Executive Branch was relevant, presents further challenges for the Republic's position.

*F. The Governing Documents are Valid*

"Matters going to the validity of the security . . . are governed by the law of Venezuela." *PDVSA III*, 41 N.Y.3d at 473. Whether National Assembly approval of the Governing Documents was required is a question of law, which we review without deference to the district court's analysis. Fed. R. Civ. P. 44.1; *see also In re Vitamin C Antitrust Litigation*, 8 F.4th 136, 142 (2d Cir. 2021). Despite the Republic's position in this case, we conclude for the reasons set forth above—especially the

Case: 25-2652, 10/27/2026, DktEntry: 125.1 (51 of 60)

Constitutional Chamber's opinions in *Andrés Velásquez* and *Brigitte Acosta*—that the Governing Documents are not national public interest contracts. Thus, National Assembly approval of the Exchange Offer and resulting Governing Documents was not required by Article 150 of the Venezuelan Constitution, and the notes and collateral are valid under the ordinary application of Venezuelan law.

## II. Act-of-State Doctrine

"The act of state doctrine bars federal and state courts from declaring invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022). It functions as a rule of decision on the merits: courts of this country may not inquire into the "validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).

The doctrine "flows from a broad avoidance principle" and "is built around separation of powers concerns relating to foreign affairs." *PDVSA IV*, 106 F.4th at 269 (citing *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International*, 493 U.S. 400, 404 (1990)). Our analysis of the act-of-state doctrine "must always be tempered by common sense." *Allied Bank International v. Banco Credito Agricola de*

*Cartago*, 757 F.2d 516, 521 (2d Cir. 1985). Because courts engaging in "the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs," we accept such acts as valid. *Kirkpatrick*, 493 U.S. at 404. In practice, this means that unlike our review of a governmental act from within this country, "[w]here a foreign official act would be deemed void by an otherwise applicable legal rule" in that jurisdiction, "the official act controls." *Celestin*, 30 F.4th at 138.

Wholly apart from the above analysis of the applicable Venezuelan law, the PDV Entities contend that we should view the three resolutions passed by the National Assembly in May 2016, September 2016, and October 2019 as establishing that the Exchange Offer was invalid from the outset. In the PDV Entities' view, these Resolutions were sovereign acts undertaken to invalidate the Exchange Offer and resulting Governing Documents, and pursuant to the act-of-state doctrine, we must accept those sovereign acts—that is, the Resolutions—as having the effect they purport to have.

Each Resolution stated something distinct. The May 2016 Resolution rejected President Maduro's claimed authority "to authorize the National Executive to sign contracts of public interest, without the approval of the National Assembly" and reasserted that "contracts of national . . . public interest concluded . . . between the National Executive . . . and companies not domiciled in

Venezuela, without the approval of the National Assembly . . . shall be null and void in their entirety." App'x at 647–48.

The September 2016 resolution followed the announcement of the Exchange Offer, and it proclaimed, among other things, that the National Assembly "reject[ed] categorically" the use of the controlling shares of CITGO as "a guarantee with priority." App'x 115. In particular, the September 2016 resolution resolved:

> First. To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral.
>
> Second. To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.
>
> Third. To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela.
>
> Fourth. To urge Petróleos de Venezuela S.A.to present the Country with a plan for the refinancing of its financial commitments and a recovery plan for the oil industry over the short- and medium-term.

App'x 115.

The October 2019 Resolution "ratif[ies]" that the Exchange Offer violated the Venezuelan Constitution. App'x 124. It states that, "following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution" and "that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly." App'x 124. The October 2019 Resolution acknowledged that PDVSA "ignore[d]" the September 2016 Resolution and "reiterate[d] all the questions that this National Assembly has been formulating since 2016" regarding PDVSA's debt and execution of national public interest contracts. App'x 123–24.

The PDV Entities contend that through these three Resolutions, the National Assembly, as the sovereign ultimately recognized by the United States, prevented the 2020 Notes from ever validly issuing. They contend that by virtue of the United States' recognition of the National Assembly as Venezuela's sovereign in 2019, we should give effect to the National Assembly's 2016 resolutions as acts of state. *See Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012)

("After the Executive Branch's recognition of a foreign state, the act of state doctrine applies retroactively to acts that were undertaken by the foreign state" and "validates all the actions and conduct of the government so recognized from the commencement of its existence." (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302–03 (1918)). And they argue that the act of barring PDVSA from entering into the Exchange Offer took place fully within Venezuela and thus must be given effect under the act-of-state doctrine.

The district court disagreed. It reiterated its prior conclusion that the Resolutions were official acts of a foreign sovereign but that the Resolutions, by their plain terms, did not "preemptively invalidate" the Governing Documents. *PDVSA V*, 2025 WL 2675871, at *32 (citing *PDVSA I*, 495 F. Supp. 3d at 276).

And it reiterated its view, in the alternative and "assuming *arguendo* that the National Assembly preemptively invalidated the Exchange Offer and the 2020 Notes," that "the extraterritorial limitation still precluded application of the act of state doctrine." *Id.* at *33. The district court reasoned that "papers were signed, contracts were executed, . . . payments [were] due in New York, and the collateral sits waiting in a vault in New York." *Id.* (citing *PDVSA I*, 495 F. Supp. 3d at 280–81). It emphasized that Venezuela's "impotence to complete the expropriation . . . makes clear that no taking has taken place in Venezuela." *Id.*

And it repeated its conclusion that "it is irrelevant that the Resolutions were issued in Venezuela, since the act-of-state doctrine looks to actual dominion over property rather than to the mere execution of official documents." *Id.*

We review the district court's conclusion that the act-of-state doctrine does not apply here without deference. *See Celestin*, 30 F.4th at 137. That said, to the extent that the district court concluded that the act-of-state doctrine does not apply here because the relevant acts were *extraterritorial*, we wholeheartedly agree.

One of the significant limitations on the reach of the act-of-state doctrine is that it does not compel us to accept as valid purported *extraterritorial* acts of state. Unlike actions within a foreign country, domestic courts may inquire "into the validity of *extraterritorial* takings." *Allied Bank*, 757 F.2d at 520 (emphasis added). The "situs of the property at the time of the purported taking," governs whether this limitation applies. *Id.* at 521.

This limitation on the territorial reach of the act-of-state doctrine flows from the policies underlying the doctrine. The separation-of-powers concerns relating to foreign affairs inhibits us from questioning what a foreign sovereign does "within its own territory." *Kirkpatrick*, 493 U.S. at 409. But the same concerns do not apply outside of the sovereign's territory.

We need not resolve every contested issue relating to the PDV Entities' invocation of the act-of-state doctrine. Even assuming that—(1) we should treat the National Assembly as the "sovereign" of Venezuela at the time of the 2016 Resolutions; (2) the Resolutions were formal acts of the sovereign; and (3) the Resolutions purported to invalidate the Exchange Offer—the extraterritoriality limitation applies, so the act-of-state doctrine does not.

A Supreme Court decision involving the expropriation of sugar is instructive. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964). In *Sabbatino*, an American commodity broker contracted to purchase Cuban sugar from a wholly-owned subsidiary of Compania Azucarera Vertientes-Camaguey de Cuba (C.A.V.), a corporation organized under Cuban law whose capital stock was owned principally by United States residents. The commodity broker agreed to pay for the sugar in New York upon presentation of the shipping documents. The day the ship was being loaded with sugar, President Eisenhower reduced the sugar quota for Cuba, and the Cuban Council of Ministers responded by granting the Cuban authorities the discretionary power to nationalize property or enterprises in which American nationals had an interest. *Id.* at 401–02. The Cuban authorities exercised that power, expropriated C.A.V.'s property, and restrained the sugar shipment. To facilitate departure of the ship carrying sugar, the

commodities broker entered into a contract with the Banco Para el Comercio Exterior de Cuba, an instrumentality of the Cuban Government, that was identical to its contract with C.A.V. At issue in the *Sabbatino* case was who was entitled to the funds tendered in payment for the shipment.

The lower courts concluded that the Cuban government's expropriation was invalid under international law, so that Cuba did not acquire good title to the sugar before it shipped. *Id.* at 406-07. The Supreme Court reversed. *Id.* at 439.

As relevant here, C.A.V. and the commodities broker contended that Cuba had "expropriated merely contractual rights the situs of which was in New York, and that the propriety of the taking was, therefore, governed by New York law." *Id.* at 413. The Court explained that the "sugar itself was expropriated" and not just a "contractual claim" because Cuba refused to let the ship sail "until a new contract had been signed." *Id.* The expropriation was of the sugar located in the harbor, not of the contractual rights to the sugar executed abroad. "Cuba's restraint of [the ship] must be regarded for these purposes to have constituted an effective taking of the sugar, vesting in Cuba C.A.V.'s property right in it." *Id.* at 414.

The *Sabbatino* Court ultimately concluded that the Judicial Branch "will not examine the validity of a taking of property within its own territory by a foreign

sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Id.* at 428.

In marked contrast to the sugar on a ship sitting in Cuba, the purported acts of state here do not involve assets sitting within Venezuela. The pre-Exchange Offer Resolutions instruct about how PDVSA should operate abroad, specifically, in New York. The Exchange Offer required holders of the 2017 Notes to tender their Notes to one of two clearing banks in Europe or the DTC in *New York*. App'x 2290. The 2020 Notes offered in exchange were issued through several Global Notes registered in the name of a *New York* general partnership and deposited with a *New York* depository. App'x 2289–90. And the collateral security interest in 50.1% of CITGO Holding is held as a physical stock certificate in a vault located *in New York*. App'x 2285.

Though the PDV Entities contend that situs of the purported sovereign act was Venezuela because the Resolutions were "Venezuelan decrees, issued under Venezuelan law in Venezuela, directed at Venezuelan state-owned entities prior to the existence of the purported debt obligation," Appellants' Brief at 63, the

decrees were ultimately concerned with how PDVSA disposed of property *in the United States*.

As this Court explained in *Allied Bank*, the extraterritoriality limitation "depends in large part on whether the purported taking can be said to have come to complete fruition within the dominion of the foreign government." *Allied Bank*, 757 F.2d at 521. The Resolutions here—purporting to preclude a transaction that took place entirely outside of Venezuela—sought to operate outside of the exclusive "dominion" of Venezuela.

We accordingly must conclude that the act-of-state doctrine does not apply, and even if the Resolutions otherwise amounted to acts of state invalidating the Governing Documents, we are not bound by the Resolutions as a "rule of decision for the courts of this country." *Celestin*, 30 F.4th at 137.

## CONCLUSION

Under Article 150 of the Venezuelan Constitution, the National Assembly's pre-approval was not required to validate PDVSA's Exchange Offer, and the Governing Documents are thus valid. And the act-of-state doctrine does not require us to give the Resolutions their purported extraterritorial effect. We thus **AFFIRM** the partial final judgment of the district court.